**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | | |
|---|---|---|
| JAMES H. FISCHER, | Plaintiff | : Case 14cv1307(PAE) |
| | | : |
| v. | | : **THIRD AMENDED COMPLAINT** |
| | | : |
| STEPHEN T. FORREST, Jr., | | : **JURY TRIAL DEMANDED** |
| SANDRA F. FORREST, | | : |
| SHANE R. GEBAUER  and | | : |
| BRUSHY MOUNTAIN BEE FARM, INC. | | : |
| | Defendants. | : |

-------------------------------------------------------------x

      Plaintiff James H. Fischer (hereinafter "Plaintiff"), for his amended Complaint against

Defendants Stephen Taylor Forrest, Jr., Sandra Fincher Forrest, Shane R. Gebauer, and Brushy

Mountain Bee Farm, Inc.,(hereinafter "Defendants") alleges as follows:

## PRELIMINARY STATEMENT

**1.**   This is an action for: (1) secondary copyright infringement of Plaintiff's copyrighted Works,

    and (2) the Defendants' multiple DMCA violations that facilitated those secondary

    infringements. This action arises from Defendants' willful, deliberate, and systematic

    misappropriation of Plaintiff's copyrighted Works in marketing an unauthorized knock-off of

    Plaintiff's product and the deliberate misuse of that misappropriated intellectual property in

    multiple publications, multiple public displays, and multiple distributions in different

    marketing campaigns.

**2.**   Defendants' verbatim copying of the unique copyrighted original expressions formerly used

    for years by Defendants with specific limited permission to describe Plaintiffs' product were

    suddenly used without permission to sell their cheap knock-off of Plaintiffs' product.  The

    intent was to create the false impression that Defendants were manufacturing and/or still

    selling Plaintiff's well-known and well-respected product. Defendants' conduct constituted a

bad-faith attempt to trade upon and profit from the goodwill earned by and associated with the unique copyrighted works created by Plaintiff to promote his product.

3. Defendants' removal of Copyright Management Information (CMI) from Plaintiff's works created the false impression that Defendants had authored the Works, and concealed Defendants' copyright infringement. The removal of CMI prompted and encouraged the infringements of Defendants' multiple sub-dealers, such as those illustrated in Exhibits 21 and 22 attached to this complaint, for which Defendants are secondarily liable.

4. In April 2011, Plaintiff demanded in writing that Defendants cease and desist their infringement and reminding Defendants of Plaintiff's exclusive rights (*see* Exhibit 15). Defendants refused (*see* Exhibit 16), deliberately, knowingly, and willfully continuing their multiple infringements of Plaintiff's exclusive rights to this day.

5. Defendants have profited from their secondary infringement of Plaintiff's copyrighted works, done irreparable harm to the value of Plaintiff's copyrighted Works, profited at Plaintiff's direct expense, and will continue to do so unless enjoined. Plaintiff seeks permanent injunctions halting all infringing activities, and ordering Court-supervised compliance. Plaintiff also seeks Defendants profits, damages and exemplary damages, pre- and post-judgment interest, and where appropriate, punitive damages, costs, and attorney's fees.

## THE PARTIES

6. James H. Fischer ("Plaintiff"), resides in Manhattan in the City of New York and is the inventor and supplier of "Fischer's Bee-Quick®," a product developed for the purpose of facilitating honey harvesting. Plaintiff's copyrights were registered in the city of New York. Additionally, Plaintiff is the Director of Education for The Honey Bee Conservancy, a nonprofit organization with 501(c)(3) status, and teaches the "*Absolutely Free Beekeeping*

*Course*" to the 1500-member co-op "New York City Beekeeping" and to other groups nationally and internationally via live interactive videoconferencing.

7. Defendant Stephen Taylor Forrest, Jr. (aka "Stephen Taylor Forrest") is President and a principal shareholder of Brushy Mountain Bee Farm, Inc. with its principal place of business at 610 Bethany Church Road, Moravian Falls, NC 28564, and, on information and belief, additional manufacturing and warehouse operations in New Columbia, PA, and Wilkesboro, NC.  Mr. Forrest exerts extensive direct day-to-day control over all Brushy activities. He has a direct and obvious financial interest in Brushy. He has personal liability as an individual for all claims, and is personally jointly and severally liable with both Sandra Fincher Forrest and Shane R. Gebauer for all damages, costs, and attorney's fees.

8. Defendant Sandra Fincher Forrest is Secretary/Treasurer and a principal shareholder of Brushy Mountain Bee Farm, Inc. at the same addresses listed above.  Mrs. Forrest exerts extensive direct day-to-day control over all Brushy activities. She has a direct and obvious financial interest in Brushy. She has personal liability identical to, and is personally jointly and severally liable with both Steven Taylor Forrest, Jr. and Shane R. Gebauer for all damages, costs, and attorney's fees.

8a.  Defendant Shane R. Gebauer was, on information and belief, at the time of filing this lawsuit, General Manager of Brushy Mountain Bee Farm, at the same address listed above, and party to an agreement that makes him a principal (or significant) shareholder in Brushy Mountain Bee Farm via an outright grant or gift of shares, rather than via purchase of shares at fair market value.  Mr. Gebauer exerts extensive direct day-to-day control over all Brushy activities. He has a direct and obvious financial interest in Brushy. He has personal liability identical to, and is personally jointly and severally liable with both Steven Taylor Forrest, Jr.

and Sandra Fincher Forrest for all damages, costs, and attorney's fees.  Note that acts of "Defendants" prior to Mr. Gebauer's employment should apply only to the Forrests.

9. Mr. and Mrs. Forrest have been listed as the sole officers and shareholders on every NC corporate filing made since the creation of the legal fiction of their corporate alter-ego in 1981 (*see* Exhibit 1). Mr. Gebauer has not been listed on any NC corporate filing, but his status as "*President*" of Brushy Mountain Bee Farm, and his "*gain[ing] more of an ownership role in the business*" were first announced in  the Dec 2014 "Bee Culture" magazine article attached to 14cv1304 Docket number 47, included by reference in this pleading. Mr. Gebauer knew or should have known that the actions 14cv1304 and 14cv1307 would have properly named him as a co-defendant but for the deliberate concealment of his agreement(s) with Mr. and Mrs. Forrest and their legal fiction of a corporation concerning his "office" and "ownership", and/or the backdating of such agreement(s), either being attempts to frustrate enforcement of a judgment in this case.

10. Brushy Mountain Bee Farm, Inc. is a North Carolina corporation with its principal place of business at 610 Bethany Church Road, Moravian Falls, NC 28564. It is the corporate entity owned, managed, directed, and operated by Defendants Stephen Taylor Forrest, Jr., Sandra Fincher Forrest and Shane Gebauer.

### JURISDICTION AND VENUE

11. This is a civil action seeking injunctive relief and damages for copyright infringement under the Copyright Act, 17 USC §§ 101, 106, 501, and 1202 *et seq.*,

12. This court has original subject matter jurisdiction over the claims pursuant to 28 USC §§ 1331, 1332, and 1338.

**13.** This Court has personal jurisdiction over Defendants pursuant to N.Y. Civ. Prac. L. & R.

("CPLR") §§ 301 and 302(a), as Defendants have (i) regularly transacted business within the

state (CPLR § 302(a)(l)); (ii) conducted a tortious act within the state by delivering and

offering to deliver products sold with infringing promotional materials  to residents of New

York (CPLR § 302(a)(2)); and/or (iii) committed a tortious act without the state causing

injury to Plaintiff resident of New York; and (a) regularly does or solicits business, and

engages in other persistent courses of conduct, in the State (CPLR § 302(a)(3)(i)) or (b)

expects or should reasonably expect the act to have consequences in the State, and derives

substantial revenue from interstate commerce (CPLR § (302(a)(3)(ii)). Upon information,

belief, and first-hand knowledge, Defendants continuously solicit business from New York

residents over the internet via a website, e-mail solicitations, via phone, via catalog mailings,

by accepting payment from New York residents, by appearing at, and selling goods face-to-

face at meetings held in New York, and by delivering and offering to deliver materials that

infringe copyrights to residents of New York.

**14.** Venue is proper in this Court pursuant to 28 USC § 1391(b)(2) and (c) because a substantial

part of the actions and wrongful conduct underlying these claims occurred in this District.

## PERSONAL LIABILITY OF CORPORATE OFFICERS

**15.** Defendants are the sole owners, shareholders, and the sole officers of their closely-held

company, legal fiction and/or alter-ego, "Brushy Mountain Bee Farm, Inc."  Defendants

work full-time, directing, controlling, and ratifying the activities of their business in a hands-

on manner, on a day-to-day basis, managing all details of operations from their offices at

headquarters, and appearing in person at numerous regional and national beekeeper meetings

to peddle their wares face-to-face as individuals, even going to the extent of accepting cash

payments for their wares and pocketing the cash, literally "running the business out of their back pockets".

16. "Piercing the corporate veil"[1] is not a prerequisite to imposing personal liability upon corporate officers and owners for infringement of intellectual property, when they are involved in, or approve of, or even merely do nothing to stop infringing activity of which they are aware.

17. The personal involvement and control of the Forrests is so extensive that they live on the site of the primary business offices and production facilities. Mr. Gebauer lives only a few minutes away, at 6987 Brushy Mountain Rd. The closely-held nature of the business, combined with the extensive and exclusive hands-on control exerted over all aspects of Defendants' business by Defendants is sufficient evidence that Defendants personally ordered, participated in, and approved of all the actions documented and alleged in this Complaint. Further, Defendants each have the individual right and ability to supervise all acts in their business, and share an obvious and direct financial interest in all activities.

18. The consistent acts and representations of the Defendants themselves illustrate the unity of interest and ownership between the legal fiction of the business and its owners. First, "Brushy Mountain Bee Farm" was established in 1977 according to Defendants' 2014 catalog pages 2 and 3, yet it was not incorporated until 12/9/1981. The incorporation was clearly a mere liability shield for the Defendants' ongoing business activities. Secondly, the Defendants' consistently represent themselves as individuals rather than corporate officers,

---

[1] The Court is asked to note that "*inequitable results if the acts in question are treated as those of the corporation alone*" would include endangering the livelihoods of the Defendants' many innocent and honest employees. Defendants' business is under-capitalized, over-extended, and lacks professional credentialed management. A judgment against the corporate entity would endanger the income of employees who had no part in the illegal acts of Defendants, or had to obey Defendants' orders. Defendants have extracted significant personal wealth from the business, and their extensive assets include shares in the business that can be sold to satisfy a judgment, without putting any employees or employee families at risk.

both in person and with each and every catalog, all which begin with a folksy letter to their customers signed "God Bless! Steve & Sandy Forrest". *Burwell v. Hobby Lobby* aside, "God Bless" is not a corporate slogan.

19. While the paragraphs above plead the conventional view of secondary liability as outlined by the Second Circuit's decision in *Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., Inc*. 316 F.2d 304 (2d Cir.1963),  Plaintiff alternatively offers the theory of liability imposed upon Hummer Winblad and Bertelsmann in regard to the "Napster" system (*see UMG Recordings Inc. et al. v. Hummer Winblad Venture Partners et al*, 3:04-cv-01166-MHP, ND CA) where liability was imposed on arms-length investor/owners whose control over Napster was limited to their status as sole owners and as a sole source of funding.  In this approach, the Court ruled that even a single specific act of exercising actual control is not a requirement for vicarious infringement, it is enough that the mere <u>ability</u> to control exists.  Identically, Defendants' are not just sole proprietors, sole stockholders, and sole officers of their legal fiction, but they are also the sole owners, and sole source of funding for the business, and thereby have the unquestioned ability to control all acts of their business alter-ego.

20.  Hence each individual Defendant is personally jointly and severally liable for all damages, costs, and attorney's fees.

## FACTUAL ALLEGATIONS RELATING TO ALL CLAIMS

### Overview

21. From 2002 to 2010, Defendants were an Authorized Dealer for Plaintiff's product, and used Plaintiff's copyrighted Works with explicit permission, granted solely for use only in direct connection with sales of Plaintiff's product.  This included the explicitly authorized use of

Plaintiff's unique and highly creative epigrams, for use in the product descriptions for

Plaintiff's product in their print catalog, on their website, and in other sales materials.[2]

22. Defendants specifically requested permission multiple times between 2002 and 2010 to use

different sets of Plaintiff's copyrighted Works on their sales website and in their printed

catalog (*see* Exhibits 6 and 7).  Each time, Plaintiff gave explicit permission allowing

Defendants to use specific selected works from among Plaintiff's individual copyrighted

works solely in connection with the sales of Plaintiff's products.

23. With each explicit grant of permission, Plaintiff sent to Defendants both camera-ready layout

artwork, plain text files, and stand-alone image files.  All of these items included both visible

Copyright Management Information, including visible copyright notices and, in the case of

artwork and images, Copyright Management Information and copyright notices imbedded in

the EXIF metadata imbedded in each "jpg"-format image.

24. In December 2010, Defendants breached the long-standing Dealership agreement, and also

announced their immediate termination of the already-breached agreement in the same email

(*see* Exhibit 3).

25. In March 2010, after the shipping all of Defendants' remaining inventory of Plaintiff's

product to another dealer, Defendants began marketing an unauthorized knock-off of

Plaintiff's product.

26. Regardless of whether the breach or termination happened first, any permission to use

Plaintiff's intellectual property in any way had been revoked, as no permission was granted

to use Plaintiff's copyrighted works in any way except specifically in the sales of Plaintiff's

---

[2] The specific complaints of direct infringement, the display of Plaintiff's copyrighted Works by Defendants on the website they own/operate, in violation of USC 17 §106(5), and their associated removal of CMI on the infringed Works, are addressed in the related action, 14cv1304.  This action only references Defendants' direct infringement in the context of their secondary infringement of Plaintiff's exclusive rights under USC 17 §106(1), §106(2), and §106(3) and in connection with the DMCA violations pertaining to those secondary infringements.

product, and Defendants both no longer had any of Plaintiff's product to sell, and also had no intention of selling Plaintiff's product.

27. Defendants displayed word-for-word verbatim copies of Plaintiff's copyrighted Works, using them to describe their cheap knock-off on their sales web site, in their printed catalog, and in other sales materials.

28. The verbatim copies are so precisely identical to Plaintiff's original copyrighted Works of unique and original expression that the possibility of independent creation is precluded.  The unusually unique expression of Plaintiffs' Works is further proof that Defendants could have only copied the specific expressions of Plaintiff's works, infringing Plaintiffs exclusive rights under 17 USC § 106.

29. Defendants also removed all Copyright Management Information (CMI) from Plaintiff's Works in each publication, distribution, and display of each of the Works infringed, to conceal the Defendants' infringement.

30. Defendants then distributed the word-for-word verbatim copies of Plaintiff's copyrighted Works after removing CMI in their printed sales catalogs, their pdf-format e-catalogs, their animated "Page Turn Pro" catalogs, and in other overt and deliberate acts of violation of the DMCA (17 USC § 1202).

31. Defendants' illegal use of Plaintiff's copyrighted Works in selling their cheap knock-off product was intended to create the false impression that Defendants were manufacturing and/or still selling Plaintiff's well-known and well-respected product. Defendants' conduct constituted a bad-faith attempt to trade upon and profit from the goodwill earned by and associated with the distinctive copyrighted Works created by Plaintiff to promote his product.

**32.** The Works infringed were used to confuse customers, create initial interest confusion, and steal sales from Plaintiff via bait-and-switch.

**33.** Defendants' sub-dealers were confused by the acts of the Defendants to the point of utilizing Defendants' infringements of Plaintiff's copyrighted Works as a basis for their own derivative works, thus making them unknowing and innocent infringers of Plaintiff's exclusive rights under copyright, and unwitting participants in furthering the confusion among customers for the profit of Defendants.

**34.** In April 2011, Plaintiff demanded in writing that Defendants cease and desist their infringement and reminding Defendants of Plaintiff's registered copyrights (*see* Exhibit 15). Defendants refused (*see* Exhibit 16), deliberately, knowingly, and willfully continuing their multiple infringements of Plaintiff's exclusive rights under copyright to this day.

**35.** Defendants have profited from their secondary infringement of Plaintiff's copyrighted works, done irreparable harm to Plaintiff's intellectual property, profited at Plaintiff's direct expense, and will continue to do so unless enjoined. Plaintiff seeks permanent injunctions halting all infringing activities, and ordering Court-supervised compliance. Plaintiff also seeks Defendants profits, damages and exemplary damages, pre- and post-judgment interest, and where appropriate, punitive damages, costs, and attorney's fees.

**Plaintiff's Product, Copyrights, CMI, and Grants of Limited Permission to Defendants**

**36.** In 1999, Plaintiff invented a new honey harvesting aid for beekeepers named "Fischer's Bee-Quick®." Plaintiff has earned significant commercial goodwill and earned a reputation as a supplier of a unique product: a food-safe, non-toxic, not foul-smelling, and effective

substance that beekeepers can trust to use with their honey and their bees.  Prior products

were based on Butyric Anhydride, a highly toxic foul-smelling substance classified as

"Hazardous Materials" and not approved for food-use by the FDA (being neither "Generally

Recognized As Safe", nor "Food-Grade").

37. Plaintiff created original creative works of authorship fixed in the tangible medium of web

pages in late 1999 and early 2000 and displayed on his website, but never published.  Proper

copyright notice was included for the Works, but Plaintiff owns copyright in all his works

from the moment they are created and fixed in any tangible medium, per 17 USC § 102(a).

38. Plaintiff later registered the copyrights for the original creative unpublished Works of

expression.

39. Plaintiff created multiple derivative works of his original creative unpublished copyrighted

Works to promote his product.

40. Plaintiff promoted and advertised his products in commerce worldwide with specific

derivative works created from his original unpublished works, including print ads, printed

flyers, brochures, point-of-sale displays, and content for Authorized Dealer catalogs.

41. Plaintiffs' product quickly became one of the most in-demand products in beekeeping.

42. Well before Defendants became a dealer for Plaintiff's product, each of Plaintiff's Works

that are at issue in this action had attained an independent economic value and life as the

focus of several separate derivative works of advertising and promotion. Each Work became

a valuable advertising asset, achieving notoriety among beekeepers and acquiring secondary

meaning uniquely associated with Plaintiff, and his product "Bee-Quick®".  Humor and

sexual innuendo had never been used to sell beekeeping products before, thus significant

notoriety was immediately gained.

**43.** Defendants become an Authorized Dealer for Plaintiff's product in 2002, and requested brochures, sales flyers, a point-of-sale display, artwork, photos, and descriptive text for their use as an Authorized Bee-Quick Dealer.  In the following years, thousands of brochures and flyers were requested by Defendant, and supplied at no charge by Plaintiff.  Every brochure and flyer included proper copyright notices.

**44.** As described in (20), (21), and (22) above, Defendants requested, and were granted permission to use specific selected Works from the set of Plaintiff's copyrighted Works solely in connection with sales of Plaintiff's product in their print catalog, their sales website, and other marketing materials.

**45.** Business as usual took place from 2002 to 2010, with close and amicable cooperation on several joint promotion and marketing efforts, including work on a few new products.

**46.** On December 10, 2010, Defendants abruptly and unilaterally notified Plaintiff of their "*discontinuing Bee-Quick in our 2011 catalog*", in the e-mail they ordered sent to Plaintiff. (*see* Exhibit 3)

**47.** Defendants' right to be a dealer/franchise was terminated by Defendants' own clearly-expressed choice. At Defendants' own choice, all Plaintiff's unsold products in Defendants' possession were shipped to another dealer by Defendants' employees. At that point, Defendants immediately lost any right, license, or permission to use any of Plaintiff's intellectual property, as all such use was permitted solely in the selling of Plaintiff's product.

**48.** Despite having no right or permission to do so, in March, 2011, Defendants methodically misappropriated Plaintiff's copyrighted Works, using them without authorization in their printed catalog and their online website to mislead customers, create confusion, and misrepresent their directly-competing cheap knock-off product as Plaintiff's product.  The

clear intent was to bait-and-switch unwitting customers, and sell Defendants' product in place of Plaintiff's product.  Defendants had none of Plaintiff's product to sell.

49. In doing so, Defendants' removal of CMI, as described in (28) through (33) above, concealed their infringement, and encouraged Defendants' sub-dealers to create derivative works based upon Defendants' infringement of Plaintiff's exclusive rights.

**The Innocent Direct Infringement of the Sub-Dealers**

50. Exhibits 21 and 22 are examples of infringements of Plaintiffs' exclusive rights by two of Defendants' sub-dealers, knowingly induced by Defendants and facilitated by Defendants' removal of CMI.

51.  "The Honey Hole" and "C&T Bee Supply" each copied Plainitff's Works verbatim, creating dirvative works, and displaying them on websites and/or distributing them in catalogs.

52. It is unknown how many other sub-dealers of Defendants have similarly been induced to infringe by Defendants.

53. Comparison of Exhibits 21 and 22 with Exhibits 8 and 20 (Defendants' infringing web page and print catalog), shows that both of these examples of infringing derivative works were based upon the Defendants' infrigements of Plaintiff's copyrighted Works, rather than Plaintiff's Works, as they precisely copy the following features unique to Defendants' infringements of Plaintiff's Works:

   a) The preamble text "For years we have promoted…"
   b) Defendants' watermark logo on the images of Defendants' knock-off product

54. The sub-dealers were misled by Defendants' and induced and encouraged to unknowingly infringe by the willful and knowing acts of Defendants, including the removal of CMI itself, and both the encouragement and the active support of re-use of Defendants' sales materials (website, catalog, flyers, etc.) by their sub-dealers.

**55.** The addition of a copyright notice on each page of the "Honey Hole" website, despite the verbatim copying from Defendants' web site and/or catalog shows the general lack of sophistication of these sub-dealers in regard to intellectual property issues.

**56.** It is clear from the above that these sub-dealers were simply making a good-faith effort to re-sell the products sold to them by Defendants and were operating under the auspices of their status as "authorized dealers".  As such, their infringements were innocent and unknowing.

**57.** Defendants sell to their sub-dealers at very minimal discounts from their list pricing, a few percent gross at most, while Defendants themselves enjoy healthy 50% to 55% gross margins on items they buy, and far more on products they make, such as the knock-off product sold via these infringements.  The induced infringements primarily profited the Defendants, not the sub-dealers induced to infringe.

**58.** Further, Defendants have the right to control their sub-dealers, and carefully monitor and exert extensive control over their sub-dealers, aggressively policing any perceived encroachment on their "intellectual property rights" as illustrated in Plaintiff's Affidavit, filed with this Amended complaint.  Defendants are thereby also (or alternatively) vicariously liable for secondary infringement as a result of doing nothing to stop the infringement of Plaintiff's exclusive rights by their sub-dealers.

**Factual Allegations Relating To All Copyright Claims**

**59.** Prior to product launch, Plaintiff created a database of all his creative unpublished works, with all works accompanied by proper copyright notice per 17 USC §401, and displayed all these unpublished works on his website (www.bee-quick.com) beginning in 2000.

60. Among the works mentioned above, Plaintiff specifically created several specific epigrams, each a uniquely creative and original work of expression.  These Works have become the subjects of this action (Herein, "**Works**", with an initial capital):

    **a)**    "Are you tired of your spouse making you sleep in the garage"?

    **b)**    "Are you tired of using a hazardous product on the bees you love"?

    **c)**    "A safe, gentle, and pleasant way to harvest your honey"

    **d)**    "A natural, non-toxic blend of oils and herbal extracts"

61. Plaintiff, the creator of these original Works of creative expression, is the sole proprietor of all right, title, and interest in the copyrights and exclusive rights of each of these Works. Plaintiff has the sole exclusive right to reproduce, redistribute, display, perform, and prepare derivative works from each of his copyrighted Works.

62. Plaintiff later registered the original, still-unpublished versions of each of these creative works as displayed on Plaintiff's website with the United States Copyright Office in accordance with 37 CFR 202, and received group registration TX-422-921, with a registration date of 2/7/2011 (*see* Exhibit 4).

63. Plaintiff created and published multiple derivative works based upon each of the unpublished Works, a series of ads, brochures, flyers, and other materials, each bearing proper copyright notices when printed and distributed. For example, Plaintiff's January 2000 version of his brochure is attached as Exhibit 5.

64. When Defendants became Authorized Dealers for Plaintiff's product in 2002, they requested and were provided at no charge with sales materials - copies of Plaintiff's derivative works – brochures, flyers, ads, and hand-outs, along with a Point-Of-Sale display.

65. All sales materials provided to Defendants contained proper copyright notices, and all sales materials either quoted the original copyrighted Works (a) - (d) listed above that were displayed on Plaintiff's website, or were derivative of these original copyrighted Works.

66. Defendants would periodically request additional copies of brochures and, and these would be included in Plaintiff's product shipments at no charge.

67. Defendants asked for Plaintiff's specific permission to use his copyrighted works in both their online sales website and print catalog in 2002, and they were granted limited permission to use Plaintiff's copyrighted Works, but only in the sales of Plaintiff's product as an Authorized Dealer.

68. The descriptions used on each of Defendants' annual sales websites and print catalogs were assembled using word-for-word verbatim copies of each of the copyrighted works (a) - (d) displayed on Plaintiff's website, as these works were agreed by Defendants and Plaintiff to be the most effective marketing possible.

69. As each year's website and catalog were created, changes would be made, and each year's website and catalog used several of Plaintiff's copyrighted Works.  On information and belief, each year's website text description for Plaintiff's product would generally match each year's print catalog text description.

70. Defendants and Plaintiff would discuss changes to the text, images, pricing, and layout of Defendants' product web pages periodically, but Defendants tended to publish catalog and website changes in the March-April timeframe each year. Examples can be viewed at the Internet Archive URLs below:

**In 2002:**
http://web.archive.org/web/20020628024037/http://www.beeequipment.com/shop.asp?p=11

**In 2003:**
http://web.archive.org/web/20030222214600/http://www.beeequipment.com/shop.asp?p=11

**In 2004:**
http://web.archive.org/web/20040214060644/http://www.beeequipment.com/shop.asp?p=13
http://web.archive.org/web/20040214061304/http://www.beeequipment.com/shop.asp?p=14

**In 2005:**
http://web.archive.org/web/20050211161056/http://www.beeequipment.com/shop.asp?p=14

**In 2007:**
http://web.archive.org/web/20071020004930/http://www.beeequipment.com/products.asp?pcode=779G

**In 2010:**
http://web.archive.org/web/20101226075553/
http://www.brushymountainbeefarm.com/Fischers-Bee-Quick-8-oz/productinfo/779/

Defendants' 2010 web page is shown in Exhibit 7.

**71.** In all of the above, Defendants' had access to and full knowledge of Plaintiff's copyrighted

Works, providing them the source material with which to infringe.

**72.** In all of the above, Defendants' had full knowledge of Plaintiff's rights under copyright, and

the highly limited nature of the use they were permitted when selling Plaintiff's product.

**73.** After announcing that they would no longer carry Plaintiff's product in their Dec 2010 email,

Defendants' permission to use Plaintiff's copyrighted works was inherently revoked, along

with their status as an Authorized Dealer for Plaintiff's product.

**74.** In March 2011, after disposing of all remaining inventory of Plaintiff's product, Defendants

displayed Plaintiff's copyrighted Works on their website and distributed Plaintiff's

copyrighted Works in Defendants' 2011 print catalog, no longer as a description for

Plaintiff's well-known and trusted product, but instead, as a description for their cheap

knock-off product, "Natural Honey Harvester", without any permission, license, or right to

do so.

**75.** In Exhibit 20, clippings from Defendants' print catalogs are shown both in their prior

authorized use of Plaintiff's copyrighted Works from 2002 to 2010, and in their unauthorized

use of the same Works to promote their own knock-off product from 2011 to the present.

Each product description includes word-for-word verbatim copies of Plaintiff's copyrighted Works (a) through (d).

**76.** Below are listed each year's direct copyright infringement on Defendants' website:

**2011:**
http://web.archive.org/web/20111228021343/
http://www.brushymountainbeefarm.com/Natural-Honey-Harvester/productinfo/474

**2012:**
http://web.archive.org/web/20121109095259/
http://www.brushymountainbeefarm.com/Natural-Honey-Harvester/productinfo/474/

**2013:**
http://web.archive.org/web/20130313015004/
http://www.brushymountainbeefarm.com/Natural-Honey-Harvester/productinfo/474/

**2014 (Current Web Page):**
http://web.archive.org/web/20140727225456/
http://www.brushymountainbeefarm.com/Natural-Honey-Harvester/productinfo/474/index.html

**77.** Defendants' infringing 2011 website listing for "Natural Honey Harvester", as shown in Exhibit 8 said:

"For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own. This 100% **NATURAL, NON-TOXIC BLEND OF OILS AND HERB EXTRACTS** works just like Bee Go and it smells good! Natural Honey Harvester **IS A SAFE, GENTLE, AND PLEASANT WAY TO HARVEST YOUR HONEY**. **ARE YOU TIRED OF YOUR SPOUSE MAKING YOU SLEEP IN THE GARAGE** after using Bee Go? **ARE YOU TIRED OF USING HAZARDOUS PRODUCTS ON THE BEES YOU LOVE?** Then this is the product for you!"

Each all-caps phrase in the above is a verbatim infringing copy of one of Plaintiff's original, creative, copyrighted Works (a) through (d) as listed above.

**78.** In late March of 2011, Plaintiff became aware that Defendants had infringed Plaintiff's Works in Defendants' 2011 catalog and Defendants' website.

**79.** Defendants did not have any license, authorization, permission, or consent to use any of Plaintiffs' copyrighted Works once they stopped carrying Plaintiff's product.

**80.** Even further still, Defendants had a full 3 additional months for any "transitional period" after Defendants' termination email for Defendants to update their website and catalog.

81. Yet further still, Defendants were displaying and distributing Plaintiff's copyrighted Works in a manner clearly intended to sell Defendants' cheap knock-off of Plaintiff's product.

82. One can verify the unique and distinctly uncommon nature of each Work with a search engine – one can search for each epigram at issue, enclosing each in quotes, and find each used only in authorized descriptions of Plaintiff's product, Bee-Quick, and in unauthorized infringing uses to describe Defendants' product "Natural Honey Harvester". Each work is truly unique, and each is properly used only by Plaintiff.

83. Defendants' direct infringement materially contributed to the infringing activity of the sub-dealers, encouraging Defendants' sub-dealers to copy Defendants' infringing website, infringing catalog, and/or other infringing sales materials, and utilize the copyrighted Works infringed in the sale of Defendants' cheap knock-off.

84. Defendants' blanket permission to their sub-dealers to utilize Defendants' sales materials materially contributed to the infringing activity of the sub-dealers, encouraging Defendants' sub-dealers to unwittingly copy Defendants' infringing materials.

85. Alternatively to the paragraph above, Defendants' full knowledge of the infringement by their sub-dealers, direct financial benefit from the infringement of the sub-dealers, clear right, ability and demonstrated willingness to control the actions of their sub-dealers, and overt choice to take no action to halt the infringement, even after filing of this lawsuit, made Defendants' vicariously liable for their sub-dealers infringement.

86. In contrast, Defendants' directly instructed employees to make harsh threats intended to intimidate and control sub-dealers who appeared to Defendants to be infringing on Defendants' own purely illusory rights, as exemplified in Plaintiffs' attached Affidavit.

87. Defendants' removal of CMI further materially contributed to the infringing activity of the sub-dealers, misleading the sub-dealers as to the authorship of the copyrighted Works.

88. Defendants' replaced Plaintiff's CMI with their own website URL and phone number on every page of each and every of their printed catalogs, further misleading sub-dealers, and materially contributing to the infringing activity of the sub-dealers.

89. Defendants' replaced Plaintiff's CMI with their own header on every page of each and every their sales website we pages, further misleading sub-dealers and materially contributing to the infringing activity of the sub-dealers.

## 1st Complaint – Secondary Copyright Infringement – Work (a)

90. Plaintiff incorporates the preceding statements as if fully set forth herein.

91. This complaint is for the secondary infringement of Plaintiff's exclusive rights to his original Work of expression (a) "*Are you tired of your spouse making you sleep in the garage*"*?* per 17 USC §106 and § 501. This Work enjoyed a valuable and economic life as a separate and independent work from Plaintiff's other Works at issue in this matter, and was a valuable marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the specific question posed directly to the beekeeper regarding the foul and highly persistent odor of the only competition, Butyric Anhydride, was, and still is, a valuable asset, and the word-for-word verbatim infringing display by the Defendants is the best proof of its independent value.

**92.** As detailed above, Defendants deliberately and willfully infringed Plaintiff's Work by copying it verbatim without authorization, and using it in Defendants' websites and catalogs starting in March 2011.

**93.** As detailed above, Defendants removed CMI, knowing that such removal would conceal their infringement of Plaintiff's exclusive rights.

**94.** As detailed above, Defendants' multiple sub-dealers created derivative works infringing this Work, copying the Work verbatim without any permission from Plaintiff on their websites and/or in their print catalogs, in or after March 2011, to re-sell the cheap knock-off product sold to them by Defendants.

**95.** As detailed above, Defendants have infringed contributorily by intentionally inducing and knowingly encouraging direct infringement by their sub-dealers. Alternatively, Defendants have infringed vicariously by profiting from the direct infringement of their sub-dealers while declining to exercise a right to stop or limit it, despite having the right and ability to supervise and control the infringing activity of the directly-infringing sub-dealers.

**96.** Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, yet remained willfully blind to the acts of both their otherwise closely-supervised employees and their otherwise tightly-policed sub-dealers, having reason to know of both.

### 2nd Complaint - Copyright Infringement – Work (b)

**97.** Plaintiff incorporates the preceding statements as if fully set forth herein.

**98.** This complaint is for the secondary infringement of Plaintiff's exclusive rights to his original Work of expression (b) "*Are you tired of using a hazardous product on the bees you love?*" per 17 USC §106 and § 501. This Work enjoyed a valuable and economic life as a separate and independent work from Plaintiff's other Works at issue in this matter, and was a valuable

marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the specific question posed directly to the beekeeper regarding the Haz-Mat status of the only competition, Butyric Anhydride, was, and still is, a valuable asset, and the word-for-word verbatim infringing display by the Defendants is the best proof of its independent value.

**99.** As detailed above, Defendants deliberately and willfully infringed Plaintiff's Work by copying it verbatim without authorization, and using it in Defendants' websites and catalogs starting in March 2011.

**100.** As detailed above, Defendants removed CMI, knowing that such removal would conceal their infringement of Plaintiff's exclusive rights.

**101.** As detailed above, Defendants' multiple sub-dealers created derivative works infringing this Work, copying the Work verbatim without any permission from Plaintiff on their websites and/or in their print catalogs, in or after March 2011, to re-sell the cheap knock-off product sold to them by Defendants.

**102.** As detailed above, Defendants have infringed contributorily by intentionally inducing and knowingly encouraging direct infringement by their sub-dealers. Alternatively, Defendants have infringed vicariously by profiting from the direct infringement of their sub-dealers while declining to exercise a right to stop or limit it, despite having the right and ability to supervise and control the infringing activity of the directly-infringing sub-dealers.

**103.** Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, yet remained willfully blind to the acts of both their otherwise closely-supervised employees and their otherwise tightly-policed sub-dealers having reason to know of both.

**3rd Complaint - Copyright Infringement – Work (c)**

104.    Plaintiff incorporates the preceding statements as if fully set forth herein.

105.    This complaint is for the secondary infringement of Plaintiff's exclusive rights to his

original Work of expression (c) "*A safe, gentle, and pleasant way to harvest your honey*."

per 17 USC §106 and § 501. This Work enjoyed a valuable and economic life as a separate

and independent work from Plaintiff's other works at issue in this matter, and was a valuable

marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative

works were created from this Work, but the original creative Work, the specific assurance to

the beekeeper regarding the safety and pleasant odor of Bee-Quick, was, and still is, a

valuable asset, and the word-for-word verbatim infringing display by the Defendants is the

best proof of its independent value.

106.    As detailed above, Defendants deliberately and willfully infringed Plaintiff's Work by

copying it verbatim without authorization, and using it in Defendants' websites and catalogs

starting in March 2011.

107.    As detailed above, Defendants removed CMI, knowing that such removal would conceal

their infringement of Plaintiff's exclusive rights.

108.    As detailed above, Defendants' multiple sub-dealers created derivative works infringing

this Work, copying the Work verbatim without any permission from Plaintiff on their

websites and/or in their print catalogs, in or after March 2011, to re-sell the cheap knock-off

product sold to them by Defendants.

109.    As detailed above, Defendants have infringed contributorily by intentionally inducing

and knowingly encouraging direct infringement by their sub-dealers. Alternatively,

Defendants have infringed vicariously by profiting from the direct infringement of their sub-

dealers while declining to exercise a right to stop or limit it, despite having the right and ability to supervise and control the infringing activity of the directly-infringing sub-dealers.

110.    Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, yet remained willfully blind to the acts of both their otherwise closely-supervised employees and their otherwise tightly-policed sub-dealers having reason to know of both.

### 4th Complaint - Copyright Infringement – Work (d)

111.    Plaintiff incorporates the preceding statements as if fully set forth herein.

112.    This complaint is for the secondary infringement of Plaintiff's exclusive rights to his original Work of expression (d) "***A natural, non-toxic blend of oils and herbal extracts.***" per 17 USC §106 and § 501. This Work enjoyed a valuable and economic life as a separate and independent Work from Plaintiff's other Works at issue in this matter, and was a valuable marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the specific assurance to the beekeeper regarding the natural, rather than synthetic, nature of the product, was, and still is, a valuable asset, and the word-for-word verbatim infringing display by the Defendants is the best proof of its independent value.

113.    As detailed above, Defendants deliberately and willfully infringed Plaintiff's Work by copying it verbatim without authorization, and using it in Defendants' websites and catalogs starting in March 2011.

114.    As detailed above, Defendants removed CMI, knowing that such removal would conceal their infringement of Plaintiff's exclusive rights.

115.    As detailed above, Defendants' multiple sub-dealers created derivative works infringing this Work, copying the Work verbatim without any permission from Plaintiff on their

websites and/or in their print catalogs, in or after March 2011, to re-sell the cheap knock-off product sold to them by Defendants.

116.    As detailed above, Defendants have infringed contributorily by intentionally inducing and knowingly encouraging direct infringement by their sub-dealers. Alternatively, Defendants have infringed vicariously by profiting from the direct infringement of their sub-dealers while declining to exercise a right to stop or limit it, despite having the right and ability to supervise and control the infringing activity of the directly-infringing sub-dealers.

117.    Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, yet remained willfully blind to the acts of both their otherwise closely-supervised employees and their otherwise tightly-policed sub-dealers having reason to know of both.


## DMCA COMPLAINTS

118.    Plaintiff incorporates the preceding statements as if fully set forth herein.

119.    Periodically, at Defendants' request, Plaintiff sent Defendants "layout-ready artwork" and "description text" for Defendants' use on their website, consisting of images of brochures, flyers and other sales materials, each image with imbedded EXIF metadata including appropriate copyright notices per 17 USC §1202(c)(3). The images also included text copyright notices, visible on the face of each image.  All text supplied was also accompanied by appropriate copyright notices in text.  All items described were derivative works of Plaintiff's original creative unpublished copyrighted Works.  All materials were provided solely for Defendants' use in sales of Plaintiff's product.  For an example of one such copyright notice, see Exhibit 5, first page, associated with Works (a) – (d).

**120.**   In March 2011, Defendants infringed upon Plaintiff's rights by ordering, overseeing, participating in, and approving of the verbatim display of Plaintiff's copyrighted Works to describe Defendants' cheap knock-off product as detailed in Plaintiff's Complaints 1-5, and additionally ordering, overseeing, participating in, and approving of the intentional removal of all of Plaintiff's copyright notices from each of the infringed Works in violation of 17 USC § 1202(b)(1).

**121.**   Defendants ordered, oversaw, participated in, and approved of the intentional display and distribution of the infringing Works on each and every of the Defendants' other marketing publications listed in Exhibit 23a, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3).

**122.**   Defendants additionally ordered, oversaw, participated in, and approved of the intentional distribution of the infringing Works in the newsletters annotated with stars in Exhibit 23b, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3).

### 5th Complaint - Removal of Copyright Management Information – Work (a)

**123.**   Plaintiff incorporates the preceding statements as if fully set forth herein.

**124.**   This complaint is for the intentional and willful removal of Plaintiff's Copyright Management Information imbedded in and attached to, and visible on the face of his original Work of expression (a), described in Plaintiff's 1st Complaint.

125.   As described above, beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional removal of all of Plaintiff's copyright notices and CMI from this Work in violation of 17 USC § 1202(b)(1).

126.   Beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional posting, display, and distribution of the infringing work in their various marketing materials as listed in Exhibits 23a and 23b, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3).

127.   Alternatively, Defendants knew of the acts of violation, had the right and ability to control their employees' actions, and did nothing to stop the violations.

128.   Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, and remained willfully blind to the DMCA violations committed by their otherwise closely-supervised employees.

### 6th Complaint - Removal of Copyright Management Information - Work (b)

129.   Plaintiff incorporates the preceding statements as if fully set forth herein.

130.   This complaint is for the intentional and willful removal of Plaintiff's Copyright Management Information imbedded in and attached to, and visible on the face of his original Work of expression (b), described in Plaintiff's 2nd Complaint.

131.   As described above, beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional removal of all of Plaintiff's copyright notices and CMI from this Work in violation of 17 USC § 1202(b)(1).

132.   Beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional posting, display, and distribution of the infringing work in their various

marketing materials as listed in Exhibits 23a and 23b, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3).

133.   Alternatively, Defendants knew of the acts of violation, had the right and ability to control their employees' actions, and did nothing to stop the violations.

134.   Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, and remained willfully blind to the DMCA violations committed by their otherwise closely-supervised employees.

**7th Complaint - Removal of Copyright Management Information - Work (c)**

135.   Plaintiff incorporates the preceding statements as if fully set forth herein.

136.   This complaint is for the intentional and willful removal of Plaintiff's Copyright Management Information imbedded in and attached to, and visible on the face of his original Work of expression (c), described in Plaintiff's 3rd Complaint.

137.   As described above, beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional removal of all of Plaintiff's copyright notices and CMI from this Work in violation of 17 USC § 1202(b)(1).

138.   Beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional posting, display, and distribution of the infringing work in their various marketing materials as listed in Exhibits 23a and 23b, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3).

139.   Alternatively, Defendants knew of the acts of violation, had the right and ability to control their employees' actions, and did nothing to stop the violations.

140.    Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, and remained willfully blind to the DMCA violations committed by their otherwise closely-supervised employees.

**8th Complaint - Removal of Copyright Management Information – Work (d)**

141.    Plaintiff incorporates the preceding statements as if fully set forth herein.

142.    This complaint is for the intentional and willful removal of Plaintiff's Copyright Management Information imbedded in and attached to, and visible on the face of his original Work of expression (d), described in Plaintiff's 4th Complaint.

143.    As described above, beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional removal of all of Plaintiff's copyright notices and CMI from this Work in violation of 17 USC § 1202(b)(1).

144.    Beginning in March 2011, Defendants ordered, oversaw, participated in, and approved of the intentional posting, display, and distribution of the infringing work in their various marketing materials as listed in Exhibits 23a and 23b, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3).

145.    Alternatively, Defendants knew of the acts of violation, had the right and ability to control their employees' actions, and did nothing to stop the violations.

146.    Alternatively, Defendants had first-hand knowledge of the copyrighted nature of the Works, and remained willfully blind to the DMCA violations committed by their otherwise closely-supervised employees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For a declaration that Defendants have willfully infringed Plaintiff's copyrights and both directly and secondarily.

2. For a permanent injunction requiring that Defendants cease all direct infringement, and all inducement of the infringement of Plaintiff's exclusive rights.

3. For damages pursuant to 17 USC § 504, and 17 USC § 1203, in such amounts as may be found or established at trial, arising from Defendants' violations of Plaintiff's rights under each of the applicable statutes. Additionally, for exemplary/enhanced damages for Defendants' willful and repeated violations of Plaintiff's rights under the applicable statutes.

4. For compensatory and punitive damages in such amounts as may be found or established at trial.

5. For Plaintiff's costs, including reasonable attorney's fees.

6. For pre-judgment and post-judgment interest according to law.

7. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: Mineola, New York

December 28, 2015


Respectfully submitted,


CUOMO LLC
BY: OSCAR MICHELEN (OM 5199)
Attorneys for Plaintiff
200 Old Country Road
Suite 2 South
Mineola NY 11501
516-741-3222
omichelen@cuomollc.com