UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JAMES H. FISCHER,                                  :

               Plaintiff,                 :
                                                  14 Civ. 1304 (PAE) (AJP)
          -against-                 :                 14 Civ. 1307 (PAE) (AJP)

STEPHEN T. FORREST, JR., SANDRA F.    :         **REPORT & RECOMMENDATION**
FORREST, SHANE R. GEBAUER, and
BRUSHY MOUNTAIN BEE FARM, INC.,       :

              Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge.**

**To the Honorable Paul A. Engelmayer, United States District Judge:**

          Plaintiff James Fischer brought these two related copyright and trademark infringement actions against defendants.  Presently before the Court are defendants' summary judgment motions in both actions.  (14 Civ. 1304, Dkt. No. 170; 14 Civ. 1307, Dkt. No. 172.)[1]  For the reasons set forth below, the motions should be <u>GRANTED</u> in their entirety.

## FACTS

### Background

          Fischer is the inventor of Fischer's Bee-Quick, a product used to facilitate honey harvesting.  (<u>Compare</u> 14 Civ. 1307, Dkt. No. 111: 3d Am. Compl. ¶ 6, <u>with</u> 14 Civ. 1307, Dkt. No. 148: Brushy Mtn. Answer ¶ 6.)[2]  Beginning in 2000, Fischer marketed Fischer's Bee-Quick on his

---

[1]     For the remainder of this Report & Recommendation, the Court will refer only to the summary judgment filings in 14 Civ. 1307.

[2]     Although defendants filed a Local Rule 56.1 statement with their initial summary judgment motion (Dkt. No. 164), they did not do so after the Court ordered defendants to resubmit the motion in a consolidated format (Dkt. No. 169).  The Court thus gathers the facts below from the parties' exhibits.

website using, <u>inter alia</u>, the following four phrases ("the Phrases"):

> a) "Are you tired of your spouse making you sleep in the garage after using Butyric Anhydride?"
>
> b) "Are you tired of using a hazardous product on the bees you love?"
>
> c) "Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey"
>
> d) "A Natural, Non-Toxic Blend Of Oils and Herbal Extracts"

(Dkt. No. 177: Def. Br. Ex. 10: 9/23/11 Submission at 27; Def. Br. Ex. 15; 14 Civ. 1304, Dkt. No. 50: 2d Am. Compl. Ex. 5.)[3/] Fischer created derivative promotional materials that used the Phrases, including a brochure.  (14 Civ. 1304, 2d Am. Compl. Ex. 5.)

Defendants Stephen and Sandra Forrest were the owners of Brushy Mountain Bee Farm (Dkt. No. 175: Stephen Forrest Aff. ¶ 2), and in 2007 hired defendant Shane Gebauer, Brushy Mountain's current president (Dkt. No. 173: Gebauer Aff. ¶ 1; Dkt. No. 180: Michelen Aff. Ex. B: Gebauer Dep. at 6).  In 2014, Brushy Mountain Bee Farm Holdings, Inc. obtained equity in Brushy Mountain Bee Farm and the Forrests "ceased having any equity interest in Brushy Mountain Bee Farm, Inc."  (Gebauer Dep. at 14, 19.)  According to Gebauer, from approximately 2008 through 2013, he and the Forrests collaborated to design Brushy Mountain's catalogs and website by selecting the images used in each advertisement and drafting "the text that was used to describe the various products."  (Gebauer Dep. at 24, 26-31, 86; Michelen Aff. Ex. D: Sandra Forrest Dep. at 6.) Brushy Mountain "would draft its own copy [and] describe the products that it had purchased from

---

[3/]     The Court has considered the exhibits attached to Fischer's Second Amended Complaint as it did in its Report & Recommendation on defendants' motion to dismiss, <u>Fischer</u> v. <u>Forrest</u>, 14 Civ. 1304, 14 Civ. 1307, 2017 WL 128705 at *2 (S.D.N.Y. Jan. 13, 2017) (Peck, M.J.), <u>R. & R. adopted</u>, 2017 WL 1063464 (S.D.N.Y. Mar. 21, 2017), and as defendants have in their instant memorandum of law (<u>e.g.</u>, Def. Br. at 11).

other vendors that it was reselling." (Gebauer Dep. at 29.) Gebauer continues to collaborate with others at Brushy Mountain "to review and approve the Brushy Mountain Bee Farm catalog," the content of which generally mirrors the website. (Id. at 31, 86.) The Forrests claim that they helped assemble the Brushy Mountain catalog and website until approximately 2009—two years after Gebauer's hire—at which time Gebauer assumed full control over the catalog and website content. (Michelen Aff. Ex. C: Stephen Forrest Dep. at 26-27; Dkt. No. 176: Hudson Aff. Ex. C: Sandra Forrest Dep. at 17.)

In 2002, Brushy Mountain began purchasing Fischer's Bee-Quick from Fischer or his distributor; Brushy Mountain re-sold it through its annual catalog and website. (Dkt. No. 174: Sandra Forrest Aff. ¶ 2; Stephen Forrest Aff. ¶¶ 4-5.) The Fischer's Bee-Quick advertisement (with some variation throughout the years) stated:

> This 100% Natural, non-toxic blend of oils and herb extracts works just like Bee Go and it smells good! Fischer's Bee Quick is a safe, gentle, and pleasant way to harvest your honey. Are you tired of your spouse making you sleep in the garage after using Bee Go? Are you tired of using a hazardous product on the bees you love? Then this is the product for you!

(Sandra Forrest Aff. ¶ 3; Gebauer Aff. ¶ 14 & Ex. F; see also 14 Civ. 1307, Dkt. No. 70: 2d Am. Compl. Ex. 20.) Sandra Forrest states that she wrote the Fischer's Bee-Quick text advertisement, as defendants did with the other products sold through Brushy Mountain's catalog. (Hudson Aff. Ex. C: Sandra Forrest Dep. at 8.) The Forrests further claim that they created the phrase, "Are you tired of your spouse making you sleep in the garage?" but could not recall whether or not they created the remaining phrases that Fischer alleges he created and later copyrighted. (Sandra Forrest Dep. at 8-9; Hudson Aff. Ex. D: Stephen Forrest Dep. at 16-17, 19; see pages 1-2 above.)

Around 2010, Brushy Mountain allegedly was unable to obtain additional shipments of Fischer's Bee-Quick, and defendants decided to sell a comparable product that performed the

same function.  (Gebauer Dep. at 54-55; Stephen Forrest Dep. at 36.)  Defendants purchased the product through a third-party and branded it "Natural Honey Harvester."  (Gebauer Dep. at 55-56, 71; Stephen Forrest Dep. at 36.)  Gebauer claims that Stephen Forrest created the name "Natural Honey Harvester" and that the product description used in Brushy Mountain's catalog was the product of defendants' collaborative effort.  (Gebauer Dep. at 55, 71.)  Stephen Forrest, in contrast, claims that Gebauer "wrote the product description himself" as well as "the text that actually appears on the label of Natural Honey Harvester."  (Hudson Aff. Ex. D: Stephen Forrest Dep. at 37.)

On December 10, 2010, a Brushy Mountain employee informed Fischer that it was discontinuing the sale of Fischer's Bee-Quick, at which point defendants lost any right to distribute or display Fischer's products.  (14 Civ. 1307, 2d Am. Compl. Ex. 3b: 12/10/10 Email.)[4/]  By no later than April 2011, Fischer discovered that Brushy Mountain was selling Natural Honey Harvester, the advertisement for which allegedly infringed on his Fischer's Bee-Quick mark and copyright, and that Brushy Mountain otherwise allegedly was infringing on Fischer's intellectual property in the Brushy Mountain catalog and website.  (Gebauer Aff. Ex. D: 4/5/11 Letter.)  On April 5, 2011, Fischer wrote to Stephen Forrest demanding that defendants cease their alleged copyright and trademark infringement.  (Id.)  In an April 14, 2011 response letter, Gebauer, Brushy Mountain's then General Manager, wrote: "After careful review by our attorney, there does not seem to [be] grounds for your

---

[4/]   The parties apparently presume that the basic facts of this case are established by Fischer's operative complaint and the Court's ruling on defendants' motion to dismiss.  In its Report & Recommendation, the Court, in reliance on Fischer's complaint and the attached exhibits, identified December 10, 2010 as the date defendants "'immediately lost any right, license, or permission to use any of [Fischer's] intellectual property, as all such use was permitted solely in the selling of [Fischer's] product.'"  Fischer v. Forrest, 2017 WL 128705 at *1.  Defendants rely on this date as the trigger for any infringement claims (Def. Br. at 18-19), to which Fischer does not object (see generally Dkt. No. 179: Fischer Br.).  The Court accordingly will continue to rely on this date as well.

request.  If you would like to provide more specific information as to how you believe we may be infringing on your Copyrights or Trademark, we will certainly review that information.  However, at this point we shall consider this matter closed."  (Gebauer Aff. Ex. E: 4/14/11 Letter.)

Gebauer concedes that, "[o]n December 10, 2010, Brushy Mountain did not immediately remove the Bee-Quick ad from its website" where it remained until at least December 26, 2010.  (Gebauer Aff. ¶¶ 13-14 & Ex. F.)  Brushy Mountain's 2011 catalog, mailed to consumers on January 21, 2011, included the following ad for Natural Honey Harvester that used the Phrases:

> For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own.  This 100% Natural, non-toxic blend of oils and herb extracts works just like Bee Go® and it smells good!  Natural Honey Harvester™ is a safe, gentle, and pleasant way to harvest your honey.  Are you tired of your spouse making you sleep in the garage after using Bee Go®?  Are you tired of using hazardous products on the bees you love?  Then this is the product for you!

(Def. Br. Ex. 6: 2011 Catalog at 2; Def. Br. Ex. 7: Twete Aff. ¶¶ 3-4.)  Brushy Mountain used the same or a substantially similar advertisement for Natural Honey Harvester in its 2012 through 2014 catalogs (14 Civ. 1307, 2d Am. Compl. Ex. 20), and on its website until at least December 28, 2011 (14 Civ. 1304, 2d Am. Compl. Ex. 8).  This advertisement was used by two of Brushy Mountain's third party vendors, The Honey Hole and C&T Bee Supply, in 2012 and 2014.  (14 Civ. 1307, 2d Am. Compl. Exs. 21-22.)

Moreover, Gebauer admits that photos of Fischer's Bee-Quick remained on Brushy Mountain's website until January 28, 2011, when they were replaced with images of Natural Honey Harvester.  (Gebauer Aff. ¶ 15.)  Fischer's exhibits, however, purportedly show an image of Fischer's Bee-Quick on Brushy Mountain's website as late as March 3, 2014.  (See 14 Civ. 1304, 2d Am. Compl. Exs. 9-12.)

Fischer also alleges that defendants intentionally removed copyright management

information ("CMI") from Fischer's promotional brochure and the Fischer's Bee-Quick bottle photos. (Hudson Aff. Ex. A: Fischer Dep. at 131-33, 137-38.) Fischer's brochures that he used on the Fischer's Bee-Quick website and provided to defendants contained the Fischer's Bee-Quick logo, the four copyrighted Phrases, other information and a copyright notice. (14 Civ. 1304, 2d Am. Compl. Ex. 5; Fischer Dep. at 131-32, 137, 183-84.)[5/] When defendants continued using the copyrighted Phrases in their ads for Natural Honey Harvester after their relationship with Fischer terminated, defendants changed the textual reference in one of the Phrases from "Fischer's Bee-Quick" to "Natural Honey Harvester." (Fischer Dep. at 132-33, 137-38; Fischer Aff. at 6; 14 Civ. 1307, 2d Am. Compl. Ex. 20); see also  Fischer v. Forrest, 14 Civ. 1304, 2015 WL 195822 at *8 (S.D.N.Y. Jan. 13, 2015) (Engelmayer, D.J.) ("[T]he Bee-Quick brochure attached to the complaints . . . stated that 'Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey.' . . . Brushy Mountain replaced the textual reference to 'Fischer's Bee-Quick' with the words 'Natural Honey Harvester.'"). Fischer alleges that defendants also stripped the metadata from Fischer's original Fischer's Bee-Quick bottle photo displayed on Brushy Mountain's website (Fischer Dep. at 137-38; 14 Civ. 1304, 2d Am. Compl. Ex. 9), and overlaid the photo with a watermark of the Brushy Mountain Bee Farm logo (14 Civ. 1304, 3d Am. Compl. ¶ 141 & Ex. 10; Dkt. No. 182: Hudson Reply Aff. Ex. 1: Gebauer Dep. at 91-92; Dkt. No. 183: Gebauer Supp. Aff. ¶ 5). Defendants deny removing CMI from Fischer's works. (Gebauer Aff. ¶ 8; Sandra Forrest Aff. ¶ 8; Stephen Forrest Aff. ¶ 9.)

---

[5/]    Although Fischer's copyright registration covered the entire Fischer's Bee-Quick website, and he states in his affidavit that the brochure "is not the only source of the epigrams [Phrases] at issue" which are "found on various web pages" (Michelen Aff. Ex. E: Fischer Aff. at 4), he claimed at his deposition that defendants took the Phrases from the brochure itself (Fischer Dep. at 137).

**Fischer's Copyright Registration**

On February 7, 2011 after his falling out with defendants, Fischer filed a copyright registration application for the "text and images of [the] Bee-Quick.com website," listing the "Year of Completion" as 2000. (Dkt. No. 177: Def. Br. Exs. 4, 8-9.)  In his February 7, 2011 submission to the Copyright Office, Fischer mistakenly included over 2,000 pages of information, much of it irrelevant to his registration application.  (Def. Br. Ex. 8; see also Dkt. No. 176: Hudson Aff. Ex. A: Fischer Dep. at 119; Dkt. No. 180: Michelen Aff. Ex. E: Fischer Aff. at 4.)  The Copyright Office detected the error and Fischer submitted a corrected second deposit copy on September 23, 2011 (Def. Br. Exs. 10-11), and a third on September 24, 2011 (Def. Br. Exs. 12-13).  Fischer's September 23 and September 24, 2011 submissions contained a Fischer's Bee-Quick brochure that included the Phrases. (Def. Br. Ex. 10: 9/23/11 Submission at 26; Def. Br. Ex. 12: 9/24/11 Submission at 4; Def. Br. Ex. 15.)  According to defendants, this brochure was not contained in Fischer's February 7, 2011 submission.  (See Def. Br. Ex. 8.)

After the third submission, Copyright Office representative Mary Svrjcek emailed Fischer regarding the brochure, stating: "The PDF of the brochure could not be registered with the website, since one exists in print copies and one only exists online.  We do not register websites and print documents together."  (Def. Br. Ex. 16: 9/29/11 Emails at 6.)  Fischer responded:

> There must be a misunderstanding, as my "brochure" clearly is an integral part of the web site, and one's choice of file format [i.e., html versus pdf] should make no . . . difference . . . .
>
> . . . .
>
> I know of no way to print a pdf file without first displaying it in a viewer, so the file clearly must exist "only online", with printing being entirely optional.
>
> . . . .

> It is crucial to me to register the pdf file, as it is the product brochure, and contains the statement of warranty for the product.
>
> The product brochure is actually more important to protect with copyright registration than the remainder of the website.

(Id. at 5-6.)  Svrjcek sought clarification on the brochure's publication in response:

> Is the brochure published within the website?  Your last message made it sound as if the brochure was separate from the website, but now I am not so sure.
>
> . . . .
>
> We cannot register a website with works that are published separately in print.  This is due to the "unit of publication" requirement, which states that published work[s] can only be registered on the same application if they are first published together on the same date as a "unit of publication."  Because a website only exists online, while a print brochure only exists in physical copies, they do not constitute a unit of publication, and each may only be registered separately.
>
> However, if the material in the brochure was also published on the same day on the website, then the "unit of publication" requirement does not apply, and the brochure and website can be registered together.  All we need is your confirmation.

(Id. at 3-4.)

Fischer responded that: (1) "the brochure was to be viewed online, with printing to be optional;" (2) "[t]he brochure was integral to the website, as we were introducing a new product;" and (3) "everything [i.e., the brochure and remainder of the website submission] was published at the same date/time and on the same website."  (Id. at 2-3.)  Svrjcek responded, "Okay! Very good. . . .  The registration certificate will be printed and mailed to you within the next few weeks."  (Id. at 2.)

The Copyright Office issued Fischer a copyright registration dated September 24, 2011, the date of his third and final submission.  (Def. Br. Ex. 14: 10/11/11 Emails.)  Upon receipt, Fischer emailed Svrjcek, stating:

> Ms. Svrjcek:

> I expected that the effective date of registration would be the Date in February when I first submitted my application and uploaded the much more extensive set of files than the minimal set you needed.
>
> What I see is a date of 2011-09-24.
>
> Am I reading it wrong?
>
> Thanks!
>
> jim fischer

(Id. at 6.)  Svrjcek responded:

> Well, as I understood it, the second set of files contained some material that was not in the first set.  That is why the later date applied, even though the later set was smaller than the first set.  Otherwise, there would have been no need to send the second set of files.  If I misunderstood that, then this would change the situation.

(Id. at 5.)  Fischer responded:

> Ms. Svrjcek:
>
> Once again, I must apologize for my lack of experience in this area.
>
> The later set of files was a subset of the first set of files.
>
> The second upload was done simply to remove any potential confusion over the extraneous items that you mentioned, such as the images of other company's products . . . .   These extraneous items would not have been covered by any copyright your office might issue me, and they merely confused matters.
>
> . . . .
>
> The only intent in uploading the minimal file set was to make your review less tedious, by removing all files in the initial upload that were added to the website since 2000, thus leaving only the small set of files that comprised the initial website, and remained in place as more content was added later.
>
> . . . .
>
> [T]he only problem [with the February 2011 submission] was the unwieldy nature of the file set, as extraneous material was included along with the required deposit materials.  I did not want to ask you to slog through a list of files and pick them out of the larger set uploaded, so I uploaded the subset.

(Id. at 3-4.)  Svrjcek responded, "Okay! Very good," and mailed Fischer a copyright registration certificate dated February 7, 2011, when Fischer submitted his first deposit copy.  (Id. at 2; Def. Br. Ex. 4.)

## ANALYSIS

### I.  SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., 553 F. App'x 13, 14 (2d Cir. 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed."  Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[6] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which

---

[6]   See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 552 F. App'x 47, 49 (2d Cir. 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.

While "disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or

unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g.,

Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

## II.    DEFENDANTS HAVE NOT SHOWN THAT FISCHER'S COPYRIGHT REGISTRATION IS INVALID

Defendants challenge Fischer's copyright registration on a number of grounds,

arguing that: (1) Fischer failed to provide a proper deposit copy resulting in an invalid registration

certificate; (2) Fischer made material misrepresentations in his copyright application that render it

invalid; (3) the four Phrases contained in the Fischer's Bee-Quick advertisement are not entitled to

copyright protection; and (4) Fischer's copyright registration is not for the four Phrases, but the

entire Fischer's Bee-Quick.com website.  (Dkt. No. 177: Def. Br. at 19-25.)

### A.    The Deposit Copy

"In order to obtain a valid [copyright] registration, the registrant must have deposited

a genuine copy of the work . . . .  Where the deposit turns out not to be genuine, not to be for the

work covered by the registration, or not to be representative of the works sought to be registered in

the case of group registrations, the registration is invalid . . . ."  5 PATRY ON COPYRIGHT § 17:119

(2017) (fns. omitted); accord, e.g., Nova Design Build, Inc. v. Grace Hotels, LLC, 652 F.3d 814, 817

(7th Cir. 2011) ("The copy submitted must be a bona fide copy—that is, virtually identical to the

original and . . . produced by directly referring to the original." (quotations omitted)); Kodadek v.

MTV Networks, Inc., 152 F.3d 1209, 1211 (9th Cir. 1998); Tavory v. NTP, Inc., 495 F. Supp. 2d

531, 535 (E.D. Va. 2007) ("Not just any kind of copy will suffice, though; only originals or 'bona

fide copies' are acceptable."), aff'd, 297 F. App'x 976 (Fed. Cir. 2008), cert. denied, 557 U.S. 935, 129 S. Ct. 2861 (2009).

      Defendants argue that Fischer failed to submit a "genuine" deposit copy of the Fischer's Bee-Quick website, rendering his copyright registration invalid. (Dkt. No. 177: Def. Br. at 19-21.) Defendants cite one alleged deposit error related to the PDF brochure Fischer included in his second and third copyright submissions. (See page 7 above.) Fischer was presented with the brochure at his deposition and testified as follows:

> Q. Mr. Fischer, I've placed in front of you what's been marked Defendant's Exhibit 19 (handing). We've been talking about a Bee-Quick trifold brochure. Is Defendant's Exhibit 19 a copy of that brochure?
>
> A. This is different-a different version. This is a derivative.
>
> Q. What do you mean it's a derivative?
>
> A. It's a derivative work.
>
> MR. MICHELEN [plaintiff's counsel]: May I see?
>
> THE WITNESS: Notice the bullet points there (handing), below the logo.
>
> Q. When you say bullet points-I don't see any bullet points, but I do see a number of sentences.
>
> MR. MICHELEN: He means the bullet points - no bees are harmed - do you see those?
>
> MR. HUDSON [defense counsel]: I see.
>
> A. Those are the dead giveaway, the bullet points are different, and so is the text above them.
>
> Q. When would you have created Defendant's Exhibit 19?
>
> A. Well, it purports to be 12/2000, but it doesn't look like the 2000s. The text is different. So I don't know what the story is with this. Where did you get this?
>
> Q. What is different on the 2000 trifold brochure that you recollect and the one you

have that's marked Defendant's Exhibit 19?

A.  Well, the whole front panel here is different.  This would be the front, with the logo (indicating).

MR. MICHELEN: Let the record reflect that he's done a trifold on Exhibit 19, and he's referring to the right-hand column on the front page.

A.  So everything below the logo is different.  This may have been a draft copy.  I don't know what it is, but it's not authentic.  It's not the real McCoy.

(Dkt. No. 176: Hudson Aff. Ex. A: Fischer Dep. at 103-04; see also Def. Br. Ex. 15.)

Defendants claim that this testimony conclusively establishes that Fischer admitted that "the only document that contains the four phrases serving the basis of the present lawsuit was 'not authentic'" and that "he did not submit a genuine copy of his website." (Def. Br. at 21.)  Fischer claims that he was confused during his deposition:

> Mr. Hudson gave me a series of documents and demanded that I authenticate them, starting with copies of each complaint revision and each exhibit revision.  The stack of undifferentiated sheets of white paper was several inches thick by the time he flashed in front of me two similar documents, both formatted to look like the Bee-Quick brochure.  The first had to be a draft version, as the "bee" was drawn crudely.  The other was very different from the first, but at least had a proper logo.  Given that I was looking at 17 year-old documents, I did my best to explain what seemed different when comparing the two documents.  But neither document was correctly identified, as the purpose of the questions asked was to force statements to be used as they are being used here.

(Dkt. No. 180: Michelen Aff. Ex. E: Fischer Aff. at 5.)

Fischer's counsel adds: "At [Fischer's] deposition he was stating that he did not believe the exhibit he was shown was the authentic version . . . of what was submitted to the Copyright Office not that he submitted an inauthentic or fake document to the Copyright Office." (Dkt. No. 179: Fischer Opp. Br. at 10.)  That interpretation is plausible on this record given that the deposition questions and answers are far from a model of clarity.  Fischer never was asked directly whether the brochure presented at his deposition was the one submitted with his copyright

application and, if so, whether it was a "genuine" copy of what appeared on the Fischer's Bee-Quick website. The Court accordingly has no occasion to apply the "sham affidavit" rule here. (See Dkt. No. 181: Def. Reply Br. at 10 (describing Fischer's affidavit as "very self-serving"); see, e.g., In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 758 F.3d 202, 213 (2d Cir. 2014) ("[P]laintiffs may not create material issues of fact by submitting affidavits that dispute their own prior testimony. The principle does not apply, however, if the statements 'are not actually contradictory,' or 'the later sworn assertion addresses an issue that . . . was not thoroughly or clearly[ ] explored . . . .'" (citation omitted)). Moreover, even if the "true" brochure was not submitted, the initial deposit copy of Fischer's website material included the four Phrases. (Def. Br. Ex. 8: 2/7/11 Submission at 43, 83.) Defendants have not met their burden of showing the absence of a genuine issue of material fact on this issue.

## B.    Fischer's Alleged Material Misrepresentations

"Possession of a registration certificate creates a rebuttable presumption that the work in question is copyrightable. The presumption generally is not overcome by an 'innocent misstatement'. It may be overcome, however, by proof of deliberate misrepresentation." Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d 452, 455 (2d Cir. 1989) (citations omitted). Similarly, "'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action.'" Id. at 456; accord, e.g., Crown Awards, Inc. v. Trophy Depot, Inc., 15 Civ. 1178, 2017 WL 564885 at *7 (S.D.N.Y. Feb. 13, 2017) (Peck, M.J.).

Defendants argue that Fischer "made material misrepresentations to the Registration Specialist concerning his brochure." (Dkt. No. 177: Def. Br. at 21.) Fischer informed the Copyright Office that his brochure was "an integral part of the web site" and could be viewed online with

printing optional.  (See page 7 above.)  When the registration specialist asked if the brochure was published on the same day as the website, Fischer responded, "Yes, everything was published at the same date/time and on the same website."  (See page 8 above.)  Defendants claim, without explanation, that the deposition testimony discussed in the prior section proves that these statements were false.  (Def. Br. at 21.)  However, Fischer was not asked at his deposition whether the brochure was "integral" to the Fischer's Bee-Quick website or when the brochure was published online, if it was at all.  The cited testimony provides no information in this regard, and defendants cite no other evidence to show that Fischer's representation to the Copyright Office was false.

Next, when Fischer complained about the September 24, 2011 copyright registration date, the registration specialist replied: "Well, as I understood it, the second set of files contained some material that was not in the first set.  That is why the later date applied . . . ."  (See page 9 above.)  Fischer responded that "[t]he later set of files was a subset of the first set of files," and "[t]he second upload was done simply to remove any potential confusion over the extraneous items that you mentioned, such as the images of other company's products."  (Id.)  He continued: "The only intent in uploading the minimal file set was to make your review less tedious, by removing all files in the initial upload that were added to the website since 2000, thus leaving only the small set of files that comprised the initial website, and remained in place as more content was added later." (Id.)

Defendants argue that Fischer misrepresented his later deposit submissions as a "subset of the first set of files," even though the first submission did not contain the Fischer's Bee-Quick brochure.  (Def. Br. at 21-22; see page 9 above.)  "In reliance upon this misrepresentation," defendants argue, "the Registration Specialist erroneously moved the effective date up to February 7, 2011."  (Def. Br. at 22.)  Fischer claims that his first submission "was a

clearly defective restore of files, not an attempt to mislead or defraud," and that "[w]hen the error was detected and reported, [he] quickly did a much better job of restoring only the contents that were from the appropriate time period."  (Dkt. No. 180: Michelen Aff. Ex. E: Fischer Aff. at 4.)

These emails do not permit the Court to determine as a matter of law that Fischer intentionally misrepresented the contents of his copyright submission, or that he knew the first submission (which was over 2,000 pages long) did not contain the brochure or the four Phrases in some other form.  See Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d at 455-56 (discussing "deliberate misrepresentation" and "'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application'" (emphasis added)).  Again, the lack of clarity as to what Fischer knew or intended is, in the Court's view, a product of a less-than-helpful deposition transcript.  Defense counsel could have examined Fischer about the later deposit submissions, how they were compiled, and whether Fischer was aware of the missing brochure, but defense counsel did not do so.  The other evidence defendants cite (Def. Br. at 19) establishes merely that Fischer knew there were errors in his first submission, which is undisputed:

> Q.  Are you aware that on your February 7, 2011, submission to the Copyright Office, you submitted a number of countries' flags?
>
> A.  As I said, there were a number of things that were included in error due to a tree selection error in the backup, meaning in restoring the backup.

(Dkt. No. 176: Hudson Aff. Ex. A: Fischer Dep. at 119.)

Fischer's testimony and his emails with the Copyright Office registration specialist do not prove a misrepresentation to the Copyright Office.  The Court should deny defendants' summary judgment motion to invalidate Fischer's copyright registration on the basis of material misrepresentations.

### C.    The Phrases

"The sine qua non of copyright is originality.  To qualify for copyright protection, a work must be original to the author.  Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.  To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345, 111 S. Ct. 1282, 1287 (1991) (citations omitted); see also, e.g., Boisson v. Banian, Ltd, 273 F.3d 262, 268 (2d Cir. 2001) ("Simply because a work is copyrighted does not mean every element of that work is protected.  'The threshold question is what characteristics of [plaintiffs'] design have gained copyright protection,'" which "extends only to those components of a work that are original to the author.").  Thus, while "facts are not copyrightable," Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 344, 111 S. Ct. at 1287, "[a]n original expression of facts is copyrightable, even where the facts themselves are not . . ., [and] a sufficiently creative sequence will merit copyright protection," Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1075 (2d Cir. 1992) (citation omitted).

Even if a work exhibits a minimal degree of creativity, it must also be of sufficient length.  "Words and short phrases such as names, titles, and slogans; familiar symbols or designs; mere variations of typographic ornamentation, lettering or coloring; [and] mere listing of ingredients or contents" are "not subject to copyright." 37 C.F.R. § 202.1(a).[7]  However, there is no mechanical

---

[7]    See also, e.g., Arica Inst., Inc. v. Palmer, 970 F.2d at 1072 ("We further agree with the district court that of the approximately 250 instances of alleged copying where access was found, all but twenty or so refer to single words or short phrases which do not exhibit the minimal creativity required for copyright protection."); Narell v. Freeman, 872 F.2d 907, 911 (9th Cir. 1989) ("Ordinary phrases are not entitled to copyright protection."); Salinger v.
(continued...)

rule stating how long a phrase must be to enjoy copyright protection, and even the shortest of phrases may merit protection if particularly creative.  See, e.g., Heim v. Universal Pictures Co., 154 F.2d 480, 487 n.8 (2d Cir. 1946) ("There may be wrongful copying, though small quantitatively; so if someone were to copy the words, 'Euclid alone has looked on Beauty bare,' or 'Twas brillig and the slithy toves.'"); 1 NIMMER ON COPYRIGHT § 2.01[B][3] (2017) ("The refusal to protect short phrases applies a fortiori to one or two words.  Even marginally longer phrases ('if no pulse, start CPR') are appropriately denied copyright protection.  Too, a longer phrase may fail to win protection, if deemed sufficiently common to be unoriginal to plaintiff.  However, it must be recalled that even most commonplace and banal results of independent effort may command copyright protection, provided that the independent effort in question is quantitatively more than minimal (e.g., exceeds that required for a fragmentary work or short phrase).  Conversely, it would seem (notwithstanding [37 C.F.R. § 202.1(a)]) that even a short phrase may command copyright protection if it exhibits sufficient creativity." (fns. omitted)).

Defendants argue that the Phrases, found in a panel of Fischer's brochure included with his second and third copyright submissions, are not "original," do not contain an appreciable amount of original text, and "consist of common language conveying an idea typically expressed in a limited number of ways."  (Dkt. No. 177: Def. Br. at 22-24.)[8/]  The Court reprints the relevant

---

[7/]     (...continued)
Random House, Inc., 811 F.2d 90, 98 (2d Cir.) ("[A] cliche or an 'ordinary' word-combination by itself will frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection."), cert. denied, 484 U.S. 890, 108 S. Ct. 213 (1987); Kitchens of Sara Lee, Inc. v. Nifty Foods Corp., 266 F.2d 541, 544 (2d Cir. 1959) ("'Brand names, trade names, slogans, and other short phrases or expressions cannot be copyrighted, even if they are distinctively arranged or printed.'"); Fischer v. Forrest, 14 Civ. 1304, 2015 WL 195822 at *5 (S.D.N.Y. Jan. 13, 2015) (Engelmayer, D.J.).

[8/]     Fischer copyrighted the collective "text and images of [the] Bee-Quick.com website," not
(continued...)

portion of Fischer's brochure below:



---

(...continued)
just the Phrases. (See page 7 above.) Defendants challenge Fischer's collective registration insofar as it allegedly proves that no ordinary observer would find the Natural Honey Harvester ad, which uses only the Phrases, substantially similar to the entire Bee-Quick website. (Def. Br. at 24-25); see, e.g., TufAmerica, Inc. v. Diamond, 968 F. Supp. 2d 588, 595 (S.D.N.Y. 2013) ("To establish a prima facie case of copyright infringement, a plaintiff must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. . . .  To satisfy the second prong, a plaintiff must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." (quotations omitted)).  Since Fischer is not entitled to any damages on his copyright infringement claim (see pages 24-26 below), and defendants do not argue that Fischer's collective registration of the Bee-Quick website is impermissible or otherwise invalidates his copyright (see Def. Br. at 24-25), the Court does not reach the substantial similarity issue.

(Def. Br. Ex. 10: 9/23/11 Submission at 27; Def. Br. Ex. 15.)

Fischer's work takes readers through a series of unique rhetorical questions that play on the worries of beekeepers, including, "Are you tired of your spouse making you sleep in the garage after using Butyric Anhydride?" and, "Are you tired of using hazardous products on the bees you love?", before touting that "Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey."  What makes Fischer's work "original" and therefore protectible is that the whole of the brochure advertisement is greater than the sum of its parts.  See, e.g., Raffoler, Ltd. v. Peabody & Wright, Ltd., 671 F. Supp. 947, 951-52 (E.D.N.Y. 1987) ("Plaintiff's copyrighted advertisements, 'Why are we giving away SOLEX Electric Toothbrush Sets For Only $3?' . . . convey the idea that buying mail order from plaintiff provides the consumer with merchandise at a great value. . . . Plaintiff relies upon its distinct and original combination of slogans . . ., general advertising copy . . ., title phrased in the form of a rhetorical question, and the arrangement of words and illustrations of the marketable item . . . .").[9]  Fischer's brochure undoubtedly exhibits "some minimal degree of creativity," even though some of its content may not.  Feist Publications, Inc. v. Rural Tel. Serv. Co.,

---

[9]     "While it is common to separate unprotectible from protectible elements in a work at the infringement stage, such dissection is inappropriate at the originality stage."  2 PATRY ON COPYRIGHT § 3:35 (2017); see also, e.g., Enter. Mgmt. Ltd., Inc. v. Warrick, 717 F.3d 1112, 1119 (10th Cir. 2013) (Defendant's "view misses the forest for the trees.  Any copyrightable work can be sliced into elements unworthy of copyright protection.  Books could be reduced to a collection of non-copyrightable words.  Music could be distilled into a series of non-copyrightable rhythmic tones.  A painting could be viewed as a composition of unprotectable colors." (citation omitted)); Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1003 (2d Cir. 1995) ("We do not consider the [case cited by defendant] as authority for the broad proposition which [defendant] advances: that, in comparing designs for copyright infringement, we are required to dissect them into their separate components, and compare only those elements which are in themselves copyrightable.  As the district court noted, if we took this argument to its logical conclusion, we might have to decide that 'there can be no originality in a painting because all colors of paint have been used somewhere in the past.'").

22

499 U.S. at 345, 111 S. Ct. at 1287.[10/]  For example, the Court agrees with defendants that the phrase, "A Natural, Non-Toxic Blend Of Oils and Herbal Extracts," is merely descriptive of the product ingredients.  (Def. Br. at 23.)  But that does not render Fischer's work ineligible for copyright protection.  "The 'ordinary' phrase may enjoy no protection as such, but its use in a sequence of expressive words does not cause the entire passage to lose protection.  And though the 'ordinary' phrase may be quoted without fear of infringement, a copier may not quote or paraphrase the sequence of creative expression that includes such a phrase."  Salinger v. Random House, Inc., 811 F.2d at 98.  The Court accordingly should find that Fischer's brochure—and the four Phrases as a whole—is a copyrightable creative work.[11/]

## III.   FISCHER CANNOT OBTAIN STATUTORY DAMAGES OR ATTORNEYS' FEES FOR DEFENDANTS' ALLEGED COPYRIGHT INFRINGEMENT

### A.   Direct Infringement

Defendants argue that since Fischer only seeks statutory damages for defendants'

---

[10/]   Even considered in insolation, most if not all of the rhetorical questions are not so short as to lose copyright protection and are distinguishable from the phrases in the cases defendants cite.  (Def. Br. at 23 n.4 (citing Alberto-Culver Co. v. Andrea Dumon, Inc., 466 F.2d 705, 711 (7th Cir. 1972) ("'most personal sort of deodorant'" not protected); Peters v. West, 776 F. Supp. 2d 742, 750 (N.D. Ill. 2011) ("couldn't wait no longer" not protected), aff'd, 692 F.3d 629 (7th Cir. 2012)).)  "It is safe to assume," for example, "that no earlier marketing material has asked readers if they are 'tired of your spouse making you sleep in the garage after using [Butyric Anhydride].'  Fischer's work, though relatively brief, is therefore protectable."  Fischer v. Forrest, 2015 WL 195822 at *5.  Indeed, as to the "sleep in the garage" phrase, defendants do not directly argue that it lacks sufficient originality, only that its exact wording was not used in the Natural Honey Harvester advertisement which replaced, as the Bee-Quick ads did, the phrase "Butyric Anhydride" with "Bee Go."  (See page 5 above.)  Defendants ignore that "protected expression has been 'used' whether it has been quoted verbatim or only paraphrased."  Salinger v. Random House, Inc., 811 F.2d at 97.

[11/]   However, the parties dispute whether Fischer or defendants created the Phrases.  (See page 3 above.)

alleged copyright infringement, his Copyright Act claims are barred by 17 U.S.C. § 412 because the first infringing act occurred before Fischer registered his copyright.  (Dkt. No. 177: Def. Br. at 17.)

### 1.   Fischer Elected Statutory Damages

"[A]n infringer of copyright is liable for either" actual or statutory damages, 17 U.S.C. § 504(a), and "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action," 17 U.S.C. § 504(c)(1).  Fischer's counsel confirmed at a discovery conference on May 27, 2016 that Fischer seeks only statutory damages.  (14 Civ. 1304, Dkt. No. 138: 5/27/16 Conf. Tr. at 6, 22.)  Moreover, Fischer responded to defendants' interrogatory seeking "an accounting of all damages you are seeking from Defendants . . . for each cause of action alleged in your Second Amended Complaint," by stating that he "seeks only statutory damages." (Dkt. No. 180: Michelen Reply Aff. Ex. A: Fischer Interrogatory Response No. 11.)[12/]

Fischer does not dispute that his damages election is binding.  (See generally Dkt. No. 179: Fischer Opp. Br. at 6-8); see also, e.g., Latin Am. Music Co. v. Spanish Broad. Sys., Inc., 13 Civ. 1526, 2017 WL 512454 at *6 (S.D.N.Y. Feb. 6, 2017) ("Although this election 'may be made at any time before final judgment is rendered, once a plaintiff elects statutory damages he may no longer seek actual damages.'"); Marano v. Aaboe, 05 Civ. 9375, 2010 WL 6350785 at *3 (S.D.N.Y. Oct. 20, 2010) ("Although the statute allows a plaintiff to elect between actual damages and statutory damages, it does not provide a plaintiff with the right [to] revise its election after it is

---

[12/]   Although the interrogatory referred to the second, and not the third, amended complaint, Fischer's interrogatory response post-dates the December 28, 2015 filing of the Third Amended Complaints in both actions.  (14 Civ. 1304, Dkt. No. 89: 3d Am. Compl.; 14 Civ. 1307, Dkt. No. 111: 3d Am. Compl.)

clearly made." (citing cases)), <u>R. & R. adopted</u>, 2011 WL 1157553 (S.D.N.Y. Mar. 28, 2011).[13/]

### 2.   Fischer Cannot Obtain Statutory Damages

Subject to certain exceptions not here applicable,

no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for–

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412.  "Courts in this district have held that Section 412 of the Copyright Act imposes a bright-line rule that precludes recovery of statutory damages and attorneys' fees where the first act of infringement in a series of ongoing infringements occurred prior to the work's copyright registration, finding such a bright-line rule preferable to case-by-case analyses of whether a series of infringements 'has stopped sufficiently such that the restart constitutes a new set of infringements.'"  <u>Solid Oak Sketches, LLC</u> v. <u>2K Games, Inc.</u>, 16 Civ. 724, 2016 WL 4126543 at *2 (S.D.N.Y. Aug. 2, 2016).[14/]   Thus, "[e]ven '[w]here the alleged infringement begins before

---

[13/]   To be clear, this is not a case where the plaintiff tentatively or mistakenly elected one form of damages instead of another.  <u>Cf.</u> <u>Latin Am. Music Co.</u> v. <u>Spanish Broad. Sys., Inc.</u>, 2017 WL 512454 at *6; <u>Med. Educ. Dev. Servs., Inc.</u> v. <u>Reed Elsevier Grp., PLC</u>, 05 Civ. 8665, 2008 WL 4449412 at *11 (S.D.N.Y. Sept. 30, 2008) (Lynch, D.J.).  Fischer elected statutory damages over a year ago at a conference before Judge Pitman and stood by that representation in his March 14, 2017 interrogatory response.  <u>See</u> 6 PATRY ON COPYRIGHT § 22:171 (2017) ("The statute does not provide guidance on how plaintiff elects the form of recovery it desires.  The short answer is any means by which plaintiff's intention is manifested.  Plaintiff may elect in . . . a letter to opposing counsel . . . or in an oral statement in court.").  Defendants, moreover, framed their discovery around Fischer's election.  (<u>See</u> 5/27/16 Conf. Tr. at 6.)

[14/]   <u>See also</u>, <u>e.g.</u>, <u>Troll Co.</u> v. <u>Uneeda Doll Co.</u>, 483 F.3d 150, 158 (2d Cir. 2007); <u>Grecco</u> v.
(continued...)

registration and continues after registration, statutory damages and attorney fees are still
unavailable.'" <u>Solid Oak Sketches, LLC</u> v. <u>2K Games, Inc.</u>, 2016 WL 4126543 at *2; <u>accord</u>, <u>e.g.</u>,
<u>Peterson</u> v. <u>Kolodin</u>, 13 Civ. 793, 2013 WL 5226114 at *8 (S.D.N.Y. Sept. 10, 2013).[15/]

        Fischer does not dispute that Brushy Mountain lost any right to distribute or display

---

[14/]        (...continued)

        <u>Associated Press</u>, 16 Civ. 6240, 2017 WL 2913501 at *4 (S.D.N.Y. July 7, 2017) ("Although
the Second Circuit has not ruled on this issue, district courts in this Circuit agree that
pursuant to this bright-line rule, if there is a series of infringements (as there is alleged to be
in this case), recovery of statutory damages and attorneys' fees is precluded when the
infringement claim is against a defendant that began its infringement before registration.");
<u>Fioranelli</u> v. <u>CBS Broad. Inc.</u>, 15 Civ. 952, 2017 WL 1400119 at *8-9 (S.D.N.Y. Jan. 19,
2017); <u>Pearson Educ., Inc.</u> v. <u>Ishayev</u>, 11 Civ. 5052, 2014 WL 2153911 at *1 (S.D.N.Y. May
22, 2014) (Engelmayer, D.J.) ("A copyright owner is entitled to recover statutory damages,
so long as its copyright was registered before the work was infringed.").

[15/]        Fischer's sole argument is that "the evidence has shown that each year, the annual catalog
and website (which mirrors the catalog) was redesigned and re-drafted by Brushy and the
individual defendants," and thus "[t]hese new catalogs and website pages constitute
re-publication and therefore re-infringement."  (Dkt. No. 179: Fischer Opp. Br. at 6.)
Fischer only cites New York state case law and the Court's prior discussion of the state law
right of publicity republication rule to support his position (<u>id.</u> at 6-8), without
acknowledging that he brought a federal, not common law, copyright infringement claim (14
Civ. 1304, Dkt. No. 89: 3d Am. Compl. ¶¶ 76-90; 14 Civ. 1307, Dkt. No. 111: 3d Am.
Compl. ¶¶ 90-117).   The only "republication" the Court discussed in its Report &
Recommendation relevant to copyright infringement was in reference to the statute of
limitations.  <u>Fischer</u> v. <u>Forrest</u>, 14 Civ. 1304, 2017 WL 128705 at *7 n.9 (S.D.N.Y. Jan. 13,
2017) ("If discovery proves that some discrete infringing acts have occurred within the three
year limitations periods applicable to Gebauer or Brushy Mountain, Fischer's actionable
claims would be limited accordingly (as he acknowledges).") (Peck, M.J.), <u>R. & R. adopted</u>,
2017 WL 1063464 (S.D.N.Y. Mar. 21, 2017).  Defendants correctly argue in their reply brief
that tolling or re-triggering of the statute of limitations is irrelevant to whether statutory
damages can be obtained under 17 U.S.C. § 412.  (Dkt. No. 181: Def. Reply Br. at 5); <u>see</u>,
<u>e.g.</u>, <u>Solid Oak Sketches, LLC</u> v. <u>2K Games, Inc.</u>, 2016 WL 4126543 at *3 ("Plaintiff also
claims that 2K16 constitutes a separate act of infringement because Plaintiff filed its action
within the Copyright Act's three-year statute of limitations.  In support of this argument,
Plaintiff relies on cases that state that each act of infringement creates a distinct harm, which
gives rise to an independent claim for relief, and argues that this logic should be applied to
within the statutory damages context as well.  However, Plaintiff cites no authority for the
proposition that this general principle overcomes the clear provisions of Section 412 where
the original infringement occurred prior to copyright registration.").

Fischer's products on December 10, 2010 when Brushy Mountain discontinued its sale of Fischer's Bee-Quick.  (See page 4 above.)  However, the Fischer's Bee-Quick advertisement containing Fischer's Phrases remained on Brushy Mountain's website until at least December 26, 2010, and Brushy Mountain's 2011 catalog, mailed on January 21, 2011, included the allegedly infringing ad for Natural Honey Harvester containing the four Phrases.  (See page 5 above.)  Brushy Mountain continued to use the same or a substantially similar advertisement for Natural Honey Harvester in its 2012 through 2014 catalogs, and on its website until at least December 28, 2011.  (Id.)  Fischer's February 7, 2011 copyright registration therefore post-dates defendants' first acts of infringement via their website and catalog (December 26, 2010 and January 21, 2011, respectively).  (See pages 5, 7 above.)  Fischer thus is barred from recovering statutory damages or attorneys' fees from defendants for their alleged copyright infringement.[16/]

---

[16/]    The Second Circuit has remarked that "Congress understood section 412 to mean that a post-registration act of infringement will not be deemed to have commenced before registration if the infringing activity ceased for an appreciable" or "non-trivial period of time."  Troll Co. v. Uneeda Doll Co., 483 F.3d at 158-59.  "In such a case, the copyright owner could recover statutory damages and attorney's fees for that new, post-registration act of infringement."  Id. at 159.  The "appreciable" period of time in Troll is "nine or ten years."  Troll Co. v. Uneeda Doll Co., 483 F.3d at 159.  Even assuming Troll applies in this case, see Grecco v. Associated Press, 2017 WL 2913501 at *4; U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc., 04 Civ. 6189, 2008 WL 3906889 at *15 (S.D.N.Y. Aug. 21, 2008), no appreciable period of time elapsed between defendants' infringements.  Defendants engaged "in a series of ongoing infringements" on an annual basis beginning in December 2010 before Fischer applied for or registered his copyright.  Solid Oak Sketches, LLC v. 2K Games, Inc., 2016 WL 4126543 at *2.  The one-year gap between catalogs in this context does not constitute an appreciable amount of time such that defendants' post-registration infringements are actionable.  See, e.g., Solid Oak Sketches, LLC v. 2K Games, Inc., 2016 WL 4126543 at *3 ("Here, there was only a one-year gap between the pre-registration infringement in 2K15 and post-registration infringement in 2K16, which does not constitute an 'appreciable period of time' in this context." (record citation omitted)); U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc., 2008 WL 3906889 at *15 ("The 'appreciable period of time' between infringements in [Troll] was nearly a decade.  Here, by contrast, the periods between pre- and post-registration acts of infringement for the eighteen titles listed on

(continued...)

B.       **Vicarious and/or Contributory Infringement**

Fischer claims that defendants are liable for secondary copyright infringement because two Brushy Mountain vendors, The Honey Hole and C&T Bee Supply ("the Vendors"), used the infringing Natural Honey Harvester advertisement in 2012 and 2014.  (See page 5 above; see also 14 Civ. 1307, Dkt. No. 111: 3d Am. Compl. ¶¶ 50-58.)  Fischer alleges that defendants provided Natural Honey Harvester and its accompanying advertisement to the Vendors for their use. See Fischer v. Forrest, 14 Civ. 1304, 2015 WL 195822 at *7 (S.D.N.Y. Jan. 13, 2015) (Engelmayer, D.J.) ("[T]he facts alleged permit the plausible inference that Forrest contributed to the third-party infringement, such as by making the copyrighted material available to those companies or asking them to use Fischer's text to promote Natural Honey Harvester.").[17/]  Defendants deny this.  (Dkt. No. 173: Gebauer Aff. ¶ 12; Dkt. No. 174: Sandra Forrest Aff. ¶ 10; Dkt. No. 175: Stephen Forrest Aff. ¶ 11.)  Accepting Fischer's allegations for purposes of this motion, defendants would face joint liability for the Vendors' direct infringement by contributing to the Vendors' use of the infringing advertisement.  See, e.g., Universal City Studios, Inc. v. Nintendo Co., 615 F. Supp. 838, 857 (S.D.N.Y.) ("The liability of one found guilty of vicarious infringement is joint and several with all infringers."), opinion clarified, 726 F. Supp. 928 (S.D.N.Y. 1985), aff'd, 797 F.2d 70 (2d Cir.), cert. denied, 479 U.S. 987, 107 S. Ct. 578 (1986).

As discussed in the prior section, Fischer cannot obtain statutory damages for

---

[16/]     (...continued)
Schedule D are far shorter, ranging from eight days to slightly more than two years.").

[17/]     See also, e.g., EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 99-100 (2d Cir. 2016) ("A contributory infringer is 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'"), cert. denied, 2017 WL 1365643 (June 19, 2017).

defendants' <u>direct</u> infringement.  Neither party, however, addresses whether Fischer may obtain statutory damages for the Vendors' direct infringement for which defendants may be contributorily liable.  Fischer only can obtain statutory damages if the Vendors' post-registration infringement is not "part of an ongoing series of infringing acts" that began with Brushy Mountain's pre-registration infringement.  <u>Troll Co.</u> v. <u>Uneeda Doll Co.</u>, 483 F.3d 150, 158 (2d Cir. 2007).  Fischer cannot recover for the reasons set forth in <u>Bouchat</u> v. <u>Bon-Ton Dep't Stores, Inc.</u>, 506 F.3d 315, 329-32 (4th Cir. 2007), <u>cert. denied</u>, 553 U.S. 1014, 128 S. Ct. 2054 (2008).

In April 1996, the <u>Bouchat</u> plaintiff submitted a logo for a new NFL team to the team's owner for consideration.  <u>Bouchat</u> v. <u>Bon-Ton Dep't Stores, Inc.</u>, 506 F.3d at 324.  In June 1996, the NFL's marketing division, National Football League Properties ("NFLP"), created and began marketing a logo that "bore a remarkable resemblance to" plaintiff's logo; the NFLP used the infringing team logo until 1998.  <u>Id.</u>  In July 1996, after the NFLP's infringement began but before it ended, the plaintiff copyrighted his logo.  <u>Id.</u>  "During the time the [infringing logo] was the team logo, the NFLP licensed it as part of a package of all NFL team logos to hundreds of manufacturers and retailers for use on [the team's] merchandise."  <u>Id.</u>

The Fourth Circuit held that "[b]ecause NFLP's first infringement preceded [the plaintiff's copyright] registration, [the plaintiff] could not pursue statutory damages against NFLP" under 17 U.S.C. § 412.  506 F.3d at 330.  As to the licensees, however, the plaintiff "argue[d] that the correct approach would [be] to treat the date on which each individual licensee first violated [the plaintiff's] copyright as the date that licensee's infringement commenced under § 412(1)."  506 F.3d at 330.  The Fourth Circuit noted that the damages limitation in § 412 must be read in conjunction with § 504(c) that permits "statutory damages 'for all infringements involved in the action . . . for which any one infringer is liable individually, or for which any two or more infringers are liable

jointly and severally.'"  506 F.3d at 330 (quoting 17 U.S.C. § 504(c)).  "NFLP gave each licensee permission to copy, so NFLP was also responsible for the licensee's acts of copying, making NFLP jointly and severally liable for the infringing acts of each licensee."  Id. at 330-31.  Because § 504(c) does not treat an individual infringer differently than multiple jointly liable infringers when assessing statutory damage liability, the Fourth Circuit held that the statute "thus subjects a licensor-licensee pair to the same tracing rule that would apply to either one as an individually liable infringer."  506 F.3d at 331.  The court accordingly was required to "trace the licensee's post-registration infringing conduct back to NFLP's pre-registration conduct and thereby deny statutory damages to" the plaintiff.  Id.

That "none of the licensees appear[ed] responsible for NFLP's initial act of infringement" did "not change the analysis."  Id.  The Fourth Circuit concluded:

> Section 504(c)(1) speaks of "infringers," not parties.  Because a statutory damages award covers "all infringements involved in the action . . . for which" infringers are liable, it is appropriate to treat the earliest date of infringement by any participant in a line of related copyright violations as the date of commencement.  Focusing on NFLP's conduct here is entirely logical.  Once NFLP designed and licensed the [infringing] logo that infringed [the plaintiff's] copyright, the liability of all of NFLP's licensees became a foregone conclusion.  Thus, we hold that a copyright owner may not obtain statutory damages from a licensee liable jointly and severally with a licensor when the licensor's first infringing act occurred before registration and was part of the same line of related infringements that included the licensee's offending act.

506 F.3d at 331 (citation omitted).

Here, defendants' (alleged) infringement of Fischer's copyright in December 2010 was part of a series of related infringements by defendants and the Vendors of the same copyrighted work.  Although defendants and the Vendors may lack a formal licensor-licensee relationship present in Bouchat, Fischer claims that defendants authorized the Vendors to market the product and allegedly infringing ad.  If true, defendants and the Vendors thus would be jointly and severally

liable for the Vendors' infringement.  (See page 27 above.)  This relationship suffices to connect defendants and the Vendors as "participant[s] in a line of related copyright violations."  See, e.g., Livingston v. Art.com, Inc., No. 13-CV-03748, 2014 WL 3404722 at *6 (N.D. Cal. July 11, 2014) (quotations omitted).  The Court holds for the purpose of assessing statutory damages under § 412 and § 504(c) that the Vendors' (alleged) infringement commenced on December 10, 2010 when Brushy Mountain's first infringing act took place, thus barring statutory damages and attorneys' fees against defendants for vicarious or contributory infringement based on the Vendors' infringement. (See page 5 above); see also, e.g., Arista Records LLS v. Lime Grp. LLC, 06 Civ. 5936, 2010 WL 6230927 at *5 (S.D.N.Y. Dec. 28, 2010) ("There would be little motivation to register [a copyright] early in the face of massive induced infringement, if the copyright owner could obtain statutory damages against an inducer so long as the copyright was registered prior to any one act of direct infringement [by a third party], regardless of how long the owner delayed in registration from the date when the inducer began distribution of an infringement-enabling product or service."), R. & R. adopted, 2011 WL 1226277 (S.D.N.Y. Mar. 29, 2011).

The Court should grant summary judgment for defendants dismissing Fischer's vicarious and/or contributory copyright infringement claims.

## C.     Any Claim For Injunctive Relief Is Moot

Defendants argue that because Fischer cannot obtain damages for defendants' copyright infringement, his copyright claims should be dismissed in their entirety.  (Dkt. No. 177: Def. Br. at 19.)  While defendants are correct that Fischer disclaimed all monetary relief other than statutory damages, which are unavailable, they ignore the fact that Fischer's complaints in both actions also seek injunctive relief.  (14 Civ. 1304, Dkt. No. 89: 3d Am. Compl. Prayer ¶ 2; 14 Civ. 1307, Dkt. No. 111: 3d Am. Compl. Prayer ¶ 2.)  Section 412 precludes "statutory damages [and]

attorney's fees, as provided by sections 504 and 505," not any other form of relief.  17 U.S.C. § 412.

A plaintiff prevented from recovering statutory damages and fees under sections 504 and 505 may

still obtain an injunction under 17 U.S.C. § 502.  See, e.g., Intrepidus, LLC v. Bivins, 15 Civ. 7721,

2017 WL 1608896 at *4 (S.D.N.Y. Apr. 28, 2017) ("Plaintiff seeks a permanent injunction pursuant

to 17 U.S.C. § 502(a) of the Copyright Act.  Section 412 of Title 17 of the United States Code

restricts a plaintiff's ability to recover statutory damages and attorneys' fees pursuant to sections 17

U.S.C. §§ 504 and 505, but it does not prohibit a plaintiff from seeking injunctive relief for

copyright infringement under section 502, even if the plaintiff did not register the work within the

requisite period of time to recover statutory damages and attorneys' fees."); Medisim Ltd. v.

BestMed LLC, 910 F. Supp. 2d 591, 629 n.169 (S.D.N.Y. 2012) ("[E]ven if [plaintiff] is not entitled

to damages on its copyright claim, it may still be entitled to injunctive relief."); Love v. City of

N.Y., 88 Civ. 7562, 1989 WL 140578 at *2 (S.D.N.Y. Nov. 17, 1989) (Plaintiff "argues that if

defendants' view of § 412 is adopted an infringer can infringe far more extensively after registration

than before, with relative impunity.  The answer to that argument is that there are some remedies

available to a plaintiff even against infringements that began before registration, including injunctive

relief . . . .").

However, at oral argument on the summary judgment motions, defendants stipulated

to (1) remove any links and photos containing Fischer's name or product on Brushy Mountain's

website, and (2) not use the four Phrases again in the future; Fischer agreed that this mooted the

issue of injunctive relief.  (7/11/17 Oral Arg. Conf. Tr. at 8-9, 29); see, e.g., Beck Chevrolet Co. v.

General Motors LLC, 11 Civ. 2856, 2011 WL 13156875 at *3 (S.D.N.Y. June 15, 2011) ("A request

for injunctive relief is moot when the offending conduct ceases and the court finds that there is no

reasonable expectation that it will resume." (quotations omitted)).  The Court accordingly should

grant summary judgment to defendants dismissing Fischer's copyright infringement claims in their entirety.

## IV.   <u>FISCHER HAS NOT ESTABLISHED A DMCA CLAIM</u>

The Digital Millennium Copyright Act ("DMCA"), PL 105-304, 112 Stat 2860 (1998), "was enacted in 1998 to implement the World Intellectual Property Organization Copyright Treaty, and to update domestic copyright law for the digital age." <u>Viacom Int'l, Inc.</u> v. <u>YouTube, Inc.</u>, 676 F.3d 19, 26 (2d Cir. 2012) (citations omitted). The DMCA protects, among other things, the "[i]ntegrity of copyright management information" ("CMI"), and prohibits the removal of CMI from copyrighted works. <u>See generally</u> 17 U.S.C. § 1202. "The purpose of CMI is to facilitate licensing of copyright for use on the Internet and to discourage piracy." S. REP. 105-190 at 92 n.18 (1998). The DMCA provides:

> No person shall, without the authority of the copyright owner or the law–
>
> (1) intentionally remove or alter any copyright management information,
>
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>
> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b). The term "copyright management information" is defined as:

> any of the following information conveyed in connection with copies . . . of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of, and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

. . . .

(6) Terms and conditions for use of the work.

(7) Identifying numbers or symbols referring to such information or links to such information.

(8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

17 U.S.C. § 1202(c).  As to the phrase "conveyed in connection with" used in § 1202(c), "[t]he term 'conveyed' is used in its broadest sense and is not meant to require any type of transfer, physical or otherwise, of the information.  It merely requires that the information be accessible in conjunction with, or appear with, the work being accessed."  S. REP. 105-190 at 35 (1998).

"To establish a violation under subsection 1202(b), a plaintiff must show '(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally.'"  Gattoni v. Tibi, LLC, 16 Civ. 7527, 2017 WL 2313882 at *4 (S.D.N.Y. May 25, 2017).[18/]  Alternatively, a plaintiff can show that the defendant "distribute[d] . . . copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner . . . knowing, or . . . having

---

[18/]   Accord, e.g., Reilly v. Commerce, 15 Civ. 5118, 2016 WL 6837895 at *6 (S.D.N.Y. Oct. 31, 2016); Sheldon v. Plot Commerce, 15 Civ. 5885, 2016 WL 5107072 at *13 (E.D.N.Y. Aug. 26, 2016), R. & R. adopted, 2016 WL 5107058 (E.D.N.Y. Sept. 19, 2016); BanxCorp v. Costco Wholesale Corp., 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010).

reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement . . . ." 17 U.S.C. § 1202(b)(3); see, e.g., Friedman v. Live Nation Merch., Inc., 833 F.3d 1180, 1187 (9th Cir. 2016) ("The statute does prohibit the intentional removal of CMI.  But [plaintiff] could also prevail upon a showing that [defendant] distributed his works with the knowledge that CMI had been removed, even if [defendant] did not remove it.").[19]

### A.    The Fischer's Bee-Quick Bottle Photo

Fischer alleges that defendants stripped the metadata from Fischer's original Fischer's Bee-Quick bottle photo displayed on Brushy Mountain's website.  (See page 6 above.)  Fischer cannot establish a DMCA violation with respect to the metadata allegedly embedded in the Fischer's Bee-Quick photo because he submitted no evidence as to the contents of the metadata.  Fischer testified that "Brushy Mountain removed the metadata from" his images, but never explained or submitted any exhibits detailing the contents of that metadata.  (See Dkt. No. 176: Hudson Aff. Ex. A: Fischer Dep. at 137-38, 140.)  The terms "metadata" and "CMI" are not interchangeable; photo metadata often includes information that does not qualify as CMI.  See, e.g., United States v. Post, 997 F. Supp. 2d 602, 603 (S.D. Tex. 2014) ("In digital photos, metadata typically includes 'the date

---

[19]    The Court notes that Fischer only pled in his Third Amended Complaints that defendants "removed" CMI from his copyrighted works and distributed those works knowing the CMI had been removed under 17 U.S.C. § 1202(b)(1) & (3).  (14 Civ. 1304, Dkt. No. 89: 3d Am. Compl. ¶¶ 91-120; 14 Civ. 1307, Dkt. No. 111: 3d Am. Compl. ¶¶ 118-46.)  Fischer did not allege that defendants altered or inserted false CMI, and thus the Court does not address those portions of the statute.  See, e.g., Kennedy v. Gish, Sherwood & Friends, Inc., 143 F. Supp. 3d 898, 914 (E.D. Mo. 2015) ("A plaintiff cannot amend his complaint through arguments in his brief in opposition to a motion for summary judgment. . . .  Although the Court has broadly construed the language in the operative complaint as it relates to [plaintiff's] copyright infringement claim, his DMCA claim is clearly limited and only alleges removal of copyright management information as the violation.  Indeed, neither [plaintiff's] original complaint nor his five subsequent amended complaints allege a violation of the DMCA through a distribution of copied works.  The Court will not consider this unpled allegation.").

and time the photo was taken; camera settings, such as aperture and shutter speed; manufacturer

make and model . . . and—in the case of smartphones—the GPS coordinates of where the photo was

taken.").

        Fischer has not established that defendants violated the DMCA by removing CMI

from his copyrighted photo.  See, e.g., Vcom Int'l Multi-Media Corp. v. Gluck, No. 14-CV-3398,

2017 WL 1137442 at *8 (D.N.J. Mar. 27, 2017) ("Without presenting a screenshot (or some other

visual depiction or description) of the Copyright management information as it appears on Vcom's

Websites, the Court is unable to ascertain whether Vcom's Copyright management information was

falsified, altered, or removed in violation of the DMCA.  As a result, Vcom has not met its burden

in demonstrating a violation of the DMCA.").[20]

**B.**    **The Brochure**

        Defendants' allegedly infringing advertisement undeniably copied, sometimes

verbatim, the Phrases from Fischer's Bee-Quick brochure.  Gebauer testified that he and the Forrests

authored the text advertisements that appeared in Brushy Mountain's digital and print catalog.  (See

---

[20]    Placing the burden of production on Fischer is appropriate in this instance.  Compare
Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001).  Gebauer claims that a Brushy Mountain
employee, not Fischer, took the disputed photograph, and thus the only metadata embedded
in the photo would have been inserted by Brushy Mountain.  (Dkt. No. 173: Gebauer Aff.
¶ 6.)  Although Gebauer's affidavit mentions a second photo of a "medicine shaped bottle"
(Gebauer Aff. ¶ 7), Fischer's complaint only alleged that the pump top bottle image
contained CMI and Fischer did nothing to clarify his allegations on summary judgment (see
14 Civ. 1304, Dkt. No. 89: 3d Am. Compl. ¶ 42(e), 117 & Ex. 9).  Defendants, moreover,
specifically argued in their brief that "Fischer has failed to show any works with CMI."
(Dkt. No. 177: Def. Br. at 27.)  "Accordingly, where, as here, the non-movant bears the
burden of proof at trial, the movant can satisfy its burden of production by pointing out an
absence of evidence to support an essential element of the non-movant's case."  Ginsberg v.
Healey Car & Truck Leasing, Inc., 189 F.3d 268, 270 (2d Cir. 1999).  Defendants have met
their burden, but Fischer has not shown "'the existence of CMI on the [infringed work],'"
notwithstanding any dispute of fact as to who took the photo.  Gattoni v. Tibi, LLC, 16 Civ.
7527, 2017 WL 2313882 at *4 (S.D.N.Y. May 25, 2017).

pages 2-3 above.)  From at least 2005 through 2010, Fischer authorized defendants to publish

Fischer's Bee-Quick advertisements using the Phrases, but those ads otherwise bear no resemblance

to the brochure in content or appearance.   In 2011, defendants published their infringing

advertisement that copied the prior authorized ads almost word for word, but added no new content

from the brochure.   However, defendants changed the phrase, "Fischer's Bee-Quick™ is a safe,

gentle, and pleasant way to harvest your honey," by replacing "Fischer's Bee-Quick™" with

"Natural Honey Harvester."   The brochure and advertisements appear below:



**Clears supers fast
without foul odors or
harsh chemicals**

**A Natural, Non-Toxic Blend Of
Oils and Herbal Extracts**

**Full refund if not satisfied**

Are you tired of your spouse making you sleep
in the garage after using Butyric Anhydride?

Are your bees more aggressive when
blown at 100 mph by leaf blowers?
Are you tired of messing with
jamming or useless bee-escapes?

Are you tired of using a hazardous product on
the bees you love?

Are you terrorizing and killing bees
trying to shake and brush them?

Fischer's Bee-Quick is a safe, gentle,
and pleasant way to harvest your
honey.   Safe for you, honey, & bees.

- No bees are harmed
- No hive chaos – no "bee clouds"
- No foul odor – smells nice!
- No noisy machines to lug around
- No extra lifting of supers

### Natural Honey Harvester™ 

For years we have promoted the use of a
natural product to harvest honey but an
unreliable supply of such a product has
forced us to come out with our own. This
100% Natural, non-toxic blend of oils and
herb extracts works just like Bee Go® and
it smells good! Natural Honey Harvester™
is a safe, gentle, and pleasant way to
harvest your honey.  Are you tired of your
spouse making you sleep in the garage
after using Bee Go®?  Are you tired of
using hazardous products on the bees you
love?  Then this is the product for you!

Catalog # 474    Natural Honey Harvester (7 oz.) ...... Shp. Wt. 1 lb.    $12.95
                       Natural Honey Harvester (1 Gal) ....... Shp. Wt. 15 lbs.  $69.95

**2011 - Infringement**

### Fischer's Bee Quick™

This 100% Natural, non-toxic blend of oils
and herb extracts works just like Bee Go®
and it smells good!  Fischer's Bee Quick™
is a safe, gentle, and pleasant way to harvest
your honey.  Are you tired of your spouse
making you sleep in the garage after using
Bee Go®?  Are you tired of using a hazardous
products on the bees you love?  Then this is
the product for you!

Catalog # 779    Fischer's Bee Quick™ (7 oz.) Shp. Wt. 1 lb. .......... $12.95
Catalog # 779G Fischer's Bee Quick™ (1 Gallon) Shp. Wt. 15 lbs. $69.95

**2010 – Authorized Use**

(Dkt. No. 177: Def. Br. Ex. 10: 9/23/11 Submission at 27; Def. Br. Ex. 15; 14 Civ. 1307, Dkt. No. 70: 2d Am. Compl. Exs. 5, 20.)

  Fischer argues that "the product name 'Fischer's Bee Quick,' by virtue of containing the plaintiff's name, also constituted CMI." (Dkt. No. 179: Fischer Opp. Br. at 18.)  Fischer's argument rests on Judge Engelmayer's ruling on the motion to dismiss Fischer's Second Amended Complaint.  Fischer v. Forrest, 14 Civ. 1304, 2015 WL 195822 at *8 (S.D.N.Y. Jan. 13, 2015) (Engelmayer, D.J.).  Judge Engelmayer stated:

> [T]he original text at issue contained the name "Fischer."  Specifically, it stated that "Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey." Fischer's name, although used to describe the product, also serves to identify the author of the work and therefore qualifies as CMI under [17 U.S.C. § 1202(c)].

Id. (citations omitted).)  Judge Engelmayer held, and Fischer now argues, that the complaint stated a claim in alleging that defendants removed Fischer's CMI when they "replaced the textual reference to 'Fischer's Bee-Quick' with the words 'Natural Honey Harvester.'"  Id.[21/]

  Fischer must show that defendants "intentionally remove[d]" CMI that was "conveyed in connection with copies . . . of [his] work or . . . displays of [his] work."  17 U.S.C. § 1202(b)(1), (c).  The relevant "work" here is the source material, i.e., the brochure, from which the defendants created a derivative advertisement using the four Phrases, and yet another derivative advertisement that removed "Fischer's Bee-Quick."  (See Dkt. No. 176: Hudson Aff. Ex. A: Fischer Dep. at 137 ("Q.  So we have a clear record, how many sentences are you alleging that . . . defendants removed from your brochure?  A.  Four.").)  Thus, defendants did not remove any CMI

---

[21/] Fischer does not argue that any other CMI was removed from the copied materials.  (See Fischer Opp. Br. at 17-19; Dkt. No. 180: Michelen Aff. Ex. E: Fischer Aff. at 6.)  While Fischer separately claimed in his complaint that defendants removed the copyright notice from the Fischer's Bee-Quick brochure, Fischer does not pursue that claim here which, in any event, lacks merit.  (14 Civ. 1307, Dkt. No. 111: 3d Am. Compl. ¶ 120.)

from Fischer's work itself.  As the Court noted at oral argument, "when [defendants] lost authority to sell Bee Quick, they modified . . . not Mr. Fischer's ad, but their own ad" that they had created based on Fischer's brochure.  (7/11/17 Oral Arg. Conf. Tr. at 25-26); see, e.g., Faulkner Press, L.L.C. v. Class Notes, L.L.C., 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010) (Defendant "argues that it did not 'remove' any copyright management information contained in the textbooks or on the film study questions.  Its student note takers simply took notes from [plaintiff's] course and those notes were compiled into note packages. . . .  [N]othing was removed from the copyrighted works.  Instead, information from [plaintiff's] courses was allegedly copied into a different form and then incorporated into the note packages." (citations omitted)).  Fischer cites no authority to support such an attenuated theory of DMCA liability.[22]

Alternatively, assuming arguendo that the "work" is the four Phrases collectively, Fischer's DMCA claim fails because he has not shown that the Phrases contain any CMI.  The DMCA's expansive definition of CMI cannot trigger liability any time a person's name is contained in a copyrighted work without reference to how that information was used and displayed on the work itself.  Assume the following is a line from a larger copyrighted text advertisement: "Orville

---

[22]    The Court's holding that CMI was not "removed" in this case is based on such attenuation. However, the Court is skeptical that even a more direct extraction of phrases from a larger copyrighted work could constitute "removal" of CMI under the DMCA.  The DMCA prohibits removal of "information conveyed in connection with copies . . . of a work . . . ." 17 U.S.C. § 1202(c).  Extraction of distinct elements of a work is not a "cop[y] . . . of [the] work" without CMI.  If, for example, someone extracted and reproduced several sentences from a copyrighted Sherlock Holmes story, without crediting the Conan Doyle Estate, it would stretch the definition of "removal" to say that CMI had been "removed" from the copyrighted "work."  It might be copyright infringement, but it would not be a DMCA violation.

Redenbacher's Popcorn is perfect for movie nights or for making fun recipes with the family."[23]  If someone copied this sentence but republished it in another manner after replacing "Orville Redenbacher" with some other name, it is inconceivable that a DMCA violation would result, even though "Orville Redenbacher" (in this hypothetical) qualifies as "[t]he name of . . . the copyright owner."  17 U.S.C. § 1202(c)(3).  "Orville Redenbacher," as used in this line of the advertisement, does not have any CMI significance— it simply is part of the product's name (just like Kellogg's Corn Flakes or Wrigley's Chewing Gum).  The same logic applies here.  "Fischer's Bee-Quick," as used in conjunction with the phrase it precedes, is not a reference to the copyright owner (listed as "James H. Fischer" on the brochure (14 Civ. 1307, 2d Am. Compl. Ex. 5)); "[t]he title and other information identifying the work;" or the "[t]he name of, and other identifying information about, the author of [the] work."  17 U.S.C. § 1202(c)(1)-(3).  It is merely a reference to the product name used in a sentence describing the product's particular attributes.  (See page 36 above ("Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey.").)  Compare Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc., No. 11-CV-5177, 2012 WL 414803 at *6 (N.D. Ill. Feb. 8, 2012) ("[T]he point of CMI is to inform the public that something is copyrighted and to prevent infringement.").  As such, this use of "Fischer's Bee-Quick" considered in context does not qualify as CMI.[24]

---

[23]  See  https://www.google.com/search?site=&source=hp&q=orville+redenbacher &oq=orville+redenbacher&gs_l=psy-ab.3..0i131k1j0l3.331.5885.0.5994.36.29.5.0.0.0.17 2.2720.14j12.26.0....0...1.1.64.psy-ab..5.31.2776.0..0i10k1j0i22i30k1j0i13k1.pK48pBwz 1B0.

[24]  At oral argument, Fischer argued that the product name is "Bee-Quick" and the use of "Fischer's" before it was CMI.  (7/11/17 Oral Arg. Conf. Tr. at 24-26.)  However, the bottle of the product clearly labels it as "Fischer's Bee-Quick," not simply "Bee-Quick," as does the brochure.  (14 Civ. 1304, Dkt. No. 50: 2d Am. Compl. Ex. 5; Dkt. No. 173: Gebauer Aff.

(continued...)

The Court should grant summary judgment to defendants on Fischer's DMCA claim.[25]

## V.    FISCHER DID NOT PLEAD A TRADEMARK INFRINGEMENT CLAIM

Fischer argues that his trademark claim survived the Court's order on defendants' motion to dismiss.  (Dkt. No. 179: Fischer Opp. Br. at 15-17); see Fischer v. Forrest, 14 Civ. 1304, 2017 WL 128705 at *13 (S.D.N.Y. Jan. 13, 2017) (Peck, M.J.), R. & R. adopted, 2017 WL 1063464 (S.D.N.Y. Mar. 21, 2017).   Fischer argues that "[w]hen pro se, plaintiff selected the term 'counterfeit' from the . . . list of synonyms" found in 15 U.S.C. § 1114, and cites a number of examples where the phrase "trademark infringement" is used in the Third Amended Complaint. (Fischer Opp. Br. at 15); see 15 U.S.C. § 1114(1)(a) ("Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark . . . shall be liable in a civil action . . . .").  Defendants, of course, argue that Fischer "has only brought counterfeiting claims and not trademark infringe[ment] claims."  (Dkt. No. 177: Def. Br. at 29.)  The Court agrees with defendants.

In its Report & Recommendation dismissing Fischer's trademark counterfeiting claim, the Court observed: "Fischer may have intended to bring a trademark infringement claim against defendants, but his Third Amended Complaint, drafted and filed by counsel, specifically references defendants' use of 'counterfeit' marks.  The trademark 'counterfeit' claims cannot survive,

---

[24]    (...continued)
Exs. A, C.)  Thus, "Fischer's Bee-Quick," like "Wrigley's Chewing Gum" or "Orville Redenbacher's Popcorn," is the product name, not CMI.

[25]    Because there is no evidence that the photo and cited portions of the brochure used in the advertisement contained CMI, Fischer cannot establish that defendants "distribute[d] . . . copies of [Fischer's] works . . . knowing that copyright management information has been removed."  17 U.S.C. § 1202(b)(3).

and Fischer has not sought further leave to amend."  Fischer v. Forrest, 2017 WL 128705 at *13

n.14.  Fischer objected to the Court's Report & Recommendation (14 Civ. 1304, Dkt. No. 137; 14

Civ. 1307, Dkt. No. 150), and Judge Engelmayer affirmed on March 21, 2017 after the close of

discovery, Fischer v. Forrest, 14 Civ. 1304, 2017 WL 1063464 at *1 (S.D.N.Y. Mar. 21, 2017)

(Engelmayer, D.J.).  At no time did Fischer seek leave to amend his trademark claim.

       Whatever fleeting references made in the complaints to "trademark infringement,"

the trademark counts are clearly titled "Use of a Counterfeit Mark In Commerce," and repeat again

and again that the images defendants used were "Counterfeit Marks."  (14 Civ. 1304, Dkt. No. 89:

3d Am. Compl. ¶¶ 140-63.)[26/]  Moreover, Fischer's interrogatory responses contain a clear

admission: "The action brought by Plaintiff is for Trademark Counterfeiting, not Trademark

Infringement."  (Dkt. No. 180: Michelen Aff. Ex. A: Interrogatory Response No. 8.)[27/]  The Court

---

[26/]    It is true that "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citations omitted).  But it does not matter what Fischer did pro se when he drafted his initial and amended complaints.  What matters is the content of the operative Third Amended Complaint that was drafted and filed by his counsel.  (14 Civ. 1304, 3d Am. Compl.; 14 Civ. 1307, Dkt. No. 111: 3d Am. Compl.)  While Judge Engelmayer ruled in Fischer's favor on defendants' motion to dismiss Fischer's First Amended Complaint, Fischer was still pro se at that time and was entitled to have his complaint read liberally.  See Fischer v. Forrest, 14 Civ. 1304, 2015 WL 195822 at *4 (S.D.N.Y. Jan. 13, 2015) (Engelmayer, D.J.) ("Pro se complaints must be construed liberally and interpreted to raise the strongest arguments that they suggest." (quotations omitted)).  However, Fischer is not now entitled to a liberal reading of his lawyer-drafted Third Amended Complaint because he was pro se at some other point in this case.

[27/]    Moreover, counterfeiting claims are not the same as infringement claims.  A "counterfeit" mark is a term of art in the Lanham Act, and proof of counterfeiting entitles the plaintiff to an enhanced damages award.  See, e.g., Georgia-Pac. Consumer Prods. LP v. von Drehle Corp., 781 F.3d 710, 718 (4th Cir. 2015) ("Section 1117 provides vastly different legal standards, based on the egregiousness of the offense, for determining when a district court can modify an award—distinguishing an award for knowingly and intentionally using a

(continued...)

(and Judge Engelmayer) already decided this issue.  Fischer cannot revive a "trademark" claim via his response to defendants' summary judgment motion.

## VI.    FISCHER HAS NOT ESTABLISHED A FALSE ENDORSEMENT CLAIM

### A.    Legal Standards Governing False Endorsement Claims

"'Section 43(a) of the Lanham Act proscribes false designations of origin or false or misleading descriptions of fact in connection with any goods in commerce that are likely to cause confusion or that misrepresent the nature, characteristics, qualities, or geographic origin of the goods.'" S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001).  The Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  "A trademark is not required for a successful section 43(a) claim, which

---

27/    (...continued)
counterfeit mark from an award for using a noncounterfeit mark."); Sream, Inc. v. Khan Gift Shop, Inc., 15 Civ. 2091, 2016 WL 1130610 at *5 (S.D.N.Y. Feb. 23, 2016) ("The Lanham Act permits courts to award higher statutory damages in counterfeiting cases than in cases where the infringing mark at issue, while confusingly similar to the plaintiff's mark, does not meet the definition of 'counterfeit.'"), R. & R. adopted, 2016 WL 1169517 (S.D.N.Y. Mar. 22, 2016); 15 U.S.C. § 1127; 15 U.S.C. § 1117(b), (c).

'mak[es] certain types of unfair competition federal statutory torts, whether or not they involve infringement of a registered trademark.'" Jackson v. Odenat, 9 F. Supp. 3d 342, 354 (S.D.N.Y. 2014).

"The heart of a successful claim based upon §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), . . . is the showing of likelihood of confusion as to the source or sponsorship of defendant's products." Standard & Poor's Corp. v. Commodity Exch., Inc., 683 F.2d 704, 708 (2d Cir. 1982). Thus, "[t]o prevail on a false endorsement claim in the Second Circuit, a plaintiff must prove that 'the defendant, (1) made a false or misleading representation of fact; (2) in commerce; (3) in connection with goods or services; (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services.'" Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d 424, 448 (S.D.N.Y. 2014) (Engelmayer, D.J.); accord, e.g., Fischer v. Forrest, 14 Civ. 1304, 2015 WL 195822 at *11 (S.D.N.Y. Jan. 13, 2015) (Engelmayer, D.J.).

False endorsement may occur where plaintiffs' "'voices, uniforms, likenesses, published words, or names [a]re used in such a way as to deceive the public into believing that they endorsed, sponsored, or approved of defendant's product.'" Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d at 446. Of particular relevance to this case, an action under § 1125 will lie "when a celebrity's identity is connected with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service." ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 925-26 (6th Cir. 2003); accord, e.g., Roberts v. Bliss, 15 Civ. 10167, 2017 WL 354186 at *3 (S.D.N.Y. Jan. 24, 2017) ("The false or misleading representation of fact, in the context of a false endorsement claim, may involve the misleading implication that a celebrity or public figure endorses a product, when she does not."); Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d at 449 ("'[F]alse endorsement occurs when a defendant uses a celebrity's persona

without permission to suggest a false endorsement or association.'"); Jackson v. Odenat, 9 F. Supp.

3d at 355 ("[C]elebrities have a trademark-like interest in their individual personas.").

Courts determine the likelihood of confusion in the false endorsement context

through a modified version of the Polaroid factor test.  See Standard & Poor's Corp. v. Commodity

Exch., Inc., 683 F.2d at 708 (citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d

Cir.), cert. denied, 368 U.S. 820, 82 S. Ct. 36 (1961)).[28]  The Polaroid factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the
> products and their competitiveness with one another; (4) evidence that the senior user
> may "bridge the gap" by developing a product for sale in the market of the alleged
> infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the
> imitative mark was adopted in bad faith; (7) respective quality of the products; and
> (8) sophistication of consumers in the relevant market.•

Kelly-Brown v. Winfrey, 717 F.3d 295, 307 (2d Cir. 2013) (quotations omitted).  Since the Polaroid

factors are most often used to determine the likelihood of confusion with respect to trademarks, not

the use of celebrity names or personas, "[c]ourts adjust the factors when dealing with false

endorsement claims.  In such cases, the quality of the products and 'bridging the gap' are often not

considered." Jackson v. Odenat, 9 F. Supp. 3d at 356.  For example, in a case involving use of the

plaintiffs' well-known band name and songs in defendant's video advertisement, Judge Engelmayer

recently instructed a jury to consider five factors tailored to the false endorsement analysis: "'(1) the

level of recognition that the [plaintiffs] have among purchasers of [defendant's] products; (2) the

similarity between the [plaintiffs'] music and names and the music and names used by [defendant];

---

[28]     See also, e.g., Roberts v. Bliss, 2017 WL 354186 at *7; Beastie Boys v. Monster Energy Co.,
66 F. Supp. 3d at 456; Jackson v. Odenat, 9 F. Supp. 3d at 355-56; Bondar v. LASplash
Cosmetics, 12 Civ. 1417, 2012 WL 6150859 at *5 (S.D.N.Y. Dec. 11, 2012) ("In
determining whether there is a likelihood of confusion, courts in this Circuit apply an
eight-factor test derived from Polaroid . . . .  This test has been used, with modifications, to
examine claims of celebrity false endorsement." (fns. omitted)).

(3) any evidence of actual consumer confusion regarding whether the [plaintiffs] endorsed [defendant's] products; (4) [defendant's] intention in selecting the [plaintiffs'] music and names; and (5) the sophistication of [defendant's] potential customers.'" Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d at 456.

When evaluating consumer confusion, "[n]o single [Polaroid] factor is dispositive, nor is a court limited to consideration of only these factors." Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 130 (2d Cir. 2004).  "The application of the Polaroid test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the [marks] in their totality, consumers are likely to be confused.'" Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009).

### B.    Fischer Cannot Establish A Likelihood of Confusion

Fischer alleges that defendants violated section 43(a) when they created website links that included Fischer's name in the URL; these URLs linked to defendants' Natural Honey Harvester product.  (14 Civ. 1304, Dkt. No. 89: 3d Am. Compl. ¶¶ 164-90.)  Fischer's examples include:

- http://brushymountainbeefarm.com/Fume-Pad-w_-**Fischers-Bee-Quick**/productinfo/777F/

- http://brushymountainbeefarm.com/8-Frame-Fume-Pad-w_**Fischers-Bee-Quick**/productinfo/254FPQ/

- http://brushymountainbeefarm.com/images/799**fischers**.jpg

- http://brushymountainbeefarm.com/images/799**fischers**sm.jpg

(14 Civ. 1304, 3d Am. Compl. ¶ 171 & Exs. 10, 12-13 (bolding added).)[29]  Fischer claims that

_____

[29]    Exhibit 10 appears to show defendants' unauthorized use of Fischer's Bee-Quick bottle image, in addition to the allegedly misleading URL containing Fischer's name.  (See 14 Civ. 1304, 3d Am. Compl. Ex. 10.)  Because no false endorsement claim is pled with respect to
(continued...)

"[t]hese URLs . . . were intended to exploit Plaintiff's name to provide false cachet for Defendants, create confusion, and imply falsely that Plaintiff endorses Defendants and their Products." (14 Civ. 1304, 3d Am. Compl. ¶ 172.)

The Court applies a modified <u>Polaroid</u> analysis. Since Fischer has successfully marketed "Fischer's Bee-Quick" since 2000 online, and defendants used Fischer's last name in URLs on web pages marketing a directly competing and alleged "knock off" product, the first three <u>Polaroid</u> factors favor Fischer. <u>Kelly-Brown</u> v. <u>Winfrey</u>, 717 F.3d 295, 307 (2d Cir. 2013) ("'(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another'"). However, there is no evidence of actual confusion (for reasons discussed below), and there is no evidence that the URLs were adopted in bad faith. <u>See</u> <u>Kelly-Brown</u> v. <u>Winfrey</u>, 717 F.3d at 307 ("(5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith").[30] These factors cut against Fischer and are significant on the facts of this case.

---

[29]    (...continued)
    any use of Fischer's name, mark, or likeness aside from the cited URLs, the image does not factor into the Court's analysis. (<u>See</u> 3d Am. Compl. ¶¶ 164-90.)

[30]    Gebauer states: "When Brushy Mountain switched from the Bee-Quick to the Natural Honey Harvester product, the ad created by Brushy Mountain for the Bee-Quick product was changed, but the URL was mistakenly not changed. Once I learned the URLs contained the words 'Fischers' and 'Fischer's Bee-Quick' I had the URLs changed." (Dkt. No. 173: Gebauer Aff. ¶ 9.) This is a plausible explanation of why the URLs contained Fischer's name after his product was removed. But Fischer cites two working links that <u>still use his name</u>. (Dkt. No. 180: Michelen Aff. Ex. E: Fischer Aff. at 10.) It appears, however, that these links are somehow archived in Brushy Mountain's web server, as they direct users to a stand alone image of Fischer's Bee-Quick. Since these links include Fischer's name, but are not used on any web page advertising defendants' products, they could not, standing alone, support a false endorsement claim. At oral argument, defense counsel further explained that defendants could not remove the URLs during the litigation without concern that it could be perceived as spoliation of evidence. (7/11/17 Oral Arg. Conf. Tr. at 8-9.) Moreover, defendants have agreed now to remove the links. (<u>Id.</u>)

Considering the Polaroid factors and in particular the manner in which Fischer's name is used, the Court finds that Fischer cannot establish a likelihood of confusion as to whether he "'endorsed, sponsored, or approved of defendant's product.'" Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d 424, 446 (S.D.N.Y. 2014) (Engelmayer, D.J.); see also, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009) ("[T]he Polaroid test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the [marks] in their totality, consumers are likely to be confused.'").

Websites are comprised of URLs, i.e., "uniform resource locator[s]," that "consist[] of a domain name and a post-domain path." Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc., 326 F.3d 687, 691 (6th Cir. 2003).  A domain name "is an identifier somewhat analogous to a telephone number or street address," e.g., "http://brushymountainbeefarm.com." Id. "A website's domain name . . . signifies its source of origin and is, therefore, an important signal to Internet users who are seeking to locate web resources.  Because of the importance of a domain name in identifying the source of a website, many courts have held that the use of another's trademark within the domain name of a website can constitute a trademark violation." Id.[31]  The various web pages within a website are linked to particular "post-domain" paths that follow the domain name, e.g., "/Fume-Pad-w_-Fischers-Bee-Quick/productinfo/777F/." See Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc., 326 F.3d at 691.  Unlike a domain name, "[a] post-domain path . . . merely shows how a website's data is organized within the host computer's files." Id.

---

[31]    See also, e.g., People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 366-67 (4th Cir. 2001) (defendant's domain name "peta.org" caused likelihood of confusion with plaintiff's registered "PETA" mark); Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1327 (9th Cir. 1998) (defendant's "Panavision.com" domain name violated trademark rights of plaintiff Panavision International, L.P.).

This is not a case where defendants employed a domain name such as "Fischers.com" or "Fischersbeequick.com" to sell their own product, which would support a false endorsement claim. Rather, Fischer's name was buried in the post-domain paths of the Brushy Mountain web pages. At least two courts have declined to find a likelihood of confusion on that basis alone. See, e.g., Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc., 326 F.3d at 692, 696-98 (no likelihood of confusion for false designation of origin claim where registered "Lap Traveler" mark was contained in post-domain path of "a2zsolutions.com/desks/floor/laptraveler/dkfl-lt.htm," going so far as to state that "[b]ecause post-domain paths do not typically signify source, it is unlikely that the presence of another's trademark in a post-domain path of a URL would ever violate trademark law"); Patmont Motor Werks, Inc. v. Gateway Marine, Inc., No. 96-2703, 1997 WL 811770 at *4 n.6 (N.D. Cal. Dec. 18, 1997) ("[T]he fact that the [plaintiff's] Go–Ped mark appeared in the path of [defendant's] website's URL—'www.idiosync.com/goped'—does not affect the Court's conclusion that the website does not imply [plaintiff's] sponsorship or endorsement.").[32]/ The use of Fischer's name in this post-domain path context simply does not imply his endorsement or approval of defendants' products.[33]/ No consumers are likely to believe that Fischer has somehow endorsed or

---

[32]/   The Court acknowledges that the Second Circuit in Kelly-Brown rejected the Sixth Circuit's reasoning in Interactive Products "that in instances where the defendant does not use the mark as a designation of origin, consumers are unlikely to be misled as to the source of the goods," without reference to the Polaroid factors. Kelly-Brown v. Winfrey, 717 F.3d at 307. The Court emphasizes that its holding rests on consideration of the Polaroid factors, to "address[ ] what is beyond doubt the central question in considering consumer confusion: whether consumers were actually confused . . . ." Kelly-Brown v. Winfrey, 717 F.3d at 307. Interactive Products, while providing a helpful discussion of the mechanics of website URLs, does not guide the Court's consumer confusion analysis.

[33]/   Compare Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 409, 413 (9th Cir. 1996) (use of professional basketball player's name in television commercial); Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d at 455 (use of band's name on defendant's "YouTube channel and (continued...)

49

approved Natural Honey Harvester when viewing the post-domain portion of the URL, if they even see it at all.[34/]  There further is no evidence that defendants created the URLs for the purpose of inducing confusion, nor any examples of actual confusion tied to the post-domain paths.  See Kelly-Brown v. Winfrey, 717 F.3d at 307.[35/]  The Court should grant summary judgment to

---

[33/]    (...continued)
Facebook page, [and] in the press release promoting the [defendant's promotional] video");
Rostropovich v. Koch Int'l Corp., 94 Civ. 2674, 1995 WL 104123 at *1, 3-4 (S.D.N.Y. Mar. 7, 1995) (use of musician's name "prominently across the front cover of . . . compact discs" marketed by defendant); Geisel v. Poynter Prods. Inc., 283 F. Supp. 261, 265, 268 (S.D.N.Y. 1968) (use of author Dr. Suess' name "printed in large and prominent type on defendants' sales materials").

[34/]    The "sophistication of consumers in the relevant market" Polaroid factor weighs in defendants' favor for the same reasons.  See Kelly-Brown v. Winfrey, 717 F.3d at 307; Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 390 (2d Cir. 2005) ("Our analysis of consumer sophistication 'consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'"), cert. denied, 547 U.S. 1019, 126 S. Ct. 1570 (2006).  Fischer argues that "the sophistication of the consumer here actually makes it more likely that they were confused as they would know that Fischer's name was synonymous with quality bee-keeping products."  (Dkt. No. 179: Fischer Opp. Br. at 21.)  The Court disagrees.  Whether defined as the typical consumer of beekeeping products, or internet users writ large, no ordinary consumer is likely to see Fischer's name in the post-domain path of the URL and wonder if that signified his endorsement of a completely different product in the accompanying web page.

[35/]    In an attempt to show actual confusion, Fischer attached an alleged review of Natural Honey Harvester from the Brushy Mountain website.  (Dkt. No. 180: Michelen Aff. Ex. E: Fischer Aff. Ex. B; see also Fischer Opp. Br. at 20-21 (citing exhibit).)  The one-star review laments: "The first bottle I bought last year worked well but this new stuff was a complete waste of time and money."  (Fischer Aff. Ex. B.)  Fischer claims that the reviewer "impl[ies] that he did not understand that the 'new stuff' was a completely different product, 'Natural Honey Harvester'.  Clearly, if Natural Honey Harvester was the 'new stuff', the 'old stuff' had to have been Bee-Quick."  (Fischer Aff. at 7.)  Even if it were appropriate to infer that the reviewer mistook Natural Honey Harvester for Fischer's Bee-Quick (the review is undated and never mentions either product), the Court will not heap inference on inference to conclude that the confusion plausibly arose from Fischer's name in the Brushy Mountain URL.  See, e.g., Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997) ("Likelihood of confusion means a probability of confusion; it is not sufficient if confusion
(continued...)

defendants on Fischer's false endorsement claim.[36/]

## VI.   **FISCHER HAS NOT ESTABLISHED AN UNFAIR COMPETITION CLAIM**

Fischer brings a New York common law unfair competition claim in reliance on the same facts as his Lanham Act section 43(a) claim.  (See 14 Civ. 1304, Dkt. No. 89: 3d Am. Compl. ¶ 205 ("Defendants acted in bad faith by misusing Plaintiff's name to falsely imply that Plaintiff's

---

[35/]      (...continued)
is merely possible." (quotations omitted)).  The reviewer does not even state whether he bought the product online or via Brushy Mountain's print catalog.  Moreover, Gebauer submitted a supplemental affidavit stating that the review was posted "on Brushy Mountain's website . . . on May 7, 2013 . . . two and a half years . . . after Brushy Mountain stopped selling the Bee-Quick product," and that there is no record of the reviewer ever buying Fischer's Bee-Quick from defendants.  (Dkt. No. 183: Gebauer Supp. Aff. ¶¶ 3-4.)

Fischer further testified that "by misusing my surname as the address of the page in the URL, they [Brushy Mountain] appear much higher" because "URLs rank very high in how pages appear in search results."  (Dkt. No. 176: Hudson Aff. Ex. A: Fischer Dep. at 212-13.)  Fischer's affidavit states that "Google results for [Fischer bee] (which includes 'bee', [']beekeeping', etc.), cite Plaintiff's products and services in 9 of first 10 results, 17 of first 20, and 21 of first 30 results."  (Fischer Aff. at 9.)  Evidence that users searching for Fischer's Bee-Quick were directed to defendants' website selling a competing product might support a likelihood of confusion.  However, Fischer's testimony is too vague to establish that he or anyone else actually searched for "Fischer's" or "Fischer's Bee-Quick" and received search results for Brushy Mountain's competing products and, if they did, that the results were caused by the post-domain URL paths.  See, e.g., Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc., 326 F.3d at 698 n.7 ("IPC also complains that a2z's portable-computer-stand web page is listed as one of the hits when one does an Internet search for the term 'laptraveler.'  IPC's own expert, however, testified that 'the path name does not bias a search engine.'  In addition, IPC has offered no proof that defendants did anything nefarious to cause search engines to hit a2z's web page when searching for 'laptraveler.'  For instance, IPC does not present any evidence that defendants referenced 'laptraveler' in the metatags of a2z's portable-computer-stand web page.  The record does not contain any evidence that explains why a2z's web page is hit when performing an Internet search for 'laptraveler.'").

[36/]      See, e.g., Roberts v. Bliss, 15 Civ. 10167, 2017 WL 354186 at *6 (S.D.N.Y. Jan. 24, 2017) ("'Normally, the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers of the parties' goods.'  But where Plaintiff 'cannot possibly show confusion as to source or sponsorship' claims can be dismissed as a matter of law." (citations omitted)).

valuable endorsement rights were granted to Defendant, even though they were not, and by using Plaintiff[']s valuable name in conjunction with multiple website URLs for pages intended to sell Defendants' directly-competing cheap knock-off product.").)

"The elements of unfair competition under New York law closely parallel the elements of unfair competition under the Lanham Act.  However, there are two exceptions: a plaintiff must show 'either actual confusion or a likelihood of confusion, and there must be 'some showing of bad faith' on the part of the defendants." Medisim Ltd. v. BestMed LLC, 910 F. Supp. 2d 591, 606 (S.D.N.Y. 2012) (fns. omitted); accord, e.g., Crye Precision LLC v. Duro Textiles, LLC, No. 16-1333-CV, 2017 WL 1735247 at *3 (2d Cir. May 3, 2017); Fischer v. Forrest, 14 Civ. 1304, 2015 WL 195822 at *12 (S.D.N.Y. Jan. 13, 2015) (Engelmayer, D.J.).  There is no evidence of actual confusion and the use of Fischer's name in a post-domain portion of Brushy Mountain's website was not likely to cause confusion regarding Fischer's endorsement of defendants' product for the reasons set forth above.  The Court should grant summary judgment to defendants dismissing Fischer's unfair competition claim.

## VII.   FISCHER HAS NOT ESTABLISHED A FALSE ADVERTISING CLAIM

The Second Circuit recently reiterated the elements of a Lanham Act false advertising claim:

> To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff.
>
> A plaintiff may establish falsity in two different ways.  To establish literal falsity, a plaintiff must show that the advertisement either makes an express statement that is false or a statement that is "false by necessary implication," meaning that the advertisement's "words or images, considered in context, necessarily and unambiguously imply a false message."  A message can only be literally false if it is unambiguous.  If an advertising message is literally false, the "court may enjoin

the use of the message without reference to the advertisement's impact on the buying public."

If a message is not literally false, a plaintiff may nonetheless demonstrate that it is impliedly false if the message leaves "an impression on the listener or viewer that conflicts with reality." Courts have, at times, required a claim of implied falsity to be supported by extrinsic evidence of consumer confusion. Alternatively, courts have allowed implied falsity to be supported by evidence that the defendant intended to deceive the public through "deliberate conduct" of an "egregious nature," in which case a rebuttable presumption of consumer confusion arises.

Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 65 (2d Cir. 2016) (citations & fns. omitted).

The "challenged message" here is a portion of defendants' Natural Honey Harvester advertisement that reads: "For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own. This 100% Natural, non-toxic blend of oils and herb extracts works just like Bee Go® and it smells good!" (See page 5 above.) Defendants, apparently misunderstanding Fischer's claim, argue that the phrase regarding "an unreliable supply" is factually accurate. (Dkt. No. 177: Def. Br. at 32-33.)[37/] Rather, Fischer argues that "defendant Shane Gebauer admitted in his deposition that all defendants did was buy a third party's product and put their label on it, making the statement that defendants 'came out with their own' product false." (Fischer Opp. Br. at 22; see also Fischer Aff. at 8 ("The falsifiable statement is 'come out with our own'. As depositions and discovery verified that Defendants merely bought a product from another company, so it is not 'our own'. The falsity is material, in that it

---

[37/]    Fischer responds that defendants "rely on emails from a Betsy Brey, their employee, to plaintiff to show that the phrase 'unreliable supply' was factually correct. But this assertion is mere opinion, impossible to quantify, not falsifiable." (Dkt. No. 179: Fischer Opp. Br. at 21-22; see also Dkt. No. 180: Michelen Aff. Ex. E: Fischer Aff. at 8 ("[T]he term 'unreliable supply' is inherently an opinion. As such it is not even a falsifiable statement, and could never be the basis for a false advertising claim.").)

misrepresents the nature and characteristics of the 'Natural Honey Harvester' product in terms of quality control and purity.").)  Fischer additionally claims that "the third-party manufacturer makes nothing but cleaning products, calling into question if the product is even food-grade, let alone '100% Natural'" (Fischer Opp. Br. at 22), as the Natural Honey Harvester ad also states (see page 5 above).  And, according to Fischer, "when asked 'Is [Natural Honey Harvester] actually natural?', Mr. Gebauer stated 'I assume so.'"  (Fischer Aff. at 8.)

**A.    "100% Natural"**

The Court begins with the statement that Natural Honey Harvester is a "100% Natural, non-toxic blend of oils and herb extracts."  (See page 5 above.)  Natural Honey Harvester competes directly with Fischer's Bee-Quick, the products serve the same function (Dkt. No. 180: Michelen Aff. Ex. B: Gebauer Dep. at 54-55), and both claim to be all natural (see pages 3, 5 above). A false representation of quality conceivably could divert sales from Fischer to defendants by putting Natural Honey Harvester on par with Fischer's Bee-Quick.  See, e.g., Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 255 (2d Cir. 2014) ("[I]n addition to proving falsity, the plaintiff must also show that . . . the plaintiff has been . . . injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." (quotations omitted)).  Thus, defendants' false statements of product purity could support a false advertising claim in this context.

But there is no evidence to support Fischer's allegations.  Gebauer testified that defendants did not develop Natural Honey Harvester, which in 2011 was "already in existence" and sold by another company.  (Gebauer Dep. at 55-56.)  When asked what company sold the product, Gebauer testified: "The company which we currently buy it from."  (Gebauer Dep. at 56.)  That company is not identified in any deposition testimony (or Fischer's affidavit), there is no evidence

in the record that the company "makes nothing but cleaning products" as Fischer claims, and

Gebauer's alleged testimony (nowhere in the record) does not prove that Natural Honey Harvester

is not all natural.  See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (On

summary judgment, "[t]he time has come . . . 'to put up or shut up.'  Accordingly, unsupported

allegations do not create a material issue of fact." (citation omitted)), cert. denied, 540 U.S. 811, 124

S. Ct. 53 (2003).  Fischer has not presented any admissible evidence that the statement "100%

Natural" is either literally or impliedly false, and thus his false advertising claim fails with regard

to this aspect of the ad.[38]

> B.      **"Came Out With Our Own"**

Gebauer testified that Brushy Mountain bought a product similar to Fischer's Bee-

Quick from a third party, and bottled it under the name Natural Honey Harvester.  (Dkt. No. 180:

Michelen Aff. Ex. B: Gebauer Dep. at 55-56.)  The Court must determine whether the phrase

"c[a]me out with our own" is either literally or impliedly false and, if so, whether Fischer is likely

to suffer harm as a result.  See, e.g., Church & Dwight Co. v. SPD Swiss Precision Diagnostics,

GmBH, 843 F.3d 48, 65 (2d Cir. 2016) ("[A] plaintiff must establish that the challenged message

is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the

cause of actual or likely injury to the plaintiff.").[39]

---

[38]    The Court suspects that this evidence (among other pieces of missing evidence) might magically appear in objections to Judge Engelmayer, which, should it occur, really is a disservice to this Judge, Judge Engelmayer and defense counsel.  See, e.g., Dennard v. Kelly, 90 Civ. 203, 1997 WL 9785 at *1 (W.D.N.Y. Jan. 2, 1997) ("'[P]arties are not to be afforded a "second bite at the apple" when they file objections to' an R&R. . . .  A proceeding before the Magistrate Judge is not a meaningless dress rehearsal.").

[39]    In undertaking its analysis, the Court is aware that "[i]n considering a false advertising claim, '[f]undamental to any task of interpretation is the principle that text must yield to
(continued...)

### 1.    **Literal Falsehood**

"If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required. Importantly, however, only an <u>unambiguous</u> message can be literally false; if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." <u>Apotex Inc.</u> v. <u>Acorda Therapeutics, Inc.</u>, 823 F.3d 51, 63 (2d Cir. 2016) (citations & quotations omitted).[40/]

Defendants' claim that they "c[a]me out with" their own honey harvesting product is not literally false because it does not "necessarily imply a false message" and is susceptible to more than one reasonable interpretation. The statement could be read, as Fischer argues, to mean that defendants selected the ingredients and personally created the product. However, another reasonable interpretation is that defendants marketed a natural honey harvesting product, from whatever source, under their brand name. Indeed, Fischer does not dispute that defendants created and own the name "Natural Honey Harvester" and as such the product as branded is their own.

---

[39/]    (...continued)
context.'" <u>S.C. Johnson & Son, Inc.</u> v. <u>Clorox Co.</u>, 241 F.3d 232, 238 (2d Cir. 2001). The full statement reads: "For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own." (<u>See</u> page 5 above.) However, as described above, Fischer disclaimed reliance on the <u>reason</u> defendants produced their own product, <u>i.e.</u>, the alleged "unreliable supply," to support his false advertising claim, and instead directs the Court to consider only defendants' claim that the product was their own. (<u>See</u> page 52 & n.37 above.) In doing so, Fischer focuses on the confusion that could arise if consumers believed that defendants created their own honey harvester, as opposed to merely re-bottling a third-party's product of unknown provenance. The Court tailors its analysis accordingly.

[40/]    Accord, <u>e.g.</u>, <u>Church & Dwight Co.</u> v. <u>SPD Swiss Precision Diagnostics, GmBH</u>, 843 F.3d 48, 65 (2d Cir. 2016) ("A message can only be literally false if it is unambiguous."); <u>Playtex Prods., LLC</u> v. <u>Munchkin, Inc.</u>, 14 Civ. 1308, 2016 WL 1276450 at *5 (S.D.N.Y. Mar. 29, 2016) ("A claim cannot be literally false if it is susceptible to at least two interpretations.").

There furthermore is no other evidence—e.g., information about the third-party source of the product or what rights defendants have to market it under the Natural Honey Harvester name—that might otherwise indicate the ad's falsity.  Fischer therefore cannot establish that this statement is literally false.

### 2.  Implied Falsehood

"If a message is not literally false, a plaintiff may nonetheless demonstrate that it is impliedly false if the message leaves 'an impression on the listener or viewer that conflicts with reality.'" Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 65 (2d Cir. 2016).  Put another way, "'a plaintiff can show that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers.'  Such an implicit falsity claim requires 'a comparison of the impression [left by the statement], rather than the statement [itself], with the truth.'" Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 63 (2d Cir. 2016) (citations omitted). "[W]hereas plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message." Id. (quotations omitted, emphasis & alterations in original); accord, e.g., Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 112-13 (2d Cir. 2010) ("[W]here the statement at issue is not literally false, however, a plaintiff 'must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers,' and must 'demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement.'").[41/]

---

[41/]   As an exception, the Second Circuit has "allowed implied falsity to be supported by evidence that the defendant intended to deceive the public through 'deliberate conduct' of an 'egregious nature,' in which case a rebuttable presumption of consumer confusion arises." Church &
(continued...)

Fischer has submitted no extrinsic evidence of consumer deception or confusion. Fischer testified that "a number of competitors . . . have cropped up since" defendants published their advertisement that has "prompted opportunists to come along and make a knockoff just like theirs." (Dkt. No. 176: Hudson Aff. Ex. A: Fischer Dep. at 170.)  Fischer also cites the review from Brushy Mountain's website that the Court rejected as evidence of actual confusion in connection with Fischer's false endorsement claim.  (See page 49 n.35 above.)

This material is far too vague to have any evidentiary value here.  Fischer's testimony does not describe any of the alleged "competitors," "opportunists," or "knockoff" products in any detail, and certainly there is no evidence that defendants' advertisement caused these issues. Similarly, the review posted on Brushy Mountain's website reveals nothing about whether that consumer believed defendants had marketed their "own" product.  See, e.g., Classic Liquor Imps., Ltd. v. Spirits Int'l B.V., 201 F. Supp. 3d 428, 453 (S.D.N.Y. 2016) ("[T]he [challenged message] is not literally false and consumer deception must be established through extrinsic evidence of actual consumer reaction.  Here, SPI has no such evidence.  It did not commission a consumer survey and it points to no evidence other than one of its employee's opinions . . . .  [T]he law in the Second Circuit is unequivocal: 'a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message.'"); Playtex Prods., LLC v. Munchkin, Inc., 14 Civ. 1308, 2016 WL 1276450 at *8 (S.D.N.Y. Mar. 29, 2016) ("Therefore, because the Fit

---

41/   (...continued)
Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d at 65; accord, e.g., Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 256 (2d Cir. 2014) ("[E]ven in cases of implied falsity, where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers are, in fact, being deceived." (quotations omitted)).

Disclaimer is not literally false and Plaintiffs have identified no admissible extrinsic evidence of consumer confusion to support their theory of implied falsity, the Court finds that Defendant is entitled to summary judgment . . . ."); Therapy Prods., Inc. v. Bissoon, 623 F. Supp. 2d 485, 496-97 (S.D.N.Y. 2009) (Plaintiff "has not produced extrinsic evidence showing that the Neira Photographs have led to consumer confusion, so it cannot raise a question of material fact as to whether [defendant's] use of these photographs constituted implicitly false advertisements."), aff'd in relevant part & remanded in part on other grounds, 410 F. App'x 416 (2d Cir. 2011).[42/]

The Court should grant defendants summary judgment dismissing Fischer's false advertising claim.

## VIII.  FISCHER'S UNFAIR BUSINESS PRACTICES, UNJUST ENRICHMENT AND BREACH OF CONTRACT CLAIMS SHOULD BE DISMISSED

Fischer withdrew his unfair business practices, unjust enrichment, and breach of contract claims, which should be dismissed.  (Dkt. No. 179: Fischer Opp. Br. at 23 ("Plaintiff agrees, as defendants raise in page 35 of their Memorandum, that under an unfair business practices claim, a plaintiff must prove actual damages therefore plaintiff withdraws that claim.  For the same reasons, plaintiff likewise withdraws his unjust enrichment and breach of contract claims."); 7/11/17 Oral Arg. Conf. Tr. at 16.)

## CONCLUSION

For the reasons discussed above, defendants' summary judgment motions (14 Civ. 1304, Dkt. No. 170; 14 Civ. 1307, Dkt. No. 172) should be GRANTED in their entirety.

---

[42/]   There furthermore is no evidence that "defendant[s] intended to deceive the public through 'deliberate conduct' of an 'egregious nature'" that would give rise to a "presumption of consumer confusion."  Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d at 65.

59

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Engelmayer, 40 Foley Square, Room 2201, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Engelmayer (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:      New York, New York
            July 14, 2017

Respectfully submitted,

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies to:      Counsel (ECF)
                Judge Engelmayer