UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

JAMES H. FISCHER,                          : Case 14cv1304/14cv1307
                          Plaintiff        :
v.                                         : **FRCP 59(e)**
                                           : **MOTION FOR RECONSIDERATION**
STEPHEN T. FORREST, Jr.,                   :
SANDRA F. FORREST,                         :
SHANE R. GEBAUER and                       :
BRUSHY MOUNTAIN BEE FARM, INC.             :
                          Defendants.      :

---------------------------------------------------------------

*Although Rule 59(e) does not prescribe specific grounds for granting a motion to alter or amend an otherwise final judgment, we agree with our sister circuits that district courts may alter or amend judgment "to correct a clear error of law or prevent manifest injustice."* [1]

## Argument

The R&R *"based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence"*, [2] and those errors were overlooked in review.  Plaintiff apologizes in advance if his tone seems inappropriate at times, but the goal here is to use the simplest and plainest possible language to point out multiple oversights.

## 1) Defendants' Attack on Plaintiff's Copyright is Flatly Prohibited by 17 USC 411(b)

Failing to employ 17 USC 411(b) has resulted in reversals on appeal, even where fraud clearly was perpetrated on the Copyright Office. [3]  *"[C]ourts are in agreement that the provision [411(b)] is mandatory in nature"*. [4]

---

[1] Munafo v. Metropolitan Transp. Authority, 381 F. 3d 99 - 2nd Circuit 2004
[2] *Virgin Atlantic Airways v. National Mediation Bd.*, 956 F. 2d 1245 2nd Circuit 1992
[3] DeliverMed Holdings, LLC v. Schaltenbrand, 734 F. 3d 616 - 7th Circuit 2013
[4] Palmer/Kane LLC v. Rosen Book Works LLC, 188 F. Supp. 3d 347 - SDNY 2016

Here, Defendants put Plaintiff "on trial", mounting a reckless, unfounded attack on the copyright

for works they clearly infringed, and thereby distracted the Court sufficiently to obtain rulings

redefining what works were copyrighted, what form of copyright protection was obtained, and a

Scotch Verdict of "not proven" on the question of whether or not Plaintiff had lied to the

Copyright Office and the Court.

As a result, it is no wonder that the R&R found one justification or another for dismissal of each

and every of Plaintiff's complaints, as Plaintiff was severely prejudiced by Defendants' attempt

to falsely label Plaintiff a liar.  This was the essential goal of the effort, prejudicing Plaintiff in

the eyes of the Court. The entire SJ process was tainted by Defendants' deliberate attempts to

mislead the Court.  The entire SJ motion should be denied or stricken as a whole.

**a) Defendants' attacks on the validity of the copyright registration**

Per 17 USC 411(b), the prerequisite to any such attack is for Defendants to first show the Court

clear and compelling evidence of Plaintiff's ***intention to deceive*** the Copyright Office.

> "It has also been argued in litigation that a mistake in the registration documents…
> renders a registration invalid and thus forecloses the availability of statutory damages. To
> prevent intellectual property thieves from exploiting this potential loophole, the Act
> makes clear that a registration containing inaccuracies will satisfy the registration
> requirements of the Copyright Act unless the mistake was knowingly made." [5]

The PRO-IP Act was passed in 2008, and defense counsel, specializing in this area of the law,

could not have been unaware of the prohibitions of 411(b), moreso when he touts himself as one

of the "*Legal Elite*" in IP. [6]  This was a deliberate and cynical selection of advocacy over candor.

The Court expects high ethical standards, and simply did not expect to be misled. If the Court's

---

[5] House Report 110-617  110th Congress May 5, 2008
[6] He tweeted 2/14/18 "Appreciative and honored to be selected to the NC Legal Elite for intellectual property again
this year." ( http://twitter.com/seth_hudson )

appropriate response here is revocation of Mr. Hudson's permission to practice pro hac vice in this district, and a motion is required from Plaintiff, this is the request to file that motion.

Even before the PRO-IP Act, it was settled law that clear proof of an intention to deceive the Copyright Office was required to suggest invalidity.  *"The presumption* [of validity] *generally is not overcome by an 'innocent misstatement'. It may be overcome, however, by proof of deliberate misrepresentation."* [7]  So, the sole purpose of the Pro-IP Act and 411(b) was to prevent the precise harm done here – where the Plaintiff's character is impugned and the proceedings are delayed and distracted as the sole Defense goal of an attack not supported by the facts or law, but sure to smear Plaintiff merely by being pled.  But even before 2008, Rule 11 would have barred this pleading.

The only evidence provided by the intellectual property thieves in this case was of a simple inadvertent error, immediately acknowledged and corrected when discovered.  This was eventually acknowledged in the R&R, but only after significant confusion was sowed.

**b) Defendants' Attempt to Redefine the Copyrighted Works**

The attack on Plaintiff's Copyright was distraction enough to convince the Court that the Copyrighted Works at issue were not the "Four Phrases", logo, and label that had been the sole focus of all prior discussion, but instead, either a "brochure" or a "website".   This seems to have been a result of presenting the mere title of the Collection of Works as if it were a description defining and limiting the copyrighted works, and via repetitive references to "the brochure", as if it were anything but additional evidence that Defendants were repeatedly informed of Plaintiff's authorship and exclusive rights under copyright.

---

[7] Whimsically, Inc. v. Rubie's Costume Co., 891 F.2d 452. 455 - 2nd Circuit 1989

### c) Defendants' Claims About Deposit Copies

While Plaintiff did make an error that went unnoticed for months, purely due to the review backlog, the error was massively obvious at first glance when the deposit was reviewed, purely technical, and quickly corrected when reported to the unaware Plaintiff.

Even before the PRO-IP Act, settled law was that errors in deposits did not render a Copyright invalid. Here again, Rule 11 would have barred the SJ motion prior to 2008.

> "We refuse to disturb the jury's finding that the Isley Brothers deposited a 'complete copy' because (1) there was no intent to defraud and prejudice and (2) any inaccuracies in the deposit copy were minor and do not bar the infringement action." [8]

> Under the doctrine of fraud on the Copyright office, the presumption of validity may only be overcome by proof of deliberate misrepresentation. [9]

> "…MR Plus endeavors to defeat the presumption [of validity] by taking issue with the manner in which Fonar filed its copyright: (1) Fonar failed to submit a proper copyright deposit for each of the programs that compose the maintenance software; and (2) Fonar failed to comply with the registration requirements for a "collection." …we conclude that neither of these arguments defeats the presumption of validity, and we therefore vacate the grant of summary judgment." [10]

> 'The defense of unclean hands in copyright actions is recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action.' Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Servs., 746 F.Supp. 320, 329 (S.D.N.Y.1990) (quoting 3 M. Nimmer, Nimmer on Copyright, § 13.09[B] at 13-145 (1988))".[11]

In this case, Defendants' attempt to play 3-card monte with Plaintiff's deposit is simply barred by 411(b) without a preliminary presentation of prerequisite evidence of knowledge and scienter.

Prior to 2008, it would have been barred by Rule 11.

---

[8] Three Boys Music Corp. v. Bolton, 212 F. 3d 477 - Court of Appeals, 9th Circuit 2000
[9] Fonar Corp. v. Domenick, 105 F.3d 99, 105 (2d Cir.), cert. denied, 522 U.S. No 97-44 (1997)
[10] Id
[11] Santrayall v. Burrell, 993 F. Supp. 173 - Dist. Court, SD New York 1998

Additionally, Defendants' submitted deposit copies were **not certified** by the Copyright Office. Only certified reproductions of deposits are used in litigation as evidence of the authenticity of the deposit. In a certification statement the Copyright Office attests that the reproduction of the deposit is a true reproduction. *See* Circular 6, http://copyright.gov/circs/circ06.pdf

### d) Defendants' Highly Selective Deposition Quote

The single out-of-context quote Defendants cite as the sole basis for a number of accusations, when read in context, shows only a bullied Plaintiff, overtly threatened with physical violence by opposing counsel, and his inability to authenticate a 17-year-old document as a "True Copy" from memory in a Deposition deliberately engineered to be as stressful as possible for Plaintiff:

> The abusive day-long EBT was conducted in a claustrophobic overheated windowless basement storeroom mislabeled as a "conference room" in a Chinatown hotel, reachable only via jumping NYPD barriers for an active parade, complete with marching bands. The address given Plaintiff was "Murray St" on the shore of the Hudson River, when the actual address was 52 Mulberry St, less than 500 feet from the Moynihan Courthouse steps. This is not an exaggeration. This is exactly what actually happened.

Plaintiff plainly stated in his EBT what was copyrighted, positioned the "brochure" as merely an additional example of use of the copyrighted works, and clearly stated that the Brochure was merely additional proof that Defendants were well-aware of Plaintiff's authorship and copyright. See Exhibit 1, which puts the out-of-context quote into context, and includes the bullying. Plaintiff did not end the EBT, as it would only allow Defendants to repeat the process with even more sophisticated manipulation.

But even though the infringers' attempt to convict the plaintiff "failed" (SJ Oral Arg, Pg 4 Line 22), putting plaintiff on trial at all succeed in distracting attention away from the four Copyrighted Works at issue. As it also directly attacked Plaintiff's honesty, it convinced the Magistrate to accept Defendants other claims and unsupported statements as if they were true.

**e) Plaintiff Copyrighted a <u>Collection of Works</u>, Not A "Collective Work"**

Defendants' SJ motion claims "Fischer's Asserted Copyright Registration Is Not For The
Asserted Short Phrases, But The Entire Bee-Quick.com website" on page 24.  The R&R Pg 19
Note 8 shows that the Court accepted this accusation as factual "*Fischer copyrighted the
collective "text and images of [the] Bee-Quick.com website...*"

It is not enough to say that 17 USC 411(b) prohibits an attack on the registration - these
statements are also factually incorrect.  Plaintiff copyrighted a collection of independent
unpublished self-contained works, including each of the individual elements at issue in this case
(4 epigrams, images, logo, label, and so on)  and titled it "Text and Images of Bee-Quick.com
Website", as he was required to supply a title for the collection. Plaintiff followed 37 CFR §
202.3(b)(4)(i)(B) from 37 CFR Ch. II, 7–1–2010 Edition, which clearly states conditions that
Plaintiff fully met in his registration.  The statute concludes "*Registration of an unpublished
collection extends to each copyrightable element in the collection...*"

**f) Plaintiff Will Go On, But Assumes that the Court Gets the Point By Now**

Each and every aspect of the SJ motion and rulings was tainted and influenced by these
impermissible accusations, as Plaintiff was painted as a liar by unsupported allegations, primarily
the claim that Plaintiff registered his works only after seeing Defendants' catalog, and the claim
that Plaintiff misled the copyright office.  The SJ motion as a whole should be denied for that
reason alone, but Plaintiff will go on to list the other major points of contention that exist over
issues of triable fact.

## 2) Statutory Damages Were Not Stipulated By Plaintiff

Defendants' claim is accompanied by evidence that overtly contradicts their claim.  Further, no

rational plaintiff or attorney would stipulate statutory damages until hearing what "actual" vs

"statutory" damages would be, certainly not without some significant concession in return.

17 USC 504 allows for Plaintiff's lost profits and/or Defendants' profits.  Defendants strived to

misunderstand this, were overtly corrected by the Court, but persisted in the same incorrect

interpretation again in their SJ motion before a newly-assigned magistrate, one unfamiliar with

the prior Magistrate's ruling and his need to patiently correct Defendants' constant overreaches.

When acting pro se, the sole proprietor Plaintiff faced strategically abusive discovery demands

for extensive personal household financials, under the rubric of "seeking information on

Plaintiff's lost profits".  The difficulty of attributing "lost profits" to an infringement in any

decisive way should be obvious, making the inquiry of dubious value.  So, only Plaintiff's "lost

profits" were waived, to obviate the abusive discovery demands. Defendants' profits were never

waived, although Defendants repeatedly misused the terms "statutory damages" and "actual

damages" as it was a binary choice, despite being firmly rebuffed by the Court.  Defendants'

Exhibit 14cv1304 Doc 175 Exhibit 1 is an excerpt of Document 138, the hearing transcript where

the Court did not tolerate Defendants' attempts to speak for Plaintiff:

> MR. HUDSON: ….They're also going to specify what documents respond to which
> requests under Rule 34 and, you know, and other objections we had dealt with requests
> for information related to actual damages, but they're going to provide stipulation that
> they're not going to seek actual damages in this case.
>
> MR. GIOIA: Just to clarify, for lack of damage, we loft [the lost] profits and we're [we
> are] seeking damages, statutory –
>
> THE COURT: Okay, you're not seeking lost profits, is that right, Mr. Gioia?
>
> MR. GIOIA: That is correct.

THE COURT: Okay, go ahead.

While Mr. Gioia is cut off by the Court before he can say "...or Defendants' profits", the Court is still very clearly aware that only Plaintiff's lost profits are being waived. This was the only stipulation ever made as to damages.

Exhibit 175-2 is an estimate of Damages supplied under Rule 26a by the Plaintiff, when acting pro se. Defendants refused and apparently still refuse to provide an accounting of revenue or profits, so an estimate of damages based upon statutory damages is all Plaintiff could make. Regardless, this was not a stipulation.

Hudson Aff. Ex. E (Answer to Int. No. 11) was a reply to a request for an updated estimate of damages that seems to be missing a line. Plaintiff's impression from discussions is that the actual reply must have been something akin to:

> "See Rule 26(a) Disclosure. Plaintiff seeks <u>Defendants' sales data. Without it, we can estimate</u> only statutory damages."

Plaintiff does not have copies of the correspondence, but this is clearly a simple scrivener's error by either sender or recipient, as no competent attorney, or any sane person would stipulate to statutory damages only, for no reason at all, without negotiations or discussion. The reference to the 26(a) disclosure is plainly indicative of an answer to a question about **estimated** damages, nothing more, certainly not a stipulation/concession out of the blue.

Therefore, actual damages are still to be litigated, even if nothing else were to result from this motion. The Court was presented with unclear/confusing evidence, resulting in a "clearly erroneous assessment of the evidence", as the Court was being asked to infer a conclusion that defies logic, as it would inherently presume both an irrational Plaintiff and two different Plaintiff's attorneys both being irrational.

### 3) When Did Defendants' Use Under License End, and Infringement Begin?

Speculation that Defendants' license might have automatically terminated, been automatically rescinded, [12] or terminated via the Dec 10th 2010 email is refuted below as illegal or impossible under any possible reading of the law.

### a) The Existence of License is Uncontested

Even an implied license is still a valid license, and notice is required to terminate it. [13]

If there were no license, then Defendants would argue that the date of first infringement was 2002. They didn't, so there is a license. Defendants also specifically pled the defense of a license, which until the new claims made in the SJ motion, seemed to bar any damages for any acts in 2011.

> "Defendants stated that they had a "license" to sell. Pl. Obj. Reply at 5; see 14 Civ. 1304, Dkt. 53 ("Ans.") at 23" (14cv1304 #197)

> Affrim Defense 19: Plaintiff's claims are barred because any and all alleged use of Plaintiff's materials was within the scope of authorization and/or the nonexclusive implied license granted by Plaintiff. (14cv1304 #53)

Defendants did not argue that the preparation of the 2011 catalog, even though it must have preceded the catalog distribution, was an "infringement before registration". They knew that this activity was under the color of a license, and nothing had been said between the parties to be the basis for termination. This underlines the tacit admission by Defendants that a valid license existed, and that notice would be required to terminate it. Defendants asked the Court to rule that THEY somehow terminated the license with nothing more than a vague statement/threat

---

[12] In this document, "rescinded" and "recission" are defined as the denial that any agreement ever existed, such as a recession in the 3-day buyer's remorse period for a used car, as contrasted with "termination", which ends an agreement that has been in force, but does not attempt to pretend the agreement never existed.

[13] Davis v. Tampa Bay Arena Ltd. No. 8: 12-cv-60-T-30MAP (M.D. Fla. June 27, 2013).

about the future on Dec 10th, 2010.  Contracts don't work like that, but somehow, the Court accepted the argument.

### b) Was The License Even Breached by the Dec 10 2010 Letter?

Clearly not, no matter what conclusory bluster was in in the 2014 complaint.

> *It is well settled that pro se litigants generally are entitled to a liberal construction of their pleadings, which should be read "to raise the strongest arguments that they suggest."* [14]

Given the sudden appearance of Defendants' entirely new narrative in their SJ motion (and likely introduced to Judge Peck in Defendants' ex-parte settlement letter), Plaintiff would argue that the conclusory nature of his bluster about Defendants' Dec 10th letter should be read as it was written, offering no facts at all, and expressing a legal conclusion without basis in fact. Defendants withheld the facts about their ongoing sales of Bee-Quick in Jan, Feb, and Mar 2011, but these facts show that Defendants' Dec 10th letter was an inaccurate prediction, and that all Plaintiff's bluster did was define the terms of the agreement - *"such use was permitted solely in the selling of Plaintiff's product."*  The bluster suggested no fact and even *"read to raise the strongest arguments that they suggest'"* cannot include endorsing a legal conclusion based on an assumption later disproved by discovery from Defendants.

As nothing predicted/threatened in the Dec 10th letter actually happened, it was also pure bluster. While one might view it as Defendants' disclosure of an anticipatory breach, Plaintiff's failure to ask for any reassurance or clarification indicates that he did not.  Plaintiff's contemporaneous notes on that email were "Looking for better terms?  Wait and see."  Plaintiff viewed the Dec 10th letter as nothing but a rude and crude negotiating tactic from a habitual deadbeat customer, looking for better terms.  Plaintiff had not raised prices since 1999, so price was not the issue.

---

[14] Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)

While Defendants hid this information with an unjustified "Attorney Eyes Only" stamp, Defendants did not even receive their first shipment of "Natural Honey Harvester" until March 3, 2011, and still had 68 bottles - 34 bottles of Bee-Quick in inventory at each of their PA and NC warehouses in early Feb 2011, shown in Exhibits 2 and 3. As Defendants were still selling Bee-Quick, they were entitled to use Plaintiff's copyrights and trademarks, regardless of what other products they might have announced, vaporware or not.  It seems from the evidence that there was no possible breach until at least March 3, as until then, the only product they could sell was Plaintiff's, and they had no reason to stop selling it until they had something else to sell in its place.  Defendants' false claims to the contrary expose that Defendants employed hindsight in their pleading, when at the time in 2011, they had no reason to do anything else but sell Bee-Quick until inventory was depleted.  They feared nothing, as Plaintiff said nothing until April.

**c) Was The License Terminated by Defendants' Dec 10, 2010 Letter or a Catalog Mailing?**
As there are no agreement terms specifying automatic termination, the UCC would fill in the unspecified terms of the agreement, and notice would be required before any termination.

The conclusion "*On the bases of the parties' common attestations, the Court, for purposes of this lawsuit, assumes that as of December 10, 2010, Brushy no longer had any "right," "license," or "permission" to use Fischer's intellectual property.*" (14cv1304 #197 Pg 5)  allows Defendants to turn Plaintiff's 100% fact-free bluster into fact, and  ignores that the UCC and the laws of NY, VA, and NC, all the states mentioned in any way in this litigation, each prohibit a license termination without prior notice from the licensor. (See UCC §2-309)

**d) Does Estopple Apply to "Defendants lost any "right, license, or permission"?**

Judicial estoppel *"prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [the party] in a prior legal proceeding."* [15]

But the statement was mere opinion, not fact. *"[t]he statements sought to be used as the basis for estoppel must be presented as statements of provable facts within the knowledge of the party, and not statements of opinion."* [16]

**e) Is Specific Notice Required To Terminate a License?**

Notice is required to terminate any agreement, even:

> "for convenience" rather than for cause. *"A party has "an absolute unqualified right to terminate a contract __on notice__ pursuant to an unconditional termination clause..."* [17]

> "...when James asserted his counterclaims, he asserted a breach of contract claim arising from the licensing agreement, without alleging that he had rescinded or terminated the agreement. Moreover, although the district court referenced the September 24, 1991 "termination of the parties' relationship," it is not clear whether this included a rescission of the licensing agreement as well, or merely involved a termination of their personal relationship." [18]

So, regardless of what the parties plead, the law still applies, and prohibits any license that might terminate without notice from the licensor.

**f) Was the License Terminated On the Date of Plaintiff's April Termination Letter?**

Plaintiff demanded that Defendants make "no further use" of his copyrights and trademarks.

Clearly, this acknowledged the existing 2011 catalog and website as past misuse, and grounds for termination, but any infringement would have to be a new act, one taking place after the

---

[15] Bates v. Long Island R.R., 997 F.2d 1028, 1037 (2d Cir.1993)
[16] TLC Beatrice Intl v. Cigna Ins Co, No. 97-Civ.8589, 1999 WL 33454, at * 7 (SDNY Jan 27, 1999)
[17] A.J. Temple Marble & Tile, Inc. v. Long Island R.R., 682 N.Y.S.2d 422 (N.Y. App. Div. 1998).
[18] Graham v. James 144 F. 3d 229  2nd Circuit, 1998

termination letter. Defendants were clearly free to continue to use the 2011 catalog and website until replacing them with their new 2012 publications.

**g) Was Offering Both Plaintiff's Product and a Knock-Off a Breach of Agreement?**

Clearly not, as such license terms would be an illegal restraint of trade. See NYGBL § 340, NC Gen. Stat. §75-1, and VA law § 59.1-9.5.

**h) What if Plaintiff Sued in April? After April in 2011?**

The importance of notice in terminating a license is made clear if we consider how the Court would rule if, on the same facts, Plaintiff had sued on April 1, 2011. While there would have been clear evidence of a breach of the agreement, the lack of notice would have barred any copyright infringement claim, leaving only a breach of contract claim.

If Plaintiff had sued sometime after sending his termination letter, there would again be only a contractual dispute, as Defendants would rightly point to the clear wording of the termination letter, ordering no ***further*** use. In this scenario, the Court would not demand destruction, modification, or recall of catalogs printed prior to the April termination letter, and likely cite the Missouri Doctrine in doing so.

**i.     "...fundamentally reconceive his theory of liability"**

Responses are appropriate to several statements in 14cv1304 #197. The pro se plaintiff's pleading at issue here was:

> "At that point, Defendants immediately lost any right, license, or permission to use any of Plaintiff's intellectual property, as all such use was permitted solely in the selling of Plaintiff's product."

This was an unsupported legal conclusion. The only "fact" pled was the explanation of the agreement, which is also a conclusion, as it attempts to interpret the terms of a verbal agreement.

As a baseless conclusory statement, it was properly ignored by the Court.  While Defendants certainly did reconceive their theory of the case for Summary Judgement, Plaintiff is left wondering what facts the Court thinks he might have pled in such a statement.  Plaintiff's view is that the Court should read such hyperbole from a pro se litigant as "*Plaintiff Mad!*", perhaps why some books say that "pro se" most often translates as "make popcorn".

Defendants' letter could not have been even a request to terminate the license, as they did not mention any such license, and it was only when drafting the complaint, with benefit of hindsight, that Plaintiff saw the Dec 10th letter as anything other than a negotiating ploy by a chronic deadbeat customer, trying to evade the consequences of their poor payment history with bullying threats

**Pg 16  "Fischer in his Complaint pled directly contrary to the theory he now pursues"**

As explained above, the complaint clearly did specify that the April termination letter was a termination letter.  Regardless of what legal conclusions were offered by Plaintiff, the facts from discovery do not require Plaintiff to replead any part of his case.  It simply does not matter what Defendants did prior to the termination letter. Further, per the specific language of the termination letter, it is clear that it does not matter what Defendants did in any part of 2011.  The termination letter ordered that Defendants make **no further use**, which was a very businesslike approach to avoiding squabbles over what to do with existing catalogs and in-place marketing materials, as Plaintiff knew that Defendants would issue a new catalog and website for 2012, replacing 2011.

**Pg 17 The waste of resources would be particularly acute here because permitting Fischer to alter his theory as to when Brushy first infringed his copyright...**

When Defendants first infringed is a purely factual issue, to be decided by a jury, and as this issue only arose as part of the SJ motion, it seems that this is a factual matter that is disputed, and it backed by evidence suitable to be presented at trial.  So, no Summary Judgement is possible.

Note that all versions of Plaintiff's complaint were drafted without knowledge of facts regarding Defendants actual sales of Plaintiff's products, upon which the license was premised. Defendants attempted to hide this information, first refusing to produce any discovery at all until ordered to, and then foot-dragging for over a month, and hiding the sales/inventory data under false labels of "Attorney Eyes Only".  Now that the data can be presented, it is clear that no modification of any complaint is required – Defendants' false narrative and false accusations fall apart, and we are back to license, breach, termination, and then infringement only after expiration of the license term at the end of 2011, or when the 2012 catalog was published, whichever came later.

**Pg 17 ...would open the door to a new round of briefing (if not discovery).**

The discovery is what made clear that Defendants were hiding the evidence contradicting their claims, but to elevate a conclusory statement that would be rejected under Twombly/Iqbal to a "theory" simply makes no sense.  Plaintiff pled facts, including an agreement, a breach and a termination letter.  Anything else is part and parcel of Defendants attempt to mislead the Court.

**Pg 17  In particular, were Brushy treated as having a valid license through 2012, the issue would then arise whether Defendants' use of Fischer's copyright prior to the date of Fischer's copyright registration had been within or outside the scope of the license he granted them. "It is black-letter law that a claim for copyright infringement lies when a party's use of copyrighted material exceeds the scope of its license."**

Clearly, a verbal agreement consists only of covenants, not license conditions, and a breach of covenant in a verbal agreement can only give rise to a claim for breach of contract, not copyright infringement.  It is not enough that Plaintiff merely disapprove of the use made of the licensed works, as Plaintiff's whim or opinion of Defendants use does not form the basis for an infringement claim.

The 9th Circuit addressed this issue succinctly, holding that

> "a potential for infringement exists only where the licensee's action (1) exceeds the license's scope (2) in a manner that implicates one of the licensor's exclusive statutory rights."  "Were we to hold otherwise, Blizzard — or any software copyright holder — could <u>designate any disfavored conduct during software use as copyright infringement</u>, by purporting to condition the license on the player's abstention from the disfavored conduct." [19]

In the 9th circuit case, MDY used Blizzard's software in "bots" rather than in the usual manner, just as Defendants here used Plaintiff's IP in a manner he certainly might not intend or like.  But the remedy in both cases is under contract, not under copyright, as the license has not been terminated, and the acts are under color of a valid license.

**Pg 17 Note 6 " [Where a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendants] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true."**

Plaintiff asks again "Where's the facts?"  What facts were stated and then "changed"?  Plaintiff stated no facts at all – he merely blustered and fumed.  It is only Defendants that wish to endow mere hyperbole with magical factual qualities, and Plaintiff is forced to point out that there are no facts in the statement made, or in any conclusory statement Plaintiff might have made about infringement, as any such statement is a conclusion, unsupported by specifics, other than the clear fact that any use from 2012 onward was clearly infringing, due to expiration of license.

---

[19] MDY Industries, LLC v. Blizzard Entertainment, Inc. (9th Cir. Dec. 14, 2010)

### 4) When Did Defendants Actually Mail Their Catalog?

In the event that the issue of license does not moot the argument over the mailing date, we will review the new data now available to Plaintiff.

### a)    The Affidavit Does Not Comply With FRE For Business Records

There is no "Aberdeen, North Dakota". There is only an Aberdeen South Dakota, the residence state of Ms. Twete. Midstates has no facilities in North Dakota. There is no possible way for Ms. Twete to have written "North Dakota", but it would be an easy typo to make for someone working and living in North Carolina. The very carefully-worded affidavit was clearly written for Ms. Twete, not by her.

The statements made in the affidavit make no statement of any personal knowledge of the accuracy of the data in the spreadsheet. It is merely stated that the spreadsheet "indicates", and that the printout of the screenshot is a "true and accurate" printout. There is no mention of any maintenance, backups, or integrity of the spreadsheet. There is no personal knowledge claimed of the event purportedly documented, nor of the entries made into the spreadsheet.

The spreadsheet is clearly editable, and the Affidavit says nothing about who created the record and when, and who edited or added to the spreadsheet and when, or what backups were created near the purported shipping date. Anyone who has worked with a spreadsheet knows that they are easily corrupted with simple errors made during normal data entry.

### b)    The Spreadsheet Entry

Midstates' spreadsheet shows the copies printed, 63,805, with the "Total tonnage" 12.01 tons. The 2011 catalog weighs 6oz, so the tonnage and count match. But this total is far too low. The "postage paid" is no help, this is a calculation, not an invoice amount. MidStates Spreadsheet Entry was for only 63,805 catalogs, 1/3 the quantity in 2013 as reported by Progress Printing in

their subpoena reply. See Exhibit 4.  The number of catalogs printed and shipped by Midstates

presents a clear dispute over fact.  Where are the other 100,000 catalogs?

> Progress Printing Records
> 2015      10,000 (fall reprinting)
> 2015   165,000
> 2014   155,000
> 2013   165,000
>
> Midstates Printing Record
> 2011    63,805

Defendants clearly knew that "63,805" was far too low a number of catalogs, yet still presented

this very low number to the Court as if it were truthful/accurate.  There is no possible way for a

company started in the 1980s to suddenly grow its catalog needs by a 3 times from 2011 to 2013.

### c)      If the Number Copies Printed Is Wrong, Why Should We Trust The Date?

The record was said to be a "spreadsheet", so it is quite possible that insertion/deletion could

have caused the columns of data to move up or down, garbling the record, or moving anther

printing job quantity and ship date into the slot formerly occupied by Brushy Mountain's actual

2011 print job of roughly 150K to 160K catalogs.  If the copies data is inaccurate, none of the

data should be trusted as valid.

### d)      Ms. Twete's Opinions – Lay Opinion or Expert Opinion?

Ms. Twete is not an expert witness, so FRE 702(c) states that her testimony shall not be "based

on scientific, technical, or other specialized knowledge within the scope of Rule 702".

Also, the First, Second, Third, Fourth, and Eighth Circuits hold "that lay opinion testimony is not

admissible unless the witness personally participated in or contemporaneously observed the

subject of their testimony."

Yet Ms. Twete gave what can only be an expert opinion about the net performance of various unknown truckers, warehouses, consolidators, and freight handlers, and the USPS bulk mail facilities to which they eventually delivered the catalogs at issue.  If the opinions are to be viewed as lay opinion, then she clearly cannot have been in the Southeastern states to which Defendants' catalog is delivered to witness any deliveries of mail, or drop offs at bulk mail facilities.  Her opinions on "mailing" and "delivery" are not admissible.

**e)  The Court Should Have Demanded a USPS Form 8125 As Sole Proof of Bulk Mailing**

For certified, registered, and bulk mail, the sender is provided with a specific USPS receipt, stamped with a postmark, or signed and dated.  Courts would accept nothing less than the receipt as proof of mailing for certified or registered mail. For bulk mailing, an 8125 form was a required item in 2011, as it is how the USPS bills postage. See the attached article for how crucial the 8125 was, even in 2016.

Judge Peck was unfamiliar with bulk mailing, nor did he seem interested in the subject:

> MR. MICHELEN: … But I would argue, Judge, it's still an issue of fact that Ms. Twete does not know the date it was received, it's just an estimate, there's no –
>
> THE COURT: Oh, come on. Standard statutory construction in many federal statutes dealing with mailing is three to five days, not two weeks, etc
>
> MR. MICHELEN: Well, Judge, this is not standard mailing, this is bulk sorting; this is a mailing of 63,000 catalogs… [starts to explain the process, is interrupted].
>
> THE COURT: The Court can't take judicial notice of that.

So, while the Court has taken judicial notice of standards for first-class/registered/certified mail, and was willing to mis-apply those standards here, the court did not do so for bulk mail, nor did the Court demand (or even inquire about the existence of) proof of mailing from the USPS, as it would for any other type of mailing.

The lack of an 8125 form should raise the same suspicion as the lack of a certified mail receipt. As the document is the sole proof of mailing, it would be retained by all parties to the mailing, if for no other reason than for tax purposes.

But receipt by the bulk mail facilities in the Southeastern states where most of Brushy's customer base resides would have been several weeks from any initial shipping date in South Dakota, as there would be multiple warehouses, consolidators, and truckers in the chain, each holding individual pallets until they had a full trailer, none under any specific deadline. At receipt by a bulk mail facility, each pallet would then be broken down by 3-digit zip code, trucked to regional sorting centers, then sorted again and trucked to major 5-digit post offices, sorted again and trucked to local post offices, and finally sorted for each postal carrier to be delivered. Bulk mail is never a time-assured or time-sensitive service.

But even at the local post office "Bulk Printed Matter" is handled differently. It usually arrives at the local PO a few days in advance of scheduled delivery (hence the line on many catalogs saying "requested in home by 03/12/18 - 03/26/18" near the address). The local PO determines which day it goes out to the routes - usually the slackest day in the schedule - which varies from PO to PO but is most often Tuesday. The entire process is complex enough to suggest a bulk mail postal employee as a technical witness.

### f) Gebauer's Declaration (14cv1304 Doc 171) Deliberately Misled The Court

*16. The 2011 Brushy Mountain catalog contained a listing of new items not found in any of the previous year's catalogs. One items was a book titled "Bee Keeping For Dummies" and another item was 8 Frame Assembled Painted Medium Hive. A customer ordered the book "Bee Keeping For Dummies" on February 4, 2011 and a customer ordered February 3, 2011.*

This statement neglects to mention that Brushy Mountain's website was also updated with new products for the new year, and anyone seeing the website alone can phone in an order (or mail in

an order with a check attached, for those who do not like to use credit cards) based upon what he sees on the website. The statement has no bearing on the purported date of the print catalog mailing, and is an attempt to misinform and mislead the court.

That same declaration contains a statement that is not backed by any evidence, and claims an amazing memory, given a mailing list of over 150K addresses and a timeframe of 6 years ago, "*Mr. Fischer was on the mailing list for the 2011 catalog.*" In fact, Mr. Fischer was not. Plaintiff's only copy of the 2011 catalog was handed to him by one of his students in late March, 2011, as this person was the organizer of the group purchasing. That catalog is still in Plaintiff's possession, attached as Exhibit 5. Plaintiff, upon moving to a Manhattan apartment in the mid-2000s, methodically removed himself from mailing lists of all sorts, lacking space to keep items such as paper catalogs from dozens of bee supply vendors.

### g) Why Not Even Mention a New Catalog Until April?

If Defendants claims are true, why would they only mention their new catalog in April, 2011? Here are the complete online Issues of Bee Culture magazine for Jan-May 2011. In each case, Defendants ad is on the inside cover (turn the page). But the catalog is not mentioned until April, and is never mentioned again. This seems clear evidence that even Defendants did not expect anyone to get their 2011 catalog until March.

    Jan     http://digital.beeculture.com/?issueID=16
    Feb     http://digital.beeculture.com/?issueID=17
    March   http://digital.beeculture.com/?issueID=18
    April   http://digital.beeculture.com/?issueID=19
    May     http://digital.beeculture.com/?issueID=20

This is the essence of a "material issue of fact", moreso when in response to Defendants that lack candor in their pleadings.

## 5) DMCA

The issue boils down to "The removal of the author and copyright owner's name, when it has

been "conveyed in connection with copies... of a work... or displays of a work". 17 USC §

1202(c)(2).

### a) "Fischer's Brochure and Website"

These theories (14cv1304 #197 Pg 24) were artifacts of the 411(b) violation.

### b) Fischer's "Description Text"

**14cv1304 #197 pg 25 Fischer has not shown that Brushy removed CMI from this text, because, at the summary judgment stage, he did not adduce evidence of the content of the description text he had sent Brushy.**

We only have the Plaintiff-authored text as printed in Defendants catalog from 2002 on, as

contrasted with Defendants' website text from 2002-2005.  No one perusing the parties' websites

and the 2002 catalog would mistake Plaintiff's active-voice pitchman style with Defendants'

passive-voice purely instructional tone.  Plaintiff also showed authorship in 14cv1304 #191-7 Ex

G, and argued in detail that full copies of all catalogs be provided at oral argument in 14cv1304

#155 Pg 6-8, but never got the actual 2002 catalog from Defendants, as they ducked and dodged

and fought to prevent the Court from seeing clear proof of authorship by Plaintiff. While

Defendants knew this, and fiercely fought discovery requests for mere copies of their 2002-2014

catalogs, Cornell University has a full set of older catalogs, and can provide complete copies for

use at trial, so, the issues of copying, substantial similarity, and CMI removal are disputed

factual issues for a jury.

The conclusion "*Fischer also notes that he and Defendants "would discuss changes to the text...

of Defendants' product webpage periodically.*" (page 26)  Is mistaken - this was Plaintiff,

repeatedly asking Defendants to change their webpage text, which did NOT use Plaintiff's

works, to make it match the catalog, which DID use the Plaintiff's works.  Plaintiff viewed the

Defendant-authored website entry as less effective a sales tool exactly because it did not use his highly effective epigrams.

### c)  Fischer's Four Phrases

14cv1304 #197 Pg 27 suggests a departure from the Plain Meaning Rule, and a significant change to the clear wording of the DMCA statute, one based upon the context of the CMI. There is no dispute that "Fischer" is the author's name, and the name of the copyright holder, and these are expressly cited in the statute. Pg 27 also attempts to interpret the meaning of CMI in the context of being "part of the work" rather than CMI. There is no basis for this new interpretation.

### ii.      The Plain Meaning of the DMCA Statute Does Not Produce an "Absurd" Result

If the authors of the statute had intended there to be any exceptions for context, they would have included them in the statute. They did not. They specifically and deliberately listed the name of the author and/or copyright holder as primary examples of CMI. The phrase "conveyed in connection with the work", includes the CMI being part of the work, imbedded in the work, or appended to the work. A review of the DMCA cases litigated so far shows that the further away the CMI is from the copied works, the weaker the claim. This new and unprecedented interpretation would rule that where the CMI is as close as possible – imbedded in the work itself, is one where the close proximity itself would disqualify the author's name as CMI. Such a stark exception simply does not exist unless Congress drafts it.

### iii.     Appropriate Examples with High Stakes Implications

The pg 28 analogy of book titles and authors in book reviews suffers from a very basic and fatal flaw. Neither Ian Fleming nor any other author would write a review or promotional blurb for his own book. So while it is clear that removal of the name of a book author from a book review

would not violate the DMCA, Plaintiff submits that the removal of the name of the **writer of the book review** from the book review would be a clear example of DMCA CMI removal, as the name of the author would be removed.

Plaintiff presents a more applicable cases with multi-million dollar price tags attached to the issue of "authorship of the work" when the name of the author is part of the work.

1. **Portrait of Cardinal Fernando Niño de Guevara by El Greco**
   http://metmuseum.org/art/collection/search/436573

In this work, the artist "signed" the work on the piece of paper at the feet of the Cardinal by writing upside down, in proper perspective, and in Greek: "Domenikos Theotokopoulos made this". Domenikos Theotokopoulos is El Greco's full name, and while it is part of the work, and may not be discernable by the casual observer, this would qualify as CMI, and is the only identifying information on the painting. To declare that this is not an identification of the author of the work would make this priceless work "valueless" to the point of not even being in the Met collection at all, perhaps a student's attempt to emulate a great master.

2. **Portrait of Manuel Osorio Manrique de Zuñiga  by Goya**
   http://metmuseum.org/toah/works-of-art/49.7.41/

This work is also unsigned, but the magpie holds the artists calling card in its beak, again, not a traditional signature, but still clear proof of authorship, with the same impact as above if ignored.

3. **Raphael's work, "The Mystical Marriage of St. Catherine"**,
   http://nbcnews.com/id/35948244

This was not known to be Raphael's work at all until his signature was noticed hidden in "arabesque decorations" behind the saint. *"The signature is really important. It actually makes this painting Raphael's earliest known work,"* leading UCLA art historian Carlo Pedretti, told Discovery News.

4. **"The Arnolfini Portrait", 1434, Jan van Eyck**
   http://nationalgallery.org.uk/paintings/jan-van-eyck-the-arnolfini-portrait

The ornate Latin writing on the wall behind the portrait subjects translates to "Jan van Eyck was here 1434"

5. **Jackson Pollock's "Mural", 1943**
   http://nga.gov/exhibitions/2017/jackson-pollocks-mural.html

In this painting, the name of the artist was so well-hidden in the work, it was not recognized until 2009, and there are still arguments about it.  See http://www.artnews.com/2009/10/01/hidden-in-plain-sight/

There are hundreds more examples, and in each case, the context of the author's name does not keep it from being proof of authorship at the highest possible standards of review, with multi-million dollar price tags attached to each evaluation.  Suffice to say that Plaintiff submits that "context" has no relevance to the simple criteria "name of the author", and inclusion in the work is no barrier to the author's name being CMI.  The contention is firmly rebutted by both the plain wording of the statute, and an impressive body of fine art.

## 6)  False Endorsement

Plaintiff submits that there are no "infringement-free zones" on any visible part of a web page. The Court seems to have ruled that there is such a special place and it cannot cause any confusion, even though entire books and seminars exist on the specific issue of "Search Engine Optimization" via the creation of post-domain URL paths that will help attain high search engine rankings.  This seems unprecedented.

Plaintiff protests the use of the Polaroid factors to avoid the clear precedent of likelihood of confusion as a matter of law when ex-licensees continue to use a mark after a license expires. This is a very unusual type of logic – to overcome "likelihood of confusion as a matter of law", one employs a test, and finds no likelihood of confusion primarily due to a finding of a lack of actual confusion, when actual confusion is overtly not the standard for infringement.

To justify this, the plain meaning of a customer who bought both an "old" and a "new" product and complained about the "new stuff" on the Natural Honey Harvester Page is somehow dismissed as "heap[ing] inference on inference" in the R&R Note 35.  If this is the standard of review, lay testimony is of no value, and no possible customer survey of beekeepers could ever

convince the Court of any point.  This is at least an issue for trial, as once Defendants produce a customer list, the specific customer can be a witness, and explain himself and what he bought.

In 14cv1304 #38 and #39, Plaintiff addressed these issues in his sur-reply starting on pg 10, and including Exhibit 2.  Plaintiff points to this evidence on the record as proof that there is a triable issue of fact to be evaluated by the jury, and that, if expert opinion is needed anywhere, it may be needed here.  The value of the "post-domain path" in finding a specific product or service by name cannot be underestimated.

But the Court still summarizes the cases carefully explained in #38 and #39 without noting that they were tainted by the testimony of an expert witness who was simply wrong about a moot point – both the cases addressed only the narrow issue of "domain squatting" for a clearly licensed user of a trademark.  It was not "domain squatting", as the difference between the "domain" and the "post-domain path" was explained.  This is only discernable to those who read the full cases, and read both the testimony and the decisions.  The headnotes are wrong.

> *"Here, however, as Judge Peck recognized, Brushy has not used Fischer's name as a mark. Fischer does not, for example, allege— let alone establish— that, after termination of its license, Brushy continued to sell its products with Fischer's logo attached to them or to use Fischer's name in the domain name of its website."*

The above addresses product counterfeiting and domain squatting but not the use of another's mark in commerce. As for "use in commerce"  ***"There is no statutory requirement that the counterfeit mark be placed on the product itself. See 15 U.S.C. § 1127"*** [20]   It seems clear that use in commerce is not subject to the exceptions offered in the R&R.

---

[20] Tiffany v. Costco Wholesale Corp., 127 F. Supp. 3d 241 - SDNY 2015

**Other Seeming Errors of Law To Be Addressed**

Order 14cv1304 #153 dismissed "those copyright infringement claims against Gebauer that accrued before February 3, 2012". This ruling was somehow based solely on an analysis of the admittedly minor difference between a job title of "General Manager" and "CEO" for a firm with a payroll of a few dozen people.

The ruling ignored the actual basis for the relation back – the revelation in the referenced magazine article that Mr. Gebauer had been a part owner for several years. Mr. Gebauer's vicarious liability could not be based on his well-understood "right and ability to supervise or control the infringing activity" alone, there also had to be "a direct financial benefit from that activity". As Plaintiff only knew Gebauer to be an employee, and Gebauer's part ownership was not recorded anywhere, Plaintiff could not have named Gebauer as a defendant, yet all Defendants, Gebauer included, knew that he met **both** criteria for vicarious liability, and was liable from Plaintiff's first filing in 2014.

Accordingly, Plaintiff asks for a reconsideration of the mangled set of arguments, where no party distinguished itself, and oral argument was a monologue, admonishing both parties for the mangled arguments.

**False Advertising**

On this point, Plaintiff has simply run out of time. The R&R takes a simple question - is it our is it not "*Our Own*", and refuses to agree that the truthful advertising would not be "we came out with our own", but instead "we bought another supplier's product". The manufacturer of "Natural Honey Harvester" and the company that named the product keeps the MSDS for the product at http://cliftindustries.com/sds-sheets/, and the MSDS is found at lower right, directly above the appetizing wholesome products "Rust Inhibitor" and "Rust Remover".

If the Court is unfamiliar, MSDS sheets are the authoritative information for safety purposes from the manufacturer, and have liability implications.  If the product was Defendants' Clift Industries as the contract bottler, would not take on the liability of dealing with Haz-Mat teams and poison control centers.

**Other Issues**

Defendants may have achieved some of their goal if the Court allows them Summary Judgment on other issues not addressed here.  Plaintiff has simply run out of time, caught between the squeeze of trying to slog through thousands of pages of "discovery" in less than a week, and the firm deadline for this motion.  Defendants should not be able to prevail by subterfuge.

Dated: March 16, 2018

James Fischer
Plaintiff Pro Se
Box 287048
New York, NY 10128
917-628-4052

**Deposition vs Affidavit**

While a party cannot create an issue of fact by submitting an affidavit that contradicts his own deposition testimony, the party can contradict an out-of-context quote by presenting the full context. Below is the fuller context of the EBT, showing that it was at best, proof that Plaintiff was unable to authenticate any documents

**Pg 29 – Authenticating Documents is Hard**

Q. Mr. Fischer, I'm placing in front of you what's been marked Defendant's Exhibit 1 (handing).

Is that the complaint that you filed in the 1307 action?

A. It could be, but it could be something else printed out. I mean, it looks like it from the first page, but do you want me to read the whole thing and verify it? Because I have no way to verify it's a true copy, except for your word.

Q. If you need to read the whole thing, go ahead.

A. Where did you get this from?... I could only compare it to my original copy to verify it. I can't verify it here.

Q. Does that look like the complaint that you filed in the 1307 action?

A. It certainly looks like it, yes.

Q. Do you have any reason to believe it's not a true and accurate copy of the complaint filed in the 1307 action?

A. No. Not yet.

Q. And if you look at the last page of what's been marked Defendant's Exhibit 1, is that your signature on the last page?

A. Yes, that's my signature.

Q. So --

A. It's the middle I'm not sure about.

Q. Okay. Fair enough.

Pg 31

Q. And what's in front of you -- does that appear to be a copy of the amended complaint that you filed in the 1307 action?

22 A. Once again, I mean, the front page looks real, and, you know, it generally looks real, but I have no way to verify it, aside from comparing it to my originals. I mean, there's a lot of pages in here, and, you know, I'm willing to assume for the moment that it is.

Pg 33

A. I don't understand the difference between true, factual, accurate. [explaining that the terms seem to be synonyms, and that asking if each document is "true", then asking if it is "factual", then asking if it is "accurate" seems redundant and/or a set-up for some obscure gotcha.]

Pg 66

Q. Mr. Fischer, I'm placing in front of you what's been marked Defendant's Exhibit 10 (handing). Is that the Form CA we were just talking about that you filed with the copyright office?

A. I haven't seen this in so long. I guess so.

**Pg 71 – Ask A Nonsense Question, Get A Blank Stare**

Q. Do you know what the status of registration number TX 7-422-921 is?

A. What do you mean status?

Q. Is it listed as closed?

A. I don't know what closed means in this context.

MR. MICHELEN: He's asking do you know what the status is. Just yes or no.

A. It's copyright in full force.

Q. Are you aware that the U.S. Copyright Office has marked registration number TX 7-422-921 as closed?

A. I don't know what closed means.

MR. MICHELEN: That wasn't the question.

Q. Are you aware that the U.S. Copyright Office has marked registration number TX 7-422-921 as closed?

A. No, I am not aware, but I don't know what the word closed means. So I can't be aware of what I don't understand.

MR. MICHELEN: Off the record. (Whereupon, a discussion was held off the record.)

Pg 73

MR. MICHELEN: Just for the record, that's -- you had asked him whether the registration was closed as opposed to the case [the form CA case requesting that the standard form label "first publication date" be corrected to say "first display date"].

**Pg 76  - First Attempt To Redefine What Works Were Copyrighted**

Q. What text of the bee-quick.com website is protected under this copyright?

MR. MICHELEN: Just note my objection. You can answer the question.

A. What text is protected?

Q. Yes.

A. The entire collection of works is protected, including text.

Q. Protection of works of what?

A. Protection of all the works that are in the database that was sent to them.

[Back and forth over "multiple submissions".]

Q. Is it your testimony here today that everything that you sent to them in your first submission is protectable copyrighted text?

MR. MICHELEN: Note my objection…

[More back and forth over "multiple submissions".]

Pg 80  A. Because I was -- what I was registering here was a database of individual items, each of the works.

Pg 101 [Question about multiple submissions]

A. You've confused me so much, I'm not sure. Because I have to go back and look at the zip file.

[More back and forth over "multiple submissions".]

A. Walking in here this morning, if that would have been the first question you would have asked me, I would have said yes, I'm absolutely sure, but you've asked so many questions, I'm the sort of guy that wants to go back and take a look at the zip file.

[More back and forth over "multiple submissions".]

A. I'm very sure, but you're making me doubt myself, and that's the problem here.

MR. MICHELEN: He's answered the question. Next question.

THE WITNESS: Can we just look at the zip file?

MR. MICHELEN: No, he's not asking you to. The document speaks for itself. It's on file with the Copyright Office.

Q. Did you intend to copyright your Bee-Quick trifold brochure with your copyright application?

A. The brochure contains elements and works which are copyrighted as a part of the set of works copyrighted, yes.

MR. MICHELEN: So yes?

A. Well, not the brochure as a whole -- see, what we're talking about here is which is a work and which isn't a work. The brochure contains copyrighted works, plural, yes.


Q. Is Defendant's Exhibit (*the 19th presented for authentication*) a copy of that brochure?

A. This is different -- a different version. This is a derivative.

Q. What do you mean it's a derivative?

A. It's a derivative work.

MR. MICHELEN: May I see?

THE WITNESS: Notice the bullet points there (handing), below the logo.

Q. When you say bullet points -- I don't see any bullet points, but I do see a number of sentences.

MR. MICHELEN: He means the bullet points -- no bees are harmed -- do you see those?

MR. HUDSON: I see.

A. Those are the dead giveaway, the bullet points are different, and so is the text above them.

Q. When would you have created Defendant's Exhibit 19?

A. Well, it purports to be 12/2000, but it doesn't look like the 2000s. The text is different. So I don't know what the story is with this. Where did you get this?

Q. What is different on the 2000 trifold brochure that you recollect and the one you have that's marked Defendant's Exhibit 19?

A. Well, the whole front panel here is different. This would be the front, with the logo (indicating).

MR. MICHELEN: Let the record reflect that he's done a trifold on Exhibit 19, and he's referring to the right-hand column on the front page.

A. So everything below the logo is different. This may have been a draft copy. I don't know what it is, but it's not authentic. It's not the real McCoy.

Q. I have something that might help you. We'll mark that as 20.

(Whereupon, Bee-Quick brochure was marked as Defendant's Exhibit 20 for Identification.)

Q. Mr. Fischer, I've placed in front of you what's been marked Defendant's Exhibit 20 (handing). Do you recognize this document?

A. No, this definitely is a draft.

Q. Did you ever provide Defendant's Exhibit 20 -- and there's a backside to it also -- to any of your distributors?

A. If I did, it was to get their comments. Because if you take a look at the logo, it's like it's clearly a mockup for position and for -- it's not even -- I mean, it's -- it's a badly drawn, hand-drawn bee, so whoever -- this has got to be a draft.

MR. MICHELEN: May I see?

THE WITNESS: Yeah (handing).

A. That would have never gone out as a real piece of marketing material. That was for comments. So whoever got that was being asked for comments…

Pg 132: Q. Did the defendants make copies of your brochures?

A. They may have. I don't know. They may have, because if they ran out, they may have found it easier to just run them off on the Xerox machine themselves than get more printed from me or from Dadant.

MR. MICHELEN: But that's not part of the claim.

THE WITNESS: No, that's not part of -- yeah, that's true.

Q. Just to be clear, are you alleging that the defendants copied any of your fliers without copyright notices on them?


MR. MICHELEN: Did they copy your brochure without the copyright notice on it?

A. Without? Did you say without the --

Q. Yes.

A. No, I'm not alleging that they ever made a copy of my brochure without the copyright notice. The only time they would have done that is when they were selling the product, and they wouldn't have bothered to remove the copyright notice then.

**Take A Hypothetical About What Might Have Happened, And Force It Into a "Fact"**

Q. But you have alleged that they removed the copyright notice.

A. Yes, that's removal of the CMI.

Q. On what? I'm trying to get at -- I don't understand what copyright notice they removed if they didn't make a copy of the flier.

A. Why don't you go back to Englemayer's denial of the first motion to dismiss back in January of 2015? Because he explains it really well there. That's really a very succinct explanation, and that explanation of how simply changing Fischer's Bee-Quick to Natural Honey Harvester to him is sufficient removal of CMI right there. The replacement of Fischer with Natural -- in other

words, the name Fischer in the text, he thought that was sufficient to be CMI right there. So there's your clearest one. If you also want to talk about the photographs where they stripped the CMI out in reproduction of the JPEGs, or the text where they took the CMI out when they printed it -- now, understand, it's not a problem to take the CMI out until you start using the text without selling the product. They arguably had permission or license to do so when they were selling the product.

Pg 134: Q. So you allege they removed a copyright notice from something. I'm trying to get at what copyright notice they removed.

A. They removed copyright notices that were on virtually everything that was sent to them. The brochures had copyright notices, so **if they lifted the text from the brochures**, that's where they removed it.

Q. Did they make copies of your brochure?

A. Okay. We're going around in circles.

MR. MICHELEN: Just yes or no.

A. They may have made copies of my brochures many times. I don't know. When they were making copies of the brochures, they were selling the product. I don't believe they made copies of my brochures after they stopped selling the product. That wouldn't make any sense.


**Pg 135 Again With The Semantics – The Entire Discussion Is Academic**

Q. Is your allegation that they lifted a couple of sentences from your brochure rather than copying your entire brochure?

A. That's a reasonable thing for someone to say in your position. I would like to rephrase it. What they did is they ripped the heart from my brochure and used it to sell a competing product.

Q. So if they did not copy your brochure, how did they remove a copyright notice from it?

A. Because they reproduced the copyrighted material without reproducing the copyright notice.

Q. How many sentences do you estimate are on your brochure?

A. Total?

Q. Yes.

A. Let's say 200.

Q. Okay. And how many sentences do you allege that Brushy Mountain and the rest of the

defendants lifted from your brochure?

A. Four or five.

Q. How many?

A. Four or five. A handful.

Q. Earlier in this deposition, you gave me four.

A. Okay. There's four.

So we have a clear record, how many sentences are you alleging that Brushy Mountain and the rest the defendants removed from your brochure?

A. Four.


Pg 67

Q. I'll ask you to look at Exhibit 9, which is the certificate of registration from the Copyright Office.

Is it an error on this copyright registration that it says nation of first publication, United States, and date of first publication, December 21, 2000?

A. No.

Q. That's not an error?

A. That's not an error.

Q. So why were you attempting to change it in your Form CA?

A. Because they were calling it publication. It should be date of first display, not publication. Their standard form says publication. If you have a work that's only been displayed and hasn't been published, they say date of first publication, and you can't fix that.

Pg 69

MR. MICHELEN: You can answer the question. Is it accurate?

A. Well, I would say no, because it's not -- the work was not published. It was displayed. But, you know, if their standard form in bold print says date of first publication like you have no other choice, and when you have an unpublished copyright, I don't know what you do about that. You tell me.

=.=.=.=.=.=

Pg 129 MR. MICHELEN: Note my objection. It's [the question is] approaching argumentative. He's answered your question. This is a deposition, not a cross-examination.

=.=.=.=.=

**Pg 139 A Six-Foot Plus Defendants' Attorney Actually Threatens 5' 8' Plaintiff At Least A Decade His Senior with Assault and/or Challenges Plaintiff to a Fistfight During EBT**

Q. But my question is: Do you have any evidence that Shane Gebauer authorized anyone to remove the metadata from your photographs?

A. Well, you haven't complied with any ESI requests, so we actually don't know who did that. There's actually logs of this kind of stuff, and we'll get them, and we'll find out.

Q. Mr. Fischer, this is the fourth time I'm asking this question –

MR. MICHELEN: Just yes or no.

Q. -- **and we can walk across the street if we need to**. But do you have any evidence that Shane Gebauer approved of anyone removing the metadata from your photographs?

A. As general manager, he would have to approve.


=.=.=.=.=

**Pg 38 TRYING TO FORCE ANSWERS TO MISLEADING QUESTIONS**

Q. And they have -- the 1304 action contains the same claims as the 1307 action, correct?

A. No. You know that's not true.

Q. What's the difference?

A. Well, the judges told you.

=.=.=.=.=

**"TRICKS"**

Pg 32 Q. Okay. And I'm not trying to trick you, but I understand your answer.


Pg 35 A. Okay. Submitted by Oscar. I didn't sign.

Q. It's Mr. Michelen's signature block -- I'm not trying to trick you -- Mr. Michelen's signature block on the last page of Defendant's Exhibit 4; is that correct?

A. That's a signature block?

Q. Yes, sir.

A. Okay. But there is no actual signature.

Q. You're right.

Pg 37  Q. Mr. Fischer, I'm not here to trick you. I'm just asking you questions.

A. I honestly don't -- I don't think I signed anything.

MR. MICHELEN: So that's your answer.

THE WITNESS: Okay….

THE WITNESS: I don't understand the questions. Where are we going here?


Pg 46  A. I thought when I did the pro se stuff there was a blurb that I had to put in that I was swearing that it was true. But it's not there in these copies. Maybe those were motions that I did that on. I don't remember.

MR. MICHELEN: Mr. Fischer, the question related to that exhibit. Did you sign a verification for that exhibit to your recollection? It's a yes or no.

A. I have no idea. It's not here.

MR. MICHELEN: That's your answer.

A. Okay. It's not here.

Q. I'm just asking you -- I'm not trying to trick you, again. I'm just asking questions.


Pg 96  Q. This is not a trick question, but just for the record, in all seriousness -- I've got some things I can show you to remind you -- but what phrases are you alleging in these lawsuits that the defendants copied?

A. We've listed them in the complaint, and I'm happy to read them out of the complaint to you.

=.=.=.=.=.=.=.=.=

## SPEAK UP, SPEAK UP... YOU ARE SHOUTING

Pg 13  Q. Do you have any servers that you would have owned in the 1999 to 2000 timeframe?

A. Those were destroyed.

Q. How were they destroyed?

A. Sandy. I used to have a facility down at Floyd Bennett Field.

MR. MICHELEN: Keep your voice up.

Pg 16  Q. Mr. Fischer, it's a lot easier for me to hear you, because you and I are facing each other, but it's much tougher for the court reporter, so if you can continue to speak up, I'd appreciate it.

Pg 209 A. You're using the word counterfeiting in a context of product counterfeiting here by using the word -- and I'm not gonna tolerate that question --

Q. Do you need to take a break? Because I'm getting tired of you yelling at me.

MR. MICHELEN: Jim -- he's not yelling at you, first of all.

MR. HUDSON: Yes, he is.

MR. MICHELEN: His voice is not raised.

THE WITNESS: If I yell, the walls would vibrate.

MR. MICHELEN: Jim, Answer the question. Do you have any proof that Shane Gebauer --

A. I do not understand your use of the word counterfeiting in this context.

Q. How did you allege counterfeiting in the complaints?

A. I did not allege counterfeiting. I alleged use of a counterfeit mark in commerce, a form of trademark infringement as described in the trademark infringement statute, for the 97th time.

Date: 03/08/17
Time: 11:24:41

INVENTORY JOURNAL TRANSACTIONS
Brushy Mountain Bee Farm, Inc.

Page # 3

FOR TRANSACTIONS DATED 01/01/10 TO 12/31/13 WITH STOCK ITEMS = 474   1 GALLON, 474   8 OZ

| STOCK NUMBER | TRANSACTION INFORMATION DATE | TYPE | BIN | QUANTITY | UNIT COST | COST ADJUSTMENT | TOTAL AMOUNT | BY | INVENTORY COUNT |
|---|---|---|---|---|---|---|---|---|---|
| 474 | 8 OZ | Natural Honey Harvester 8 oz. (24 in a case) | | | | | | | |
| | WAREHOUSE | NCWARE | BIN   ROW 30 - P04A | | | | | | |
| | 03/02/11 | Delivery of product | | 408 | ... | | ... | ... | -4794 |
| | WAREHOUSE | NCWARE | BIN   ROW 30 - P04A | | | | | | |
| | 03/03/11 | Manual Inventory Adjustment | | -96 | ... | | ... | ... | -4890 |
| | WAREHOUSE | PAWARE | BIN   ROW 14 - P02B | | | | | | |
| | 03/03/11 | Manual Inventory Adjustment | | 96 | ... | | ... | ... | -4794 |

BM 004531

**Exhibit 2 – Defendants First Delivery of 8oz Natural Honey Harvester – 408 bottles, 96 sent to PA Warehouse**

Date: 03/08/17
Time: 11:24:41

INVENTORY JOURNAL TRANSACTIONS
Brushy Mountain Bee Farm, Inc.

Page # 1

FOR TRANSACTIONS DATED 01/01/10 TO 12/31/13 WITH STOCK ITEMS = 474   1 GALLON, 474   8 OZ

| STOCK NUMBER | TRANSACTION INFORMATION DATE | TYPE | BIN | QUANTITY | UNIT COST | COST ADJUSTMENT | TOTAL AMOUNT | BY | INVENTORY COUNT |
|---|---|---|---|---|---|---|---|---|---|
| 474 | 1 GALLON | Natural Honey Harvester One Gallon | | | | | | | |
| | WAREHOUSE | NCWARE | BIN   ROW 30 - P04A | | | | | | |
| | 03/02/11 | Delivery of product | | 20 | ... | | ... | ... | -42 |
| | WAREHOUSE | NCWARE | BIN   ROW 30 - P04A | | | | | | |
| | 03/03/11 | Manual Inventory Adjustment | | -4 | ... | | ... | ... | -46 |
| | WAREHOUSE | PAWARE | BIN   ROW 14 - P03A | | | | | | |
| | 03/03/11 | Manual Inventory Adjustment | | 4 | ... | | ... | ... | -42 |

**Exhibit 2 – Defendants First Delivery of Natural Honey Harvester Gallons – 20 Jugs, 4 sent to PA Warehouse**

Date: 03/08/17
Time: 10:57:42

Page # 13

INVENTORY JOURNAL TRANSACTIONS
Brushy Mountain Bee Farm, Inc.
FOR TRANSACTIONS DATED 01/01/2007 TO 12/31/2011 WITH STOCK ITEMS = 779, 779G

| STOCK NUMBER | TRANSACTION INFORMATION DATE | TYPE | QUANTITY | UNIT COST | COST ADJUSTMENT | TOTAL AMOUNT | BY | INVENTORY COUNT * |
|---|---|---|---|---|---|---|---|---|
| 779 | | Fischer's Bee Quick (7 oz) | | | | | | |
| | 01/19/11 | Manual Inventory Adjustment | | | | | | 34 |
| | WAREHOUSE | PAWARE   BIN   Row 09 - P02B | | | | | | |
| | 02/01/11 | Manual Inventory Adjustment | | | | | | 34 |
| | WAREHOUSE | NCWARE   BIN   ROW 30 04A | | | | | | |

BM 004498

**Exhibit 3 – Defendants' Manual Adjustments To Bee-Quick Inventory Costs, Showing Inventory at NC and PA Warehouses**

Brushy Mountain Catalog print summary

| Progress Printing Job # | Description | Print Qty |
|---|---|---|
| 116418 | 2015 Catalog - reprint | 10,000 |
| 114135 | 2015 Catalog | 165,000 |
| 110943 | 2014 Catalog | 155,000 |
| 107248 | 2013 Catalog | 165,000 |

**Exhibit 4 – Progress Printing's Catalogs For Brushy Mountain in 2013-2015**



Exhibit 5 – 2011 Catalog Handed To Plaintiff in March 2011 as "Just Arrived"



PRSRT STD
U.S. POSTAGE
PAID
BRUSHY
MOUNTAIN
BEE FARM

02262
P-5   P72

*******AUTO**SCH 3-DIGIT 100
187066
NYC BEEKEEPING
C/O L NEWTON
360 E 65TH ST APT 8F
NEW YORK NY 10065-6714

an Beekeeping Made Easy

to keep bees. As the cover to this year's catalog illustrates (downtown Charlotte,
n some of the largest cities. If you are or plan to keep bees in a city or developed

.com
-921-2681

**Exhibit 5 -2011 Catalog Address Label Detail**

FISCHER
340 EAST 93rd St - 21c
NEW YORK, NY 10128

PRO SE UNIT
SDNY
500 PEARL St, Room
NEW YORK, NY
100

USMS
SDNY

2018 MAR 19 AM 10:24